ACLU FOUNDATION OF ARIZONA
Jared G. Keenan (Bar No. 027068)
jkeenan@acluaz.org
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: 602-650-1854

MITCHELL | STEIN | CAREY | CHAPMAN PC
Kathleen E. Brody (Bar No. 026331)
kathy@mscclaw.com
2600 North Central Avenue, Suite 1000
Phoenix, AZ 85004
Telephone: 602-358-0290

KILLMER, LANE & NEWMAN, LLP
David A. Lane (pro hac vice)
dlane@kln-law.com
Andrew McNulty (pro hac vice)
amcnulty@kln-law.com
1543 Champa Street
Denver, Colorado 80202
Telephone: 303-571-1000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Attorneys for Criminal Justice; et al., | No. 2:17-cv-01422-SPL |
| Plaintiffs, | **PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | **HEARING REQUESTED** |
| Mark Brnovich, in his official capacity as Attorney General of the State of Arizona; et al., | (Assigned to Hon. Steven P. Logan) |
| Defendants. | |

Plaintiffs move the Court to issue a preliminary injunction enjoining Defendants and their agents from enforcing Arizona Revised Statutes ("A.R.S.") § 13-4433(B), the Victim-Contact Prohibition. Fed. R. Civ. P. 65. The Victim-Contact Prohibition violates the free-speech rights of Plaintiffs—criminal-defense lawyers and others working on behalf of criminal defendants—by prohibiting them from initiating contact with crime victims except through the defendant's litigation adversary, the prosecutor.

The Victim-Contact Prohibition imposes an overbroad content and viewpoint-based prior restraint on Plaintiffs' speech because it forbids them from communicating with the intended target of their speech and does so based on their identity as members of the criminal-defense team. *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) ("Viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject.") (cleaned up); *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 894 (9th Cir. 2007) ("ordinance that vests unbridled discretion in the licensor" is prior restraint on speech). The Victim-Contact Prohibition has no counterpart in federal law or any other state's law, and Defendants will not be able to meet the required burden for justifying such a restriction on Plaintiffs' speech.

Plaintiffs first filed this lawsuit in May 2017, and the parties have spent the last five years litigating Defendants' myriad jurisdictional and procedural defenses, up to the U.S. Supreme Court. Those defenses have now all failed, and no further obstacle prevents this Court from ruling on the merits of Plaintiffs' First Amendment claims. Plaintiffs are entitled to preliminary relief because the Victim-Contact Prohibition unconstitutionally restricts and chills their speech every day it remains in effect, and they are likely to succeed on the merits of their claims. Plaintiffs therefore renew their motion for preliminary injunctive relief and request that the Court promptly hold a hearing for the parties to present argument and evidence on this motion. *See* Doc. 11 (Plaintiffs' Motion for Preliminary Injunction, filed May 20, 2017).

**INTRODUCTION**

"[A]ttorneys and other trial participants do not lose their constitutional rights at the courthouse door." *Levine v. U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985); *see also* Freedman & Starwood, *Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys: Ratio Decidendi v. Obiter Dictum*, 29 Stan. L. Rev. 607, 614-18 (1977). Plaintiffs seek declaratory and injunctive relief to halt the Victim-Contact Prohibition's ongoing violation of their speech rights in violation of the First Amendment.

Plaintiff Arizona Attorneys for Criminal Justice ("AACJ") is a statewide not-for-profit membership organization of criminal-defense lawyers, law students, and associated professionals dedicated to protecting the rights of the accused in the courts and in the legislature, promoting excellence in the practice of criminal law through education, training, and mutual assistance, and fostering public awareness of citizens' rights, the criminal-justice system, and the role of the defense lawyer. AACJ's membership includes defense lawyers and others working on behalf of criminal defendants, including those accused of all manner of petty and serious offenses. The individual Plaintiffs are criminal-defense lawyers and an investigator. The Victim-Contact Prohibition directly infringes and chills the free-speech rights of the individual Plaintiffs and AACJ's members.

Plaintiffs wish to speak with crime victims, minor victims' legal guardians, and the surviving family members of homicide victims. Yet the Prohibition restricts that speech, going far beyond what is necessary to protect victims' rights. Under the statute, criminal-defense lawyers and others working with them may not speak to statutory crime victims without first obtaining permission through the prosecutor. But prosecutors are under no duty to accurately convey a defense attorney's message to a victim. And prosecutors must also inform the victim of their right to refuse an interview. In practice, victims who learn from the prosecutor that the defense team wants to speak with them rarely agree to do so.

Fear of professional discipline and other sanctions has deterred Plaintiffs from speaking to crime victims on any topic, whether as part of the investigatory function of their work, on other matters of interest to victims, or on matters of great public concern like imposition of the death penalty. The result has been unnecessary infringement on Plaintiffs' free-speech rights, harmful withholding of information from crime victims, and interference in the truth-seeking function of the criminal legal system. The Court should preliminarily enjoin the Victim-Contact Prohibition because it continues to violate Plaintiffs' free-speech rights every day it remains in effect.

**BACKGROUND**

**I.     Background on the Victim-Contact Prohibition**

In 1990, Arizona voters approved Proposition 104, the Victims' Bill of Rights ("VBR"), as an amendment to the state Constitution. The VBR grants crime victims the right "[t]o be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process." Ariz. Const. art. 2, § 2.1(A)(1). The VBR also provides a crime victim with the right "[t]o refuse an interview, deposition, or other discovery request by the defendant, the defendant's attorney, or other person acting on behalf of the defendant." Ariz. Const. art. 2, § 2.1(A)(5).

In 1991, Arizona enacted the Crime-Victims' Rights Implementation Act. Among the enactments was the Victim-Contact Prohibition, which reads:

> The defendant, the defendant's attorney or an agent of the defendant shall only initiate contact with the victim through the prosecutor's office. The prosecutor's office shall promptly inform the victim of the defendant's request for an interview and shall advise the victim of the victim's right to refuse the interview.[1]

A.R.S. § 13-4433(B). Under the Prohibition, members of the defense team may not contact "a person against whom a criminal offense has been committed," as well as the

---

[1] The current statute is not substantively different from its original enactment or interim amendments. This lawsuit does not challenge the statute's prohibition against a defendant contacting the victim.

person's parent or legal guardian if the person is a minor child, and "the person's spouse, parent, child, grandparent or sibling, any other person related to the person by consanguinity or affinity to the second degree or any other lawful representative of the person" if the person has been killed or incapacitated. A.R.S. §§ 13-4401(19), 13-4433(G). The Prohibition's enactment drastically changed the practice of criminal defense in Arizona.[2]

In 1997, A.R.S. § 13-4433 was amended to allow a prosecutor to refuse to forward correspondence from the defense team to victims and their families, further limiting the speech of defense lawyers and the defense team. That provision reads:

> The prosecutor shall not be required to forward any correspondence from the defendant, the defendant's attorney or an agent of the defendant to the victim or the victim's representative.

A.R.S. § 13-4433(C). As a result, the Victim-Contact Prohibition, in conjunction with § 13-4433(C), operates to prohibit defense lawyers and defense teams from contacting crime victims or their family members without the consent of the prosecutor, the defense team's litigation adversary.

No other state but Arizona prohibits criminal-defense teams from initiating contact with crime victims or restricts their speech like the Victim-Contact Prohibition.[3]

## II.   The Victim-Contact Prohibition's impact on Plaintiffs' speech

Plaintiffs are lawyers and investigators who defend individuals accused of crimes ranging from petty offenses to capital murder. As a result, the Victim-Contact Prohibition restricts Plaintiffs' communications with victims on a variety of topics for a variety of purposes.[4] For example, speaking with a victim in a burglary case can be part of the

---

[2] *See* Exh. J at 22-23 ("Well, it was kind of a watershed event for those of us who practiced criminal law because it changed the way we were able to do our job."), 26, 28.
[3] *See id.* at 18, 44.
[4] Exh. E at 22 ("I think if I could exercise my First Amendment right to talk to victims that one of the results might be a benefit to my client. It might also be a benefit [to] the victim. . . . It might be a benefit to me, too."), 69 ("[Y]ou can speak on your own behalf in the course of the interview. I mean, that's not the overall purpose, but it certainly happens. And sometimes victims will ask you questions that you are sure to make a

routine investigatory function of the defense team. Contacting a victim can also help Plaintiffs assess the victim's credibility,[5] which can be gleaned from initial communications even if those include only a refusal to submit to questioning. At times, Plaintiffs' speech can be aimed at "advancing the representation of [their] client and also aiding the victim."[6] For instance, sometimes victims seek information on a topic or want closure on an issue where the defense team can assist.[7] Sometimes, the defense team can help provide information to the victim about what to expect from the criminal legal process.[8] At other times, Plaintiffs' speech would involve advocating to a murder victim's family members that the death penalty is immoral and that a sentence of death should be actively opposed.[9] The blanket prohibition on initial communications from

---

personal choice about whether you answer or not."); Exh. I at 40 ("I believe it violates my First Amendment rights to contact a victim in any case, and it prevents me from doing my job to the best of my abilities."); Exh. J at 77 ("The purpose of the contact with the victim would primarily be to assist my client. It could have collateral benefit for me.").

[5] Exh. J at 95.

[6] Exh. E at 89. *See also id.* at 93-94 ("I believe the fully informed victims who are fully informed about the process are less likely to pursue the death penalty when they understand what it means for their interests."); Exh. I at 32 ("I would like to contact the victim in both of those cases and talk to that person. There may be things that I may be able to provide that no one else can provide. Could it advance my client's case? Sure. But it also may advance their ability for closure, their ability to know what the other side of the case is, and give them a complete picture of the case, which I think lends itself to justice for everyone."), 33-34.

[7] Exh. K at 58 ("I felt like it's appropriate to reach out to the victim for closure on an issue that might make their life better.").

[8] Exh. E at 89 (testifying that that the purpose for contacting a victim in a capital case "can be often the victim, the statutory victim, . . . is not somebody who actually witnessed the crime or anything like that. It's somebody related. In that context, they often have mitigation evidence that might lessen the penalty for our client. That's often one of the goals. But another goal is to offer to provide information to people who are embarking on a long journey and what that means for them and what they can expect, . . . oftentimes what information about the crime they may want to know I can offer to answer some of their questions."); Exh. I at 62-63.

[9] Exh. E at 92 (If the victim no longer wanted to pursue the death penalty, "that would be a benefit, I believe, for both the victim and my client.").

defense counsel to crime victims restricts and censors Plaintiffs from speaking with victims directly and with nuance on all these topics, among others.[10] The Victim-Contact Prohibition also prevents defense counsel from using their interpersonal skills to establish rapport with crime victims, which can lead a victim to agree to a discussion, interview, or questioning.[11]

Moreover, because the prosecutor has no obligation to accurately relay the defense team's message to victims, the Prohibition makes the prosecutor both the conduit for speech and the arbiter of whether the communication is actually delivered as intended. A.R.S. § 13-4433(C). In practice, the prosecution, through the victim's advocate, uses a standard form letter to communicate interview requests to victims, which does not reflect the defense team's intended speech.[12] No matter what message the defense attorney wants to convey, and even if a defense attorney writes a letter to the victim, the prosecution sends the form letter.[13] In some cases, even when requested by the defense team, prosecutors do not even send the form letter to victims.[14]

The Victim-Contact Prohibition thus also has the effect of allowing the prosecution to effectively bar **all** communication between defense counsel and crime victims. *See* Stellisa Scott, *Beyond the Victims' Bill of Rights: The Shield Becomes a Sword*, 36 Ariz. L. Rev. 249, 262 (1994) ("concerns that prosecutors are utilizing the

---

[10] *Id.* at 87 ("[I]f we can contact directly crime victims, I think it would be our obligation to attempt to do so."); *see also* Exh. K at 18-19 (defense teams may want to contact a victim without alerting their litigation adversary).

[11] *See* Exh. G at 40 (victims sometimes wish to speak with the defense team); Exh. H at 41; Exh. I at 28-29; Exh. J at 42-43 (same); Exh. K at 38 (same), 42-43 ("I developed a personality that where people feel comfortable around me. So I think I'm pretty good at blending being an attorney with being a person, too. And so I feel like I have unique attributes that would allow me to talk to victims and not do any harm."), 44, 53-55, 64-65; Exh. L at 43-44.

[12] Exh. A at 84; Exh. C at 13, 20.

[13] Exh. A at 87, 91; Exh. E at 39 ("My standard practice has been to write a letter with a request for an interview that **explains why I want to talk to the victim** and contains a signature line for agreeing or not wanting to talk to me.") (emphasis added).

[14] Exh. C at 54, 57, 74-75.

exclusive access provided by Section 13-4433 to improperly interfere with a victim's decision to grant a defense interview remain viable"). Because the prosecutor is the gatekeeper for communications between defense counsel and crime victims, the result is that almost no victims or family members are willing to speak with Plaintiffs after the prosecution counsels them.[15] *See* A.R.S. § 13-4433(B) ("The prosecutor's office shall promptly inform the victim of the defendant's request for an interview and **shall advise the victim of the victim's right to refuse the interview**.") (emphasis added). Defense teams have no way of knowing how the prosecutor conveyed the defense team's request to speak with the victim, or whether the request was conveyed at all.[16]

In addition, the precise contours of the Victim-Contact Prohibition are not always clear. For instance, prosecutors have taken the position that the Prohibition requires the prosecutor's consent to initiate contact with victims even when the victims are represented separately by their own lawyers.[17] Other times, in the case of a homicide, there could be many statutory victims, and their identities are not always obvious.[18]

Especially given the uncertainties about the Prohibition's reach, Plaintiffs rightfully fear that they will suffer sanctions if they violate the Prohibition and are chilled from speech beyond what the Prohibition restricts.[19] Since the Victim-Contact Prohibition was enacted, several criminal-defense lawyers have been referred to the State

---

[15] Exh. J at 43 ("I've never been given access to a child accuser or an adult accuser, for that matter, upon request."), 45.

[16] Exh. E at 40, 41-43 (expressing belief that prosecutor's office failed to notify victim of defense team's request to speak); Exh. G at 44 (same); Exh. J at 30-34, 46 (same); *see also* Exh. H at 36-41 (describing case).

[17] *See* Exh. G at 82-83.

[18] Exh. K at 60-61.

[19] Exh. A at 49-51, 63, 65-66, 80-81; Exh. E at 57 ("I believe that the aggressiveness with which that office has pursued the issue puts us all on notice that we'd better be careful in that area. And so in that terms, it feels like a threat, yes."), 79-81 (describing prosecution argument for broader application of Victim-Contact Prohibition that was rejected by a court); Exh. G at 46-48, 75 (describing speech chilled beyond what the Prohibition covers), 68-69, 86-87, 91-92, 118-119; Exh. I at 55-56; Exh. J at 68, 89; Exh. K at 27; Exh. L at 54.

1    Bar for professional discipline in connection with alleged violations of the law, and some

2    have been disciplined.

3        As explained in more detail below, the Victim-Contact Prohibition

4    unconstitutionally restricts and chills Plaintiffs' speech and they are entitled to

5    preliminary relief to stop any further violation of their First Amendment rights. *See*

6    *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995) ("There are circumstances in

7    which we will accord speech by attorneys on public issues and matters of legal

8    representation the strongest protection our Constitution has to offer.") (citing *Gentile v.*

9    *State Bar of Nev.*, 501 U.S. 103 (1991), and *In re Primus*, 436 U.S. 412 (1978)).

10                                **ARGUMENT**

11        Ordinarily, "[a] plaintiff seeking a preliminary injunction must establish that he is

12   likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

13   of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

14   in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

15   A preliminary injunction is also appropriate when a plaintiff raises serious questions

16   going to the merits and the balance of hardships tips sharply in the plaintiff's favor. *All.*

17   *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). For preliminary

18   injunctions "in the First Amendment context, the moving party bears the initial burden of

19   making a colorable claim that its First Amendment rights have been infringed, or are

20   threatened with infringement, at which point the burden shifts to the government to

21   justify the restriction on speech." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on*

22   *Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). Plaintiffs are entitled to a preliminary

23   injunction because the Victim-Contact Prohibition infringes their First Amendment

24   rights, and Defendants cannot justify the restriction on Plaintiffs' speech.

25

26

27

28

                                       9

**I.      Plaintiffs are likely to succeed on the merits of their claims that the Victim-Contact Prohibition violates the First Amendment.**

"[B]lanket rules restricting speech of defense attorneys should not be accepted without careful First Amendment scrutiny." *Gentile*, 501 U.S. at 1056 (plurality opinion of Kennedy, J.). The Victim-Contact Prohibition cannot withstand that scrutiny.

**A.      Plaintiffs' speech directed toward crime victims is protected by the First Amendment.**

"Being a member of a regulated profession does not . . . result in a surrender of First Amendment rights." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002); *see also Thomas v. Collins*, 323 U.S. 516, 531 (1945) ("the rights of free speech and a free press are not confined to any field of human interest"). "Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371-72 (2018) ("*NIFLA*"); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 862-63 (11th Cir. 2020). Like other professionals, attorneys have the right to speak freely subject only to the government regulating with "narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *see also Conant*, 309 F.3d at 637; *Bank of Hope v. Miye Chon*, 938 F.3d 389, 392 (3d Cir. 2019).

The Victim-Contact Prohibition strikes at core First Amendment interests of lawyers and others working on behalf of criminal defendants. An integral component of the practice of law is unfettered case investigation, which includes speaking to witnesses. The ability to investigate is crucial to effective advocacy and representation, particularly in criminal cases. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Attorneys must be able to speak frankly and openly to witnesses, who necessarily include victims.

Moreover, the Supreme Court has said that the American Bar Association Standards for Criminal Justice are "guides to determining what is reasonable" in criminal cases, *id.* at 688, and the ABA Standards require that defense counsel in death-penalty cases "must conduct in-person, face-to-face, one-on-one interviews with . . . witnesses

10

. . . who would support a sentence less than death." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11(C) (2008). The Supreme Court has, specifically, stated that investigations in death-penalty cases "should comprise efforts to discover **all reasonably available** mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting earlier version of ABA Guidelines; emphasis in *Wiggins*). In capital cases where the criminal defendant and murder victim are family members, the Victim-Contact Prohibition prevents the defense team from contacting the defendant's own family members, who often have key information that could save the defendant's life.

The Victim-Contact Prohibition also bars defense counsel from engaging in other types of communications with victims that might spare the defendant's life. Victim-impact testimony is admissible in death-penalty cases and can be critically important. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Trying to persuade victims' families not to press for the death penalty is an essential aspect of defense counsel's job in representing a defendant on trial for his or her life. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11(C) (2008). The First Amendment protects these important communications. *See Gentile*, 501 U.S. at 1057 ("The First Amendment does not permit suppression of speech because of its power to command assent.") (plurality opinion of Kennedy, J.).

Indeed, such communications about the death penalty from the defense team to families of victims are political speech. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (citation omitted). "[S]peech is of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of general interest and of value and concern to the public[.]'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). No doubt, speech regarding the death penalty, particularly speech opposing the death penalty, touches on a

matter of great public concern. Defense attorneys' direct appeals to the families of murder victims in which the death penalty is sought, therefore, "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 452 (citation omitted); *see also FCC v. League of Women Voters*, 468 U.S. 364, 381 (1984) ("[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values[.]") (cleaned up); *In re Primus*, 436 U.S. at 422, 432 ("actions . . . undertaken to express personal political beliefs and to advance . . . civil-liberties objectives" "must withstand the exacting scrutiny applicable to limitations on core First Amendment rights") (cleaned up).

**B.    The Victim-Contact Prohibition is an overbroad, viewpoint-based prior restraint on speech.**

**1.    The Victim-Contact Prohibition is a prior restraint on Plaintiffs' speech.**

Prior restraints are "administrative and judicial orders **forbidding** certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, at 4-14 (1984)) (emphasis in *Alexander*). For instance, a "licensing scheme[] requiring speech to be submitted to an administrative censor for prepublication review" is a prior restraint. *Id.* at 553 n.2.

The Victim-Contact Prohibition is a textbook prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Because the prosecutor has no obligation to convey the defense team's message in the form in which it was delivered, *see* A.R.S. § 13-4433(C), like other prior restraints, the Victim-Contact Prohibition "vests unbridled discretion in [prosecutors] over whether to permit or deny expressive activity." *City of Lakewood*, 486 U.S. at 755; *Moonin v. Tice*, 868 F.3d 853, 867 (9th Cir. 2017) ("pre-clearance regime" vested "unbounded discretion" in official to decide whether communications were "appropriate"); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (prior restraint "may not delegate overly broad licensing discretion to a government official").

The statute explicitly permits prosecutors to act as gatekeepers and decide whether and how Plaintiffs' messages reach their intended audience. A.R.S. § 13-4433(C).

### 2. The Victim-Contact Prohibition is a content and viewpoint-based restriction on Plaintiffs' speech.

A restriction is content based if it draws distinctions "based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Even "subtle" distinctions that define regulated expression "by its function or purpose . . . are distinctions based on the message a speaker conveys, and therefore, are subject to strict scrutiny." 135 S. Ct. at 2227; *accord* Cass R. Sunstein, *Democracy and the Problem of Free Speech* 169 (1993) ("When government regulates content, there is a large risk that the restriction really stems from something illegitimate: an effort to foreclose a controversial viewpoint, to stop people from being offended by certain topics and views, or to prevent people from being persuaded by what others have to say."); *see also Texas v. Johnson*, 491 U.S. 397, 412 (1989) ("the emotive impact of speech on its audience is not a secondary effect unrelated to the content of the expression itself") (internal quotations omitted). The Victim-Contact Prohibition is content based for at least three reasons.

First, the form letters that prosecutors send to victims when Plaintiffs request to speak with them compel Plaintiffs to "speak a particular message" through the form letters, imposing "a content-based regulation of speech." *NIFLA*, 138 S. Ct. at 2371. Like the notices held unconstitutional in *NIFLA*, the prosecutors' form letters "provide a government-drafted script" which is a content-based restriction on Plaintiffs' speech that "alters the content" of their speech. *Id.* (citing *Riley v. Nat'l Fed'n of the Blind*, 487 U. S. 781, 795 (1988)).

Second, the Victim-Contact Prohibition unconstitutionally restricts communications based on the identity of the speaker—namely defense attorneys and others on the defense team. *Cf. State v. Lee*, 245 P.3d 919, 923 ¶ 10 (Ariz. Ct. App. 2011) (The "plain language" of the VBR's provision granting victims the right to refuse

interviews with and discovery by the defense team "limits the scope of a victim's right only by the identity of the person requesting the interview—the defendant or the defendant's representative—and the identity of the person to whom the request is directed—a crime victim."). "[S]peech restrictions based on the identity of the speaker are all too often simply a means to control content[.]" *Reed*, 135 S. Ct. at 2230 (citations omitted); *see also Wollschlaeger v. Governor*, 848 F.3d 1293, 1307 (11th Cir. 2017) (holding that state statute prohibiting doctors from inquiring and recording whether their patients were gun owners was a viewpoint- and content-based restriction on First Amendment protected speech because the statute applied "only to the speech of doctors and medical professionals").[20] Numerous cases support the principle that the government may not favor certain speakers, with which it agrees, over other speakers, whose opinions and messages are not aligned with its goals. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."); *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95-96 (1972) ("[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."); *Hoye v. City of Oakland*, 653 F.3d 835, 849 (9th. Cir. 2011) ("[G]overnment may not favor speakers on one side of a public debate[.]").

---

[20] *See* Exh. E at 55 ("I think it applies to me as a criminal defense lawyer on the case. In other words, like if my neighbor, for instance, was a victim of a crime. I read it in the paper. I think I could go ask him about it as long as I wasn't involved in the case in any way as a lawyer."), 100 ("I think it does [restrict speech based on the content of the speech] because the content is in the context. The content is the criminal case itself. In other words, you can't talk about your case basically.").

The Victim-Contact Prohibition clearly is designed to place a government-favored speaker, the prosecutor who is litigating a criminal case on behalf of the state, in a better position than the defense team, the prosecutor's litigation adversary. Indeed, the Victim-Contact Prohibition not only favors prosecutors over defense teams by allowing prosecutors to speak when defense lawyers may not; it also makes prosecutors the arbiters of whether the defense team's message will be conveyed accurately or at all to the intended recipients, the victims. Such viewpoint discrimination aimed at suppressing speech that the government would rather not happen is not permitted by the First Amendment. *See Reed*, 135 S. Ct. at 2227.

Third, the Victim-Contact Prohibition is content based because it cannot be "justified without reference to the content of the regulated speech," and it was "adopted by the government because of disagreement with the message the speech conveys." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (cleaned up). Plaintiffs seek to initiate communications with crime victims as part of their efforts to vindicate the constitutional rights of the criminal defendants they represent. Such speech could include discussing the facts of the alleged crime, investigating possible defenses, determining whether the government conducted a fair and adequate investigation into the alleged crime, discussing the background and characteristics of the defendant, and, in capital cases, discussing the moral and legal implications of a death sentence. Of course, all this speech—generally concerning the crime and the defendant—is aimed at ensuring that the criminal defendant is treated fairly by the criminal legal system, including receiving a fair trial and receiving a fair and appropriate sentence, and sometimes securing dismissal of charges or acquittal after trial. These aims may often be at odds with those of a prosecutor, who represents the state and may have as goals securing a conviction and imposing a harsh sentence on the defendant. Thus, the Victim-Contact Prohibition impermissibly regulates speech based on the government's disagreement with the message the speech conveys, that is, a message that undermines the state's goals in convicting and sentencing the defendant. *Id.*

1

### C.   The Victim-Contact Prohibition is subject to strict scrutiny.

2      "[P]rior restraints on speech are presumptively unconstitutional and subject to

3   strict scrutiny." *Bank of Hope*, 938 F.3d at 394; *Bantam Books, Inc. v. Sullivan*, 372 U.S.

4   58, 70 (1963) ("Any system of prior restraints of expression comes to this Court bearing a

5   heavy presumption against its constitutional validity."); *accord New York Times Co. v.*

6   *United States*, 403 U.S. 713, 714 (1971) (per curiam); *see also Long Beach Area Peace*

7   *Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th Cir. 2009). Likewise, content-

8   based regulations on speech are "presumptively invalid," *R.A.V. v. St. Paul*, 505 U.S.

9   377, 382 (1992), and must elicit "the most exacting scrutiny." *Johnson*, 491 U.S. at 412;

10   *Reed*, 135 S. Ct. at 2227, 2230 ("[L]aws favoring some speakers over others demand

11   strict scrutiny when the legislature's speaker preference reflects a content preference.").

12   The Supreme Court has consistently "applied strict scrutiny to content-based laws that

13   regulate the noncommercial speech of lawyers." *NIFLA*, 138 S. Ct. at 2374.[21]

### D.   Defendants cannot establish that the Victim-Contact Prohibition meets strict scrutiny.

16      To survive strict scrutiny, Defendants must "prove that the restriction furthers a

17   compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at

18   2231; *accord Johnson*, 491 U.S. at 412. The restriction must be "actually necessary" to

19   achieve the government interest. *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729,

20   2738 (2011). "There must be a direct causal link between the restriction imposed and the

---

[21] *NIFLA* noted two circumstances in which professional speech might receive lesser, intermediate scrutiny, neither of which applies here. 138 S. Ct. at 2372-74. The Victim-Contact Prohibition does not regulate "purely factual and uncontroversial information about the terms under which services will be available." *Id.* at 2372 (cleaned up). Nor is it merely a "regulation[] of professional conduct that incidentally burden[s] speech." *Id.* at 2373. Instead, like the regulation in *NIFLA*, the Victim-Contact Prohibition directly regulates the speech of Plaintiffs based on their identity, here as members of the defense team. Even a speech regulation subject to intermediate scrutiny, however, must be "narrowly tailored to serve a significant governmental interest." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1475 (2022). The Victim-Contact Prohibition could not survive even that lesser scrutiny.

injury to be prevented." *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012) (plurality).

The VBR and its implementing legislation were adopted "to provide crime victims with basic rights of respect, protection, participation and healing of their ordeals." *Champlin v. Sargeant*, 965 P.2d 763, 767 ¶ 20 (Ariz. 1998) (quoting 1991 Ariz. Sess. Laws, ch. 229, § 2(2) (1st Reg. Sess.)) (internal quotation marks omitted). Thus, the VBR broadly recognizes that victims are entitled "[t]o be treated with fairness, respect, and dignity, and to be free from intimidation, harassment, or abuse, throughout the criminal justice process." Ariz. Const. art. 2, § 2.1(A)(1). To the extent that such interests justify restricting Plaintiffs' speech at all, the Victim-Contact Prohibition restricts far more speech that what the First Amendment allows.

### 1. The Victim-Contact Prohibition is not narrowly tailored to the state's interest.

The Victim-Contact Prohibition is not narrowly tailored to Arizona's stated interest in ensuring that crime victims are "treated with fairness, respect, and dignity" and that they are spared from "intimidation, harassment, or abuse, throughout the criminal justice process." Ariz. Const. art. 2, § 2.1(A)(1). The statute does not spare crime victims from all communications about the crime; for instance, prosecutors and the media may still seek to communicate with victims without limitation. It is contact with the criminal legal system in general, not the defense team specifically, that can be harmful to crime victims, and contact from the defense team poses no greater risk of traumatization to the victim than contact from the prosecutor's office.[22] And prosecutors are required by the law to inform a victim when the defense team requests an interview. A.R.S. § 13-4433(B). The law simply prevents Plaintiffs and others working on behalf of criminal defendants from themselves initiating contact with crime victims, no matter how receptive crime victims might be to such communications.

---

[22] Exh. A at 33, 34; Exh. C at 66, 72-73; Exh. D at 65-66; Exh. F at 24-25.

Moreover, for those victims who are not entirely aligned with the prosecution, the Prohibition does not shield them from "intimidation, harassment or abuse," but instead forces all initial defense-team contact with victims to go through the prosecutor, with whom victims may substantively disagree. *See State v. Murtagh*, 169 P.3d 602, 615 (Alaska 2007) ("[I]t is also true that some victims . . . feel harassed by the demands made on them by law enforcement personnel."). Those victims who are not aligned with the prosecution are thus forced to interact with prosecutors, which hardly protects defense-oriented victims.[23]

Likewise, the Prohibition's proscription is not limited to speech that is disrespectful, intimidating, harassing, or abusive.[24] Rather, it restricts ***all*** attempts by Plaintiffs to contact crime victims. This distinction is crucial for Plaintiffs who have no intention whatsoever to treat victims disrespectfully or abusively, or to intimidate or harass them. In fact, Plaintiffs wish to "win over" a victim so that they may have a respectful rapport during the litigation process. The defense team often treats crime victims with more respect than the prosecution (who see crime victims simply as witnesses and advocate for prosecution rather than advocating for the victims).[25] The defense team has no incentive to harass, or otherwise re-traumatize, victims (and their families) because doing so does nothing to help the defense team; and, in capital cases, doing so significantly harms the efforts of the defense team.[26] The Prohibition nevertheless prevents the defense team from speaking with crime victims at all, even if they plan to do so with fairness, respect, and dignity, which would ostensibly advance the government interest expressed in the VBR. *See Champlin*, 965 P.2d at 767 ¶ 20 ("[N]othing in the Victims' Bill of Rights . . . supports the argument that victims have a blanket right to be shielded from all contact with defendants or their attorneys until the

---

[23] Exh. B at 41; Exh. C at 67; Exh. D at 40-41.

[24] *See* Exh. E at 82 ("There was stories being told around the time they were trying to enact this that defense attorneys were abusing victims in interviews. In my experience, that wasn't the case.").

[25] Exh. D at 29-30, 65-66.

[26] Exh. B at 31; Exh. D at 48-49, 86-87.

time of trial."). Thus, the blanket ban on Plaintiffs' respectful, dignified, and fair speech aimed at victims shows that the Victim-Contact Prohibition is not narrowly tailored.

### 2. Other regulations already adequately address the state's interest.

While protecting crime victims from intimidation, harassment, and abuse is a worthy goal, the Victim-Contact Prohibition is not necessary to achieve that goal as demonstrated by other measures currently in place that sufficiently achieve this objective. Indeed, harassment and intimidation are unlawful in Arizona. *See* A.R.S. § 13-2921 (defining the crime of harassment). And defense lawyers and investigators are subject to professional discipline for inappropriate conduct toward victims. *See* Ariz. R. Prof'l Conduct ("ER") 4.4(a) (lawyers may not "use means that have no substantial purpose other than to embarrass, delay, or burden any other person"); A.R.S. § 32-2457 (grounds for disciplinary action against private investigators); *see also* ER 5.5 (lawyer must make reasonable efforts to ensure that nonlawyers employed by or associated with the lawyer act consistently with lawyer's professional obligations; lawyer can be responsible for conduct of employed or associated nonlawyers whose conduct would violate professional obligations).[27]

There is, however, nothing inherently intimidating, harassing, or abusive when a defense lawyer or investigator initiates contact with a crime victim or family member. And, like any other person, the victim may simply say, "No thank you. I do not wish to talk with you about this incident." Declining to speak with members of the defense team should easily and promptly end the encounter. In fact, the Arizona Constitution already recognizes the right of crime victims to exercise this power by "refus[ing] an interview . . . request by the defendant, the defendant's attorney, or other person acting on behalf of the defendant." Ariz. Const. art. 2, § 2.1(a)(5). If Plaintiffs persist despite the request of a

---

[27] Exh. B at 35.

19

crime victim or family member, criminal or professional sanctions may be imposed upon the offending Plaintiff. [28]

Given that a victim may simply decline a request to speak with the defense team, the Victim-Contact Prohibition seems to assume that criminal-defense lawyers and others working at their direction will not abide by ethical standards. Such an assumption puts our very system of justice at risk:

> If our adversary system is to function according to design, we must assume that an attorney will observe his responsibilities to the legal system, as well as to his client. [It is] difficult to conceive of any circumstances that would justify a court's limiting the attorney's opportunity to serve his client because of fear that he may disserve the system by violating accepted ethical standards.

*Geders v. United States*, 425 U.S. 80, 93 (1976) (Marshall, J., concurring).

Indeed, neither the federal system nor any other state in the country restricts the defense team's communications with victims the way that Arizona does. For instance, the federal government recognizes in the Federal Crime Victim's Rights Act of 2004 that crime victims have "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). But the federal scheme does not prohibit the defense team from initiating contact with victims, and in fact, defense-initiated victim outreach is common in federal cases. Likewise, other states also recognize the rights of crime victims to be free from harassment and intimidation. *E.g.*, Colo. Rev. Stat. Ann. § 24-4.1-302.5(1)(a); N.J. Stat. Ann. § 52:4B-36(c); S.C. Const. art. I, § 24(A)(1); Utah Const. art. I, § 28(1)(a). But no other state addresses this interest by requiring the defense team to initiate contact with crime victims through the prosecutor. That Arizona has gone beyond all other jurisdictions in its stated attempt to address this

---

[28] Even if a brief polite encounter with a member of the defense team should be deemed upsetting by a crime victim or family member, speech cannot be punished because it may have an adverse emotional impact on the audience. *Hustler Magazine v. Falwell*, 485 U.S. 46, 55 (1988). There is no "outrageousness" or "dignity" standard that would allow speech to be punished. *Id.*; *Boos v. Barry*, 485 U.S. 312, 322 (1987).

common concern shows that the Prohibition is not "actually necessary" or narrowly tailored to achieve the interest. *Brown*, 131 S. Ct. at 2738; *see Boos v. Barry*, 485 U.S. 312, 329 (1987) (law is not narrowly tailored when "a less restrictive alternative is readily available").

> ### 3. The Victim-Contact Prohibition threatens other important state interests.

The Victim-Contact Prohibition also fails scrutiny because it threatens another widely recognized compelling government interest in First Amendment litigation: the administration of justice. "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted[.]" *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980); *see also Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838-39 (1978). The Prohibition impedes the administration of justice in several ways.

First, the Supreme Court has recognized that "[t]here can be no fair trial unless the accused receives the services of an effective and independent advocate." *Polk Cnty. v. Dodson*, 454 U.S. 312, 321-22 (1981). The Victim-Contact Prohibition substantially impedes the effective assistance of counsel for the criminally accused by preventing defense counsel from fulfilling their constitutionally mandated duty, which implicates due process and the right to counsel, among other rights.[29] *E.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 453 (2009) (per curiam) (finding that an attorney's failure to interview witnesses in preparation for penalty phase of capital murder trial constituted ineffective assistance of counsel); Ariz. Const. art. II, §§ 4, 24. As noted above, the Supreme Court has acknowledged the ABA Standards for the adequate and proper representation of defendants as "guides to determining what is reasonable" in criminal defense. *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688). The ABA Guidelines provide that "defense counsel must independently investigate the circumstances of the crime, and all evidence . . . purporting to inculpate the client," including interviewing "witnesses having

---

[29] Exh. B at 15, 27-28, 34-35, 40, 41; Exh. B-1 at 3; Exh. D at 40-41, 48-50.

purported knowledge of events surrounding the alleged offense itself," and in capital cases, the victim's family. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases Introduction, 10.7(2)(a)(1), 10.11, 10.7, Commentary 2(a)(4) (2003). And without an adequate investigation, criminal-defense lawyers are prevented from "present[ing] all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001).

The Victim-Contact Prohibition also creates ethical problems for prosecutors, who have no legitimate stake in preventing crime victims from speaking with defense counsel because "[p]rosecutors have a special duty to seek justice, not merely to convict." *Connick v. Thompson*, 563 U.S. 51, 65-66 (2011) (cleaned up); *see also* ER 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

> [P]rosecutorial control of victims' rights provides fertile ground for ethical conflicts of interest. It is a mistake to define the state and victims as nonadversaries simply because both are harmed by the criminal act and share an interest in punishment. Adversariness exists when prosecutors violate victims' rights. Moreover, the public prosecutor is obligated to the public interest.

Douglas E. Beloof, *The Third Wave of Crime Victim's Rights: Standing, Remedy, and Review*, 2005 B.Y.U. L. Rev. 255, 337 (2005). By allowing prosecutors to control access to crime victims, the Prohibition wrongly assumes that prosecutors and victims will always be aligned and that victims will always benefit from this overly paternalistic scheme. *See P.M. v. Gould*, 136 P.3d 223, 228 ¶ 21 (Ariz. Ct. App. 2006) ("[T]he real issue in this dispute is not between the victim and the defendant, but between the victim and the state."); Ariz. R. Crim. P. 39(c)(3) ("In any event of any conflict of interest between the state . . . and the wishes of the victim the prosecutor shall have the responsibility to direct the victim to the appropriate legal referral, legal assistance, or legal aid agency.").

The Victim-Contact Prohibition also impedes the administration of justice by undermining the truth-seeking function of the legal system and thus "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 545-46; *see United States v. Cook*, 608 F.2d 1175, 1180 (9th Cir. 1979) ("As a general rule, a witness belongs neither to the government nor to the defense. Both sides have the right to interview witnesses before trial. Exceptions to this rule are justifiable only under the clearest and most compelling circumstances.") (citations and quotation marks omitted), *overruled on other grounds by Luce v. United States*, 469 U.S. 38, 1 (1984). Especially because the great majority of criminal cases are resolved through plea agreements before trial, barring the defense from accessing the victim keeps potentially crucial and exculpatory information from the defense and prevents a full and fair investigation into the crime.

### 4. The Victim-Contact Prohibition does not leave open ample alternatives for speech.

The Victim-Contact Prohibition fails First Amendment scrutiny also because it does not leave open ample alternative channels of communication. "The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (citation and internal quotation marks omitted). The Supreme Court has long held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 151-52 (1939). "[E]ven regulations that do not foreclose an entire medium of expression, but merely shift the time, place, or manner of its use, must leave open ample alternative channels for communication." *City of LaDue v. Gilleo*, 512 U.S. 43, 56 (1994) (citation and internal quotation marks omitted).

"An alternative is not ample if the speaker is not permitted to reach the intended audience." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (citation and internal quotation marks omitted). The Victim-Contact Prohibition prevents

Plaintiffs from reaching their one intended audience: crime victims and their families. For example, in a death-penalty case, during the penalty phase, there are perhaps no more important witnesses than the victim's family members. While not specifically permitted to ask the jury to impose the death penalty, the victim's family can telegraph to a jury its support for a death sentence or can provide testimony that speaks out against the inhumanity of the death penalty. Victims' family members' testimony holds great weight with juries, yet the Prohibition prevents Plaintiffs from contacting them directly. When a person's loved one has died, the tone and content of the message is important to gaining the person's trust or convincing the person to take a stand against the death penalty. There is no way that this message can be conveyed by a go-between, particularly when that messenger is tasked with ensuring that a death sentence is imposed. Allowing Plaintiffs to contact victims through prosecutors is thus not a viable alternative channel of communication.

**5.    The Victim-Contact Prohibition is unconstitutionally overbroad.**

The Victim-Contact Prohibition also reaches beyond what the government might permissibly regulate—for example, harassment—and prohibits protected speech. It is thus impermissibly overbroad.

In a First Amendment challenge, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation and internal quotation marks omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 114-15 (1972) ("The crucial question, then, is whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."). "[T]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 559 U.S. at 474 (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)).

The Victim-Contact Prohibition creates a prohibition of substantial overbreadth. However large the number of situations in which the Prohibition could apply to speech and conduct that the government might be allowed to restrict (like harassment), those situations are dwarfed by others where protected speech is also prohibited. The Prohibition is not limited to harassment but instead prohibits **any** attempt by defense counsel to communicate with a crime victim. It also "has a substantial deterrent effect on protected expression," but no Arizona court has limited its scope to allow protected speech, and its language makes clear that it applies to all speech initiated by the defense team to crime victims, regardless of context, location, or tone. *See Fratiello v. Mancuso*, 653 F. Supp. 775, 791 (D.R.I. 1987) (statute overbroad that "has neither been afforded a narrowing construction by the state courts sufficient to limit its application to unprotected expression nor is the provision readily susceptible to such an interpretation").

Because the Victim-Contact Prohibition prohibits respectful, polite speech directed at crime victims, including speech on topics of grave public concern, it is substantially overbroad and invalid. *Stevens*, 559 U.S. at 481-82.

## II.     The Victim-Contact Prohibition is causing Plaintiffs ongoing irreparable harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Jacobsen v. U.S. Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir. 1987). As discussed above, the Victim-Contact Prohibition violates the First Amendment because it is a content-based and overbroad prior restraint on speech that is not narrowly tailored to a compelling government interest and does not leave open ample alternatives for Plaintiffs' speech. Thus, Plaintiffs suffer ongoing, irreparable harm each day without an injunction. *See Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief[.]") (cleaned up).

**III.    The balance of equities favors enjoining the Victim-Contact Prohibition.**

"[The balance of equities generally favors the constitutionally-protected freedom of expression[.]" *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (cleaned up and citation omitted). Any hardship to Defendants from an injunction preventing their enforcement of a likely unconstitutional law cannot outweigh the substantial and ongoing infringement of Plaintiffs' free-speech rights and the chill on their speech from the fear of sanctions. *See Doe*, 772 F.3d at 583 (balance of equities favors granting preliminary injunction when free speech rights are chilled by fear of sanctions). Simply put, without an injunction, Plaintiffs' First Amendment rights will continue to be violated on an ongoing basis. The balance of equities favors an injunction.

**IV.    Preliminary relief serves the public interest.**

The Ninth Circuit has "consistently recognized the significant public interest in upholding free speech principles, as the ongoing enforcement of the potentially unconstitutional regulations would infringe not only the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions." *Klein*, 584 F.3d at 1208 (cleaned up). The Victim-Contact Prohibition violates the free-speech rights of the individual Plaintiffs, hundreds of AACJ members, and every other criminal-defense lawyer and defense team member in Arizona. Moreover, as Plaintiffs' evidence will show, because the right to hear and the right to speak are two sides of the same coin, the Victim-Contact Prohibition restricts the First Amendment rights of crime victims, who have corresponding rights to associate with and receive communications from the defense team unimpeded by the prosecutor. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (overbroad disclosure requirement that created the "risk of a chilling effect on association" was facially unconstitutional); *Conant*, 309 F.3d at 643 ("It is well established that the right to hear—the right to receive information—is no less protected by the First Amendment than the right to speak."); *see also Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring). ("It would be a

26

barren marketplace of ideas that had only sellers and no buyers."). Immediate relief thus clearly serves the public interest.

## CONCLUSION

The Court should enter a preliminary injunction enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them from enforcing the prohibition in A.R.S. § 13-4433(B) that restricts defense lawyers and others working on the defense team from initiating contact with the victim except through the prosecutor's office.

SUBMITTED June 24, 2022.

MITCHELL | STEIN | CAREY | CHAPMAN
By: /s/          Kathleen Brody
       Kathleen E. Brody

ACLU FOUNDATION OF ARIZONA
       Jared G. Keenan

KILLMER, LANE & NEWMAN, LLP
       David A. Lane
       Andrew McNulty

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all parties.

/s/ Peggy McClellan