UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Arizona Attorneys for Criminal Justice, et al. | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) |
| Doug Ducey, et al., | ) ) |
| Defendants. | ) ) ) |

CV-17-01422-PHX-SPL

Phoenix, Arizona
September 22, 2022
9:08 a.m.

BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>BENCH TRIAL/PRELIMINARY INJUNCTION HEARING</u>


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3            Killmer Lane & Newman LLP
              By:  DAVID A. LANE, ESQ.
 4            1543 Champa St., Ste. 400
              Denver, CO 80202
 5
              Mitchell Stein Carey Chapman PC
 6            By:  KATHLEEN E. BRODY
              2600 N. Central Ave., Ste. 1000
 7            Phoenix, AZ 85004

 8            ACLU – Phoenix, AZ
              By:  JARED G. KEENAN
 9            P.O. Box 17148
              Phoenix, AZ 85011
10

11    For the Defendant Mark Brnovich:

12            Office of the Attorney General – Phoenix
              By:  MICHAEL SHAWN CATLETT, ESQ.
13                 KATE BLAKELEY SAWYER, ESQ.
                   KATLYN JO DIVIS, ESQ.
14                 BRUNN WALL ROYSDEN, III, ESQ.
              2005 N. Central Ave.
15            Phoenix, AZ 85004–1592

16    For the Defendant Heston Silbert:

17            Fennemore Craig PC – Phoenix, AZ
              By:  TYLER CARLTON, ESQ.
18            2394 E. Camelback Rd., Ste. 600
              Phoenix, AZ 85016
19

20    For the Defendant Maret Vessella:

21            Jones Skelton & Hochuli PLC
              By:  DANIEL OLIVER KING, ESQ.
22            40 N. Central Ave., Ste. 2700
              Phoenix, AZ 85004
23

24

25
```

1                    SUMMARY OF PROCEEDINGS

2    Opening Statement by Ms. Brody                        8

3    Opening Statement by Mr. Catlett                     19

4    Closing Statement by Mr. Keenan                     164

5    Closing Statement by Ms. Sawyer                     172

6    Rebuttal Closing Statement by Mr. Lane              179

7


8                          INDEX

9    WITNESSES                Direct    Cross    Redirect
     Plaintiffs' Witnesses
10       Richard Burr          39        56
         Rhonda E. Neff        75        98        111
11       Rich Robertson       113       126
         John A. Canby        130       150        161
12

13

14


15                      E X H I B I T S

16   Exhibit No.            Description              Admitted

17    100  APAAC Letter                                   28
      101  Apache County Attorney Letter                  28
18    102  Arizona Coalition Against Domestic Violence Letter  28
      103  Maricopa County Attorney's Office Letter       28
19    104  National Lawyers Guild Letter                  28
      105  State Bar Committee Report                     28
20    106  1990 Publicity Pamphlet                        28
      107  Victims' Rights Implementation Act             28
21    108  1989 Rules of Criminal Procedure               28
      109  Bearup v. Ryan No. 16-cv-3357-SPL (D.Ariz. 1/20/17)  28
22    110  Chappell v. Ryan No. 15-cv-478-SPL (D.Ariz. 7/21/15)  28

23

24

25

P R O C E E D I N G S

1          THE CLERK:  We are on the record in CV17-1422, Arizona

2    Attorneys for Criminal Justice versus Doug Ducey, before the

3    court for a bench trial.

4          Counsel, please state your appearances.

5          MR. LANE:  Morning, Your Honor.  David Lane, Kathy

6    Brody and Jared Keenan on behalf of plaintiffs.

7          THE COURT:  Good morning to all of you.

8          MR. CATLETT:  Good morning, Your Honor.  My name is

9    Mike Catlett.  I am Deputy Solicitor General at the Arizona

10   Attorney General's office.  And I am here on behalf of Attorney

11   General Mark Brnovich.

12         I have a bit of a team here with me this morning.  At

13   counsel table with me is my colleague Kate Sawyer and my

14   colleague Katlyn Divis.

15         I also have a couple of members of our team in the

16   gallery, Sarah Mancuso and Rachel Anklen, who are staff members

17   at the AG's office and also aspiring law students.  And then I

18   have Solicitor General Beau Roysden here with us.  He actually

19   has a matter in front of Judge Snow at 9:30, so he will be in

20   and out of the courtroom a bit today.

21         THE COURT:  Thank you very much.  Good morning to all

22   of you.

23         MR. KING:  Good morning, Your Honor.  Daniel King on

24   behalf of Maret Vessella.

1          MR CARLTON:  Good morning, Your Honor, Tyler Carlton

2     of Fennemore Craig on behalf of Heston Silbert.

3          THE COURT:  Good morning to you gentlemen as well.

4          First of all, welcome to our courtroom here.  And I'm

5     very pleased that all of you did such a fine job briefing all

6     of the issues that we have in the case.  And obviously it's a

7     case that's about five years old now, and today we are set for

8     this preliminary injunction hearing and a bench trial pursuant

9     to Rule 65(a)(2).

10         Plaintiff challenged the constitutionality of Arizona

11    Revised Statute Section 13-4433(b), which is the statute which

12    provides that when a criminal proceeding is ongoing, the

13    defendant, the defendant's attorney, or an agent of the

14    defendant, shall only initiate contact with the victim through

15    the prosecutor's office.

16         The prosecutor's office shall promptly inform the

17    victim of the defendant's request for an interview and shall

18    advise the victim of the victim's right to refuse the

19    interview.  The statute was enacted by the Arizona Legislature

20    in 1991.

21         Plaintiffs' operative second amended complaint alleged

22    two counts.  Number 1, a violation of the first amendment.

23    Number 2, unconstitutional overbreadth.

24         See document 150, pages 18 through 20.

25         The plaintiff has asked this Court to, number 1,

1   declare the statute -- that the statute violates First

2   Amendment, and, number 2, to enjoin the defendants and those in

3   concert with them from enforcing Arizona Revised Statute

4   13-4433(b).

5           Again, see document 150 at page number 20.

6           The defendants Brnovich and Silbert assert that the

7   statute does not violate the First Amendment.

8           See document number 242.

9           Defendant Vessella takes no position on the

10  constitutionality of the statute, but requests that any

11  injunction be limited to enjoin the chief bar counsel from

12  seeking sanctions solely on the basis that defense counsel

13  contacted a victim without going through the prosecutor's

14  office.  And that's in violation of the statute as

15  communications could still violate other statutes or ethical

16  rules.

17          See document number 243.

18          By way of procedural history in the case, and for the

19  record, this case was initially filed the 8th of May of 2017.

20          See document number 1.

21          I dismissed plaintiffs' complaint, first amended

22  complaint, and second amended complaint, for lack of stating.

23          See documents 119, 147, 191, and 210.

24          On appeal, the Ninth Circuit Court of Appeals reversed

25  and remanded this case back to me, which is spelled out in

1    document number 220.

2          The Ninth Circuit held that plaintiffs' alleged

3    injuries were traceable to the defendants based on their

4    enforcement authority.

5          See docket number 220 at pages 3 and 4.

6          The Ninth Circuit Court of Appeals further found that

7    plaintiffs established redressability because the statute

8    prohibits all direct contact with victims, whereas Arizona Rule

9    of Criminal Procedure 39(b)(12)(A), which plaintiffs do not

10   challenge, requires only that the defense communicate requests

11   to interview a victim through the prosecutor.

12         Again, see document 220 at lines -- sorry, Pages 4 and

13   5.

14         The Ninth Circuit did, however, agree that *Younger*

15   abstention is not required.

16         See document 220 at page number 6.

17         And again, as the parties are well aware, the Ninth

18   Circuit Mandate was issued on April the 26th of 2022.

19         Ladies and gentlemen, the lawyers here right now,

20   obviously we don't have a jury, so I handle these preliminary

21   hearing bench trials a little different.  But what I would like

22   to do is hear a brief opening statement from both sides.

23         I will give both sides ten minutes, and then after

24   that, I have a lot of questions for the plaintiffs.  I have a

25   lot of questions for the defense.  Take great notes because you

8

```
 1   know the issues that I am concerned with, and you can shape

 2   your case as you want to plead it to me after I have asked all

 3   of those questions.

 4            If you have answers, I would love to hear the answers

 5   at this point.  If you don't, I know I am allowing for some

 6   additional briefing of, I believe, 10 or 12 pages after we

 7   finish today.

 8            So with that, do we have one person on the plaintiff

 9   side, or all three of you want to give a brief opening

10   statement to me?

11            MR. LANE:  Your Honor, Ms. Brody is going to do the

12   openings for us.

13            THE COURT:  Ms. Brody, if you would like, you can

14   approach the lectern.  I just ask you to pick one microphone,

15   if you would, please.

16            MS. BRODY:  Thank you, Your Honor, is this working?

17            THE COURT:  Yes, perfect.

18            MS. BRODY:  Okay.  And I may switch glasses from time

19   to time, just so I can see you but also see my papers.

20            THE COURT:  You know, I refuse to get bifocals also.

21            MS. BRODY:  Great minds, as they say.

22            Well, good morning, Your Honor.  Thank you very much

23   for the time today.  And we do appreciate your opening remarks

24   and level setting or background on the case.

25            And I do have some very brief remarks by way of
```

1    opening, and my remarks are going to summarize the important

2    facts, Your Honor, that we intend to present to you as

3    testimony as our evidence today.

4         And I will talk a little bit about what we expect the

5    defendants will seek to prove and our position on those facts

6    as well.

7         And so the way that I want to organize this, Your

8    Honor, to talk about the evidence that we are going to present

9    today, is really in four categories.

10         And so the first category, Your Honor, it's really

11    legal rather than factual.  But it's important as a preliminary

12    overarching matter, and I think it also responds to the

13    evidence that we expect the defendants to put forth today.

14         And we believe, Your Honor, and the defendants have

15    also stated this, that the issues presented in this case are

16    largely legal issues.  They are largely legal in nature.

17         And, of course, as you stated, Your Honor, our claim

18    is that A.R.S. Section 13-4433(b), what we call the victim

19    contact prohibition, is unconstitutional because it violates

20    the free speech rights of criminal defense lawyers and others

21    working on the criminal defense team in violation of the First

22    Amendment.

23         THE COURT:  You know, Counsel, every word that

24    everyone says in this courtroom is incredibly important to me.

25    At 56, I no longer write as fast as I used to.  If you could

```
 1    slow down just a little bit, that would be very helpful for me.
 2          MS. BRODY:  You got it, Your Honor.  Thank you for
 3    that feedback.
 4          So really, Your Honor, the statute itself is the first
 5    category that I want to touch on briefly.  And as Your Honor
 6    said, the statute says, and this is a quote, "The defendant's
 7    attorney or an agent of the defendant shall only initiate
 8    contact with the victim through the prosecutor's office."
 9          And the two things that I want to point out to the
10    Court about the statute relate to the evidence that we expect
11    the defendants to present today.
12          So one, the first thing about the statute, Your Honor,
13    is that on its face, it regulates speech.  It explicitly
14    regulates how defense lawyers communicate with crime victims.
15    How they are required to, quote, "initiate contact," with crime
16    victims.
17          And we expect the defendants to present evidence, Your
18    Honor, that they claim will show that the statute regulates
19    conduct and not speech.  And that evidence from the defendants
20    is undermined by the very words of the statute that we are
21    challenging, which regulates speech on its face.
22          The second thing about the statute, Your Honor, is
23    that on its face, it only regulates the speech of the defense
24    team.  It doesn't regulate anybody else.  That's facial
25    viewpoint discrimination.
```

1           The defendants here claim that they will present

2    evidence that the statute furthers certain government

3    interests, and that the statute is consistent with some

4    historical practice of prosecutors representing victims.  And

5    those things just don't hold up, Your Honor.  They're not true.

6           And our evidence will show that this statute

7    undermines the truth seeking function of the criminal legal

8    system, as well as other important government interests, and

9    also in fact that it harms victims, the people that defendants

10   claim that the law is trying to protect.  So that's the first

11   category, Your Honor.

12          The second category of evidence that we expect to

13   present to you today, we are going to present evidence to you,

14   Your Honor, about the types of things that plaintiffs and

15   others working on criminal defense teams wish to communicate

16   with victims about.

17          We are going to tell you about the types of speech

18   that this statute is stopping from happening.  And these things

19   are topics that go beyond plaintiffs and other members of the

20   defense team just doing their job.  These really go to the

21   heart of their personal beliefs as well.

22          And so in this category of types of things that --

23   types of speech that the statute is stopping from happening,

24   you are going to hear about DIVO or Defense Initiated Victim

25   Outreach in death penalty cases.

1          We have our expert here, Mr. Dick Burr.  He is going

2   to testify about DIVO, the philosophy behind that, and its

3   importance in death penalty cases.  And so you will hear from

4   him about the topics that defense teams want to talk to victims

5   about through this DIVO process.

6          THE COURT:  Counsel, I just need to stop you for just

7   one minute.  That raised an issue.

8          Have the parties talked about witnesses' presence in

9   the courtroom?

10          MS. BRODY:  Yes, Your Honor, we have discussed that,

11   and the defendants have said that they are going to invoke the

12   Rule.  Our intention is that to put Mr. Burr on as our first

13   witness, he's an expert.  The remainder of our witnesses are

14   parties to this case.

15          THE COURT:  Okay, very well.  Thank you.  My apologies

16   for interrupting.

17          MS. BRODY:  Not at all, not at all.  Thank you.

18          So you will hear from Mr. Burr.  And you are also

19   going to hear testimony that lawyers and others on the defense

20   team want to talk to victims in advance of trial because the

21   information that victims have can be crucial to understanding

22   the facts of the case.

23          And sometimes being able to get information from a

24   victim about what happened can result in resolution before

25   trial, which stops the victim from having to show up at hearing

1   after hearing after hearing, as the trial date approaches, and

2   also would stop the victim from having to testify at trial at

3   all.

4           And so sometimes, having that information from the

5   victim can, you know, give both sides more information about

6   how the case should resolve properly, and save not only the

7   victim, but the system the expense and burden.

8           And you will hear evidence, Your Honor, that, you

9   know, prosecutors in a case, they don't always know or

10  understand all the facts.  And a defense investigation that

11  includes being able to speak to the victim pretrial, can be

12  helpful for the defendant, but for the victim and the system as

13  a whole as well.

14          And then, Your Honor, other things that the defense

15  team wants to talk to victims about, one very important

16  category is mitigation evidence.  And so you are going to hear

17  testimony about this as well.  That particularly in death

18  penalty cases mitigation evidence is important.

19          And we're going to present evidence that many

20  homicides occur within families.  And so when that happens, the

21  statutory crime victims, who are relatives of the deceased

22  person, are also relatives of the defendant.

23          And we are going to present evidence, Your Honor, that

24  capital defense teams in particular are required to explore all

25  information that might help their clients escape the death

1    penalty.

2         And some death penalty cases, as you know, Your Honor,

3    they don't really involve questions of liability.  The fact

4    that the defendant did the killing is not at issue in many

5    death penalty cases.  And so really, mitigation, and what the

6    penalty is in the case is the most important issue, but really,

7    the only issue.

8         And in particular, in those killings within a family,

9    those family members of the deceased, who are also family

10   members of the defendant, they have this crucial mitigation

11   evidence that would include things like, the defendant's youth,

12   defendant's upbringing, any medical issues, any abuse issues in

13   the family that might have brought the defendant to that day.

14   And so so much information for mitigation can rest with these

15   folks.

16        In addition to that, Your Honor, we are also going to

17   present evidence that defense lawyers and others on the defense

18   team, they want to talk to victims about the process, about the

19   criminal legal process, what to expect in the process.  Their

20   only experiences with the process that might help get

21   resolution for everybody involved.

22        And, you know, some defense lawyers have been doing it

23   for a really long time.  Some defense lawyers have a really

24   unique perspective on the criminal legal process.  Some defense

25   lawyers have spent years as a prosecutor beforehand, so they

1    can offer a differing view that they might want to talk to

2    victims about.

3            And this information about the process from different

4    perspectives, Your Honor, that information can be so helpful

5    for victims.  And it's not always provided by others in the

6    system.  It's not always provided by the prosecutor in the

7    case.

8            And so this information finally, Your Honor, the final

9    category of information that people might want to talk to

10   victims about, there's also information that victims might want

11   or need to hear from the defense team.  The defense team might

12   have access to information that the prosecution or others in

13   the system simply don't have.

14           For instance, information about the defendant, or

15   information about the circumstances of the crime.  And that

16   information can be helpful to victims to find solace or

17   closure.  And so that's the second category, is things that we

18   want to talk about -- is the second category of evidence.

19           The third category of evidence that we are going to

20   focus on today, Your Honor, relates to the chill on speech that

21   is caused by this statute, that is caused by the victim contact

22   prohibition.

23           So the evidence will show, Your Honor, that the

24   statute stops lawyers and others on the defense team from

25   initiating contact with crime victims.  That's what the statute

1    prohibits on its face.  So of course it stops them from doing

2    that.

3            The evidence will also show, however, that this law

4    stops even more speech than that.  It stops speech beyond the

5    defense team simply initiating contact with crime victims.

6            The evidence will show that plaintiffs in this case

7    and other members of the defense team, they're licensed

8    professionals.  They take their obligations as licensed

9    professionals seriously, and they don't want to break the law.

10   They don't want to wreck their reputations.  Their work is

11   important to them personally, and for their families.

12           The evidence will also show, Your Honor, that they

13   don't even want to come close to the line, or do anything that

14   could possibly result in allegations against them that they

15   have violated the law.

16           And you will hear testimony about a -- about the

17   atmosphere of threats around victims issues that sort of lead

18   attorneys and others on the defense team to really shy away

19   from any contact with victims.

20           And you will also hear testimony, Your Honor, about

21   ambiguities in the law that can result when lawyers and others

22   working on the defense team, when they encounter these

23   ambiguities in the law, their reactions are to act in an

24   abundance of caution.

25           And so the evidence is going to show that the criminal

1    defense team must be cautious, even when victims initiate

2    contact with them, because they don't want to be accused of any

3    wrongdoing.  And so even in those circumstances, members of the

4    defense team are anxious and cautious about engaging in speech

5    with crime victims.

6          And then finally, Your Honor, the fourth category of

7    information that our presentation is going to focus on is, we

8    are going to present some information related to the

9    government's purported interest underlying this law.

10         And of course the main purported interest that the

11   government has put forth here is protecting victims from

12   retraumatization in the criminal legal system, and we agree

13   that that is a legitimate government interest of course.

14         But you are also going to hear evidence, Your Honor,

15   that the law doesn't protect crime victims against

16   retraumatization.

17         In fact, the evidence will show that contact with the

18   defense team in advance of trial can be helpful for victims.

19   It can help them get information sooner.

20         It can help them get more information, and that

21   information about whatever it is that they are wondering about,

22   that they are needing, that can help them understand the

23   process better.

24         And it can help reach a resolution, not just for the

25   victim, but for the entire system in a less traumatizing and

1    less burdensome way.

2              It could help the case resolve before trial, which

3    saves the victim from retraumatization, saves the victim from

4    having to attend hearing after hearing, from having to testify.

5    And the evidence will also show that the system, the legal

6    system, is better off if the defense team can speak with crime

7    victims.

8              Our system is an adversary system, of course, but it

9    is a truth seeking system.  That's why we have trials.  But the

10   evidence will show that preventing communication between a

11   crime victim and the defense team undermines that truth seeking

12   function.

13             And in the end, Your Honor, the evidence will show

14   that the government's asserted interest are simply not enough

15   to justify this law.

16             The defendants have scant evidence, if any really,

17   that this law furthers any legitimate government interest.  And

18   the defendants are required to support whatever interests they

19   put forth with actual evidence.  That's the law.  And so there

20   is no such evidence, Your Honor.

21             So again, and in conclusion, the evidence that we

22   present today will demonstrate that these important interests

23   at stake for the defendant, for victims, for the system as a

24   whole, but of course the First Amendment rights of the

25   plaintiffs and others on the defense team, all of those

1          interests are damaged by this victim contact prohibition, and

2          that the law is unconstitutional and violates the First

3          Amendment.

4                    Thank you, Your Honor.

5                    THE COURT:  Counsel, thank you so much for your words.

6                    Defense, do you have an opening statement?

7                    MR. CATLETT:  Yes, Your Honor.

8                    THE COURT:  Come on up, please.

9                    MR. CATLETT:  Thank you, Judge.  As the Attorney

10         General indicated in the prehearing statement, we believe that

11         most of the testimony and evidence to be presented today is

12         irrelevant.  And I don't say that to be pejorative, and I think

13         actually plaintiffs largely agree with that proposition.

14                   And it's irrelevant because the issues in front of

15         Your Honor are purely legal.  Plaintiffs assert a facial

16         challenge to the statute at issue.  And so therefore, as Your

17         Honor well knows, plaintiffs are required to show that the

18         statute is unconstitutional in all circumstances.

19                   The experience of individual plaintiffs is irrelevant

20         to that determination, and so their testimony about how those

21         experiences may have impacted them in individual cases, we

22         believe, is irrelevant.

23                   Nothing in the Court's ruling on the facial

24         constitutionality of the statute will prevent plaintiffs from

25         claiming that the statute is invalid as applied to them in

1    specific cases.

2         There are really only two issues for purposes of

3    whether the statute is unconstitutional and for purposes of

4    plaintiffs' facial challenge.

5         The first issue is, what is the correct legal statute

6    for determining whether the statute violates the First

7    Amendment on its face?

8         And the second question is, does the statute satisfy

9    that standard?

10        So turning to the first question.  What is the correct

11   standard for the Court to apply in determining whether this

12   particular statute violates the First Amendment on its face?

13        First, plaintiffs have severely boxed themselves in in

14   this case, and they did so by trying to avoid issues with

15   Article III standing and with abstention.

16        And in order to avoid issues with those doctrines,

17   they said, this is not about the clients that we represent in

18   state court.  And it's not about positions that we want to take

19   in furtherance of the rights or interests of those defendants.

20   This is about our own First Amendment rights, and only about

21   our First Amendment rights, and about speech that we want to

22   engage in purely as lawyers in order to do our jobs better.

23        What does -- so it's important then to sort of view

24   the issues through the prism of that particular theory that

25   plaintiffs have presented in the way that they have limited it.

1          So the question is, what does the statute do vis-a-vis

2     plaintiffs?  Not vis-a-vis their clients that they represent in

3     state court or the arguments they might want to make in

4     furtherance of their clients' rights.  What does it do

5     vis-a-vis the plaintiffs?

6          You have plaintiff attorneys and you have one

7     plaintiff private investigator.  And what the statute does is

8     it governs how they conduct discovery or obtain information

9     during ongoing criminal proceedings.

10          It governs the professional conduct of lawyers and

11     investigators.  And we know that it governs the professional

12     conduct of lawyers and investigators, because in order to

13     generate Article III standing, they brought in Colonel Heston

14     Silbert, who is the head of DPS and oversees private

15     investigator professional conduct matters.

16          And they brought in Maret Vessella, who is the chief

17     bar counsel for the State Bar of Arizona.  That's pretty good

18     proof that as to plaintiffs, the primary purpose of the statute

19     is to govern their professional conduct.  That's why the Ninth

20     Circuit held that there's Article III standing in this case and

21     remanded back to this court.

22          Like any other number of regulations, though, of

23     attorney conduct, the statute may have an incidental effect

24     on speech.  The United States Supreme Court has repeatedly said

25     that statutes regulating professional conduct may incidentally

1   impact speech, but that doesn't create a constitutional issue.

2          They said that in the *Gentile* case.  They have said it

3   in cases involving lawyer advertising, which doesn't even

4   involve courtroom proceedings, which I think are more at the

5   core of how attorneys conduct themselves as members of the bar.

6          The Court has said that state bars and state

7   governments may regulate attorney advertising.  I think that's

8   closer, much closer to speech than what Your Honor has in front

9   of you in this case.  And yet the Supreme Court said, that's

10  professional conduct, and even though that may incidentally

11  impact speech, we are going to apply a rational basis standard.

12         So this -- and you can see, this particular regulation

13  is like any number of regulations that states and state bars

14  and state supreme courts enact in order to govern attorney

15  conduct.

16         For example, there are limitations on contacting other

17  represented parties including represented victims and

18  represented codefendants.  An attorney for a criminal defendant

19  cannot reach out and make direct contact with a victim who is

20  represented by an attorney, without first seeking permission to

21  do so from that attorney.

22         And a criminal defense lawyer representing a criminal

23  defendant cannot reach out to a represented codefendant without

24  going through the codefendant's attorney.

25         It's no different than limitations on pre- and

post-trial jury contact.  It is no different than limitations

on ex parte contact with the court or the court staff.  It is

no different than limitations on the number or length of

discovery requests and court filings.

It's no different than limitations on making public

statements that could taint the jury pool.  And it's no

different than limitations on lawyer advertising.  The

arguments that plaintiffs are making in this case, you could

make the same arguments about all of those restrictions on how

lawyers conduct themselves during ongoing court proceedings.

So because the statute at issue primarily regulates

conduct, it's subject to rational basis review.  Even if the

Court determines that the statute primarily regulates speech,

it merely regulates the manner of speech.  It regulates how a

conversation is initiated, not what is contained in the

conversation.

There's no content preference contained in the

statute.  And the message desired to be conveyed is completely

irrelevant to whether the requirement to make contact through

the prosecutor is triggered or not.

The statute applies, regardless of what the message is

to be conveyed, and therefore, it is a content-neutral time,

place, and manner restriction on speech, and at most, it's

subject to intermediate scrutiny.

The second question that Your Honor will need to

```
 1    answer in this case is whether the statute satisfies the legal

 2    standard.  The Attorney General thinks it clearly does.  And

 3    the statute -- it does so because the statute serves at least

 4    four compelling state interests.

 5           First, it implements and protects multiple

 6    constitutional rights found in the Arizona Constitution and in

 7    the Victim's Bill of Rights.

 8           Second, it regulates professional conduct of lawyers

 9    and their agents.  It's well established that the states are

10    permitted to do so, and that they have a compelling interest in

11    regulating attorney conduct, and the conduct of attorneys'

12    agents, particularly during ongoing criminal court proceedings,

13    which is the only time when this statute applies.

14           Third, the statute protects against retraumatization.

15    Plaintiffs' own expert will support that you need to be

16    extremely careful when you approach victims because there's a

17    high risk of retraumatization.

18           This statute merely protects situation where attorney

19    makes direct  -- defense attorney makes direct contact, and

20    that triggers retraumatization in the victim.

21           And fourth, it levels the playing field at least

22    somewhat, between victims who have the means and wherewithal to

23    retain counsel, and therefore are not subject to direct

24    contact, and those who can't or don't have the means or

25    wherewithal to obtain counsel.
```

1          The statute also leaves open ample channels of

2     communication.  First, it only applies when formal proceedings

3     are ongoing, and it applies to a narrow set of individuals.

4          Second, it only applies to counsel and agents retained

5     by the defendant.

6          Third, it does not restrict a victim from unilaterally

7     reaching out to defense or defense counsel.  It does not

8     prohibit a state court from lifting the restriction in

9     individual cases.

10          You will hear witnesses today tell Your Honor that

11     they have made requests to state courts to allow them to make

12     direct contact, even though the statute requires that that be

13     through the prosecutor.

14          The plaintiffs in this case admitted over and over

15     again in deposition testimony that they have asked state courts

16     permission to make direct contact with crime victims, and that

17     sometimes that request is granted, and sometimes it's not.  And

18     when it's not, they have a right to challenge those rulings on

19     appellate review.

20          Plaintiffs cannot identify a more narrow way to serve

21     each and all of the four compelling interests that are -- at

22     least four compelling interests that are served by the statute.

23     And so we think even if strict scrutiny applies, that the

24     statute would be facially constitutional.

25          Finally, this Court has applied the restriction that

1    is contained in 13-3344(b) on several occasions on federal

2    habeas review, concluding that the contact regulation is both

3    reasonable and non-burdensome.

4          And while I acknowledge the Court did not have First

5    Amendment challenge in front of it in those cases, we think

6    that the Court's instincts were correct.  That it is a

7    reasonable regulation on attorney conduct, and that it's

8    non-burdensome.  Therefore, we would ask that Your Honor grant

9    judgment in favor of the defendants and deny the plaintiffs'

10   request for declaratory judgment or injunctive relief.

11         THE COURT:  Counsel, thank you very much for your

12   words.  Before I ask the parties questions, I have the exhibit

13   list here.  And I'm pretty sure both sides have met and

14   conferred about these exhibits.

15         The plaintiffs' list, I have form letter to victims.

16   Is there any objection from the defense?

17         MR. CATLETT:  No, Your Honor.

18         THE COURT:  They are received.

19         MR. LANE:  We will stipulate to all defense exhibits

20   that we --

21         THE COURT:  Just one second, please.  I'm sorry,

22   counsel, what was that?

23         MR. LANE:  We will stipulate to the admission of any

24   unobjected to exhibits from the defense as well.

25         THE COURT:  Do you have any?  I have 100 through 112.

1    Do you have any objections to any of those?

2             MR. LANE:  I believe we do not.  I think the ones we

3    objected to were the declarations, and we objected to them

4    under the hearsay rule.  I am not sure what those were

5    numbered.

6             MS. BRODY:  I believe those were removed from the

7    defendants' list; is that correct?

8             THE COURT:  Okay.  Do you have a copy of the defense

9    exhibit list?

10            MR. CATLETT:  Yes, Your Honor.

11            THE COURT:  Can you just walk over to plaintiffs and

12   show it to them and find out what they object to.

13            MR. CATLETT:  It was Exhibits 111 and 112, and we did

14   not withdraw them.  And I believe the  objection to those -- to

15   111 and 112, at least at the time of the prehearing state --

16            THE COURT:  First of all, if you are talking, the

17   court reporter has to type it up.  If you are talking to

18   opposing counsel, you need to move away from the microphone.

19   So you guys, go meet and confer about the issue, and then we

20   will talk about it on the record.  If you other lawyers need to

21   stand with them, go ahead.

22            (Discussions held between counsel.)

23            MR. LANE:  We were objecting to 111 and 112 on the

24   grounds that they are hearsay, Your Honor.  They are

25   declarations.  We object to those.  We have no objection to

1    their other exhibits.

2            THE COURT:  Okay.  Without objection, Exhibits 100

3    through 110 will be received into evidence.

4            (Exhibit Numbers 100 through 110 are admitted.)

5            THE COURT:  And what I need all the lawyers to do, if

6    you use the ELMO, or you use your laptops to show me an

7    exhibit, what I want you to do is just tell me what it is.

8            Also, we have nine lawyers here, so I need you all,

9    when you start talking, to tell me who you are so the record

10   reflects who's speaking.

11           And at the time that the defense offers the

12   declaration of Amy Bocks and the declarations spelled out in

13   112, we will address those objections specifically.

14           At this point, I have some questions for the parties

15   before we go into the substance of why we are here today.  And

16   again, when you answer the question, I know there are a lot of

17   you here, let me know who you are, and you can answer from

18   counsel table.  I will just ask you to pull a microphone over

19   so you can make sure that we have a record of what's being

20   said.

21           All right.  This is for the plaintiffs.  Are you

22   seeking to enjoin the enforcement of Arizona Revised Statute

23   13-4433(b) in its entirety, or only against attorneys and

24   agents of the defendants.

25           MR. LANE:  Your Honor, David Lane.  We are seeking

1   only to enjoin its enforcement against attorneys and their

2   agents.

3           THE COURT:  Okay.  The second question I have.

4   Constitutionally, what's the difference between the statute at

5   issue here, and restrictions against lawyers contacting

6   represented parties?

7           I will ask the question again.  Constitutionally,

8   what's the difference between the statute at issue here, and

9   the restrictions against lawyers contacting represented

10  parties.

11          MR. KEENAN:  Your Honor, Jared Keenan on behalf of the

12  plaintiffs.  Your Honor, the difference -- and it sort of

13  strikes at the heart of this statute, is the rules and

14  regulations on attorney conduct, including the prohibition on

15  reaching out directly to represented parties, is different than

16  this statute.  Because this statute doesn't regulate attorneys

17  generally.  It specifically and only represents one type of

18  attorney, criminal defense attorneys and those working for

19  defense team.  So that, Your Honor, is the difference between

20  a -- constitutionally, between this statute and any other

21  general regulation of attorney conduct.

22          MR. LANE:  David Lane.  I add that, Your Honor, that

23  the examples given by the state about how this is no different

24  than regulating discovery,  this is no different than not

25  talking to represented parties, all of those things are

1   designed to enhance the reliability and the integrity of the

2   system.  Reaching out to a represented party undermines the

3   integrity of the system, because you are doing an end run

4   around a lawyer.

5          This statute that we are seeking to hold

6   unconstitutional has nothing to do with the integrity or the

7   reliability of the entire system.  This simply skews the

8   system.  So that is a very, very important distinction between

9   the two.

10          THE COURT:  Even though prosecutors don't represent

11   victims, isn't it true that victims are much more likely to

12   share the prosecution's goals than the defense's?

13          MR. LANE:  Most often that is absolutely true, Your

14   Honor.

15          THE COURT:  My last question for the plaintiffs.  Does

16   it matter that the defense team's ability to speak to the

17   victim is unrestricted if the victim consents?

18          I will ask you again.  Does it matter that the defense

19   team's ability to speak to the victim is unrestricted if the

20   victim consents?

21          MR. LANE:  Judge, in every case where the victim

22   consents to have a conversation with the defense team, it

23   doesn't matter that they are unrestricted.  But that would be

24   true even if the statute was unconstitutional.

25          What you are going to hear is testimony from our

1    experts -- not experts, but our witnesses and parties, that

2    will say, if a victim says, "I don't want to talk to you," the

3    response is, "Have a nice day."  They walk away.

4            If a victim decides to talk to a defense investigator,

5    they have unrestricted freedom to do so.  So that's the whole

6    concept of free speech.  You can say what you want to say to

7    whom you want to say it and engage in a conversation with

8    anyone.  And if they want to put restrictions on it, they can.

9    If they don't want to, they don't have to.  That's the nature

10   of free speech.

11           MS. BRODY:  Your Honor, if I may add one point to

12   that?  Kathy Brody.  And this just goes back to one of the

13   categories that I was talking about in opening, Your Honor.

14           It may be true that that communication can happen once

15   the victim consents under the plain language of the statute,

16   but one very important part of the evidence that you're going

17   to hear today, Your Honor, is that the statute chills more

18   speech than what is just prohibited by that statute, beyond

19   what is prohibited.

20           THE COURT:  Thank you, plaintiffs.

21           I have a few questions for the defendants at this

22   point.  First question is, besides special ethical rules for

23   prosecutors, do you know of any other regulations that have

24   been held to regulate professional conduct rather than speech

25   that explicitly apply to only some members of that profession?

1          That's a very long question.  I will ask it again.

2   Besides special ethical rules for prosecutors, do you know of

3   any other regulations that have been held to regulate

4   professional conduct rather than speech that explicitly apply

5   to only some members of that profession?

6          MR. CATLETT:  Your Honor, Mike Catlett.

7          THE COURT:  Sir, I'm sorry.  We're in federal court.

8   We stand up.

9          MR. CATLETT:  Sorry, Your Honor.  I do think there are

10  restrictions on discovery and how particular parties in

11  particular types of cases obtain information during discovery.

12          You see that, I think, in the civil side with respect

13  to information that -- for example, in tort cases, that

14  particular sides of the case may want to obtain information

15  from a victim of a tort, and may want to obtain, for example,

16  an independent medical examination.  There are rules and

17  regulations that govern how someone goes about doing that.

18  So -- and the state doesn't see this as any different than

19  those types of regulations.  Information can be exchanged

20  between the victim and the criminal defense attorney.  All that

21  needs to happen is a request needs to be made through the

22  prosecutor.  The prosecutor is required to present that request

23  to the victim.  If the victim consents, then there can be

24  information flow between the victim and the criminal defense

25  attorneys.  And we don't think that arrangement is any

1    different than some of the other discovery-type arrangements

2    you see in other types of cases.

3              THE COURT:  Thank you very much.

4              Is there any justification for the statute that isn't

5    based on an assumption that the content of defense attorney's

6    speech towards a victim will be more harmful than the content

7    of a prosecutor's speech towards a victim.

8              I will ask it again.  Is there any justification for

9    the statute that isn't based on an assumption that the content

10   of a defense attorney's speech toward a victim will be more

11   harmful than the content of a prosecutor's speech towards a

12   victim?

13             MR. CATLETT:  Yes, Your Honor.  As I stated during

14   my -- Mike Catlett again.  As I stated during my presentation

15   on opening, one of the compelling interests that the statute

16   serves is it implements various rights that are contained in

17   the Arizona's Victim's Bill of Rights.

18             So, for example, a victim has a right to refuse an

19   interview during the criminal court proceedings.  That right

20   doesn't turn on whether the criminal -- that right does not

21   turn on how the criminal defense lawyer might comport

22   themselves during that interview.  And I think they have the

23   same -- the victim has the same right vis-a-vis the

24   prosecution.

25             This particular regulation furthers that interest

1    because, and I think you'll hear some testimony today about

2    this, we certainly designated some deposition testimony about

3    it.

4            Several of the plaintiffs have testified that if they

5    get the injunction they are requesting from the Court in this

6    case, and they approach victims to contact them or interview

7    them, they do not plan on informing the victim that they have

8    that right to refuse the interview.  And so this statute, we

9    think, furthers that right.

10           The form letters that, at least the Attorney General's

11   Office sends to victims upon request by a criminal defense

12   attorney inform the victim of that right.  And so we think

13   that's an important part of the statute, and it's an important

14   interest that's in the Victim's Bill of Rights that is

15   furthered by this particular regulation.

16           THE COURT:  Is contact by the defense necessarily more

17   harmful to victims than contact by the prosecutor or anyone

18   else involved in the legal system?

19           That's the first part of the question.

20           And what evidence is there that contact by the defense

21   team specifically is harmful to the victims?

22           MR. CATLETT:  Your Honor, I don't think contact by a

23   defense attorney is necessarily and in all cases more harmful

24   than contact by anyone else that's involved in the system.

25           But what I do think is -- and there is some evidence

1    of this, and it is contained in our deposition designations.

2    Paul Ahler from the Attorney General's Office talked a little

3    bit about this in his deposition, and another representative of

4    the AG's Office named Amy Bocks talks about this in her

5    deposition.

6            We do think that the risk of retraumatization is

7    higher when someone who is directly connected with the

8    individual that perpetrated a crime and caused the person to

9    become a victim, we do think the risk is higher that

10   retraumatization is likely to occur in those cases.

11           I am not here to tell you that on balance criminal

12   defense attorneys are unprofessional, or that they will go

13   around trying to retraumatize people.

14           But I think it's a matter of just human nature, that

15   if someone that is directly connected with the person that has

16   caused you to become a victim makes contact with you, the risk

17   is higher that that is going to result in retraumatization or

18   revictimization.

19           There's evidence in the record of that reality.  And I

20   think the Arizona Legislature, it's not unreasonable or

21   irrational for the Arizona Legislature to come to that

22   conclusion in enacting this regulation.

23           THE COURT:  Ordinarily in the time, place, or manner

24   analysis, courts consider whether there are alternative

25   channels for the same speaker to communicate the same message

1    to the same audience but in a different time, place, or manner.

2            So why should I consider the fact that the statute

3    allows other speakers to communicate with victims as an

4    alternative channel for communication, and is there any

5    precedent for doing so, that you know of?

6            MR. CATLETT:  Again, Mike Catlett.  Your Honor, we

7    think that's one minor part of the analysis of whether there

8    are alternative open channels to communication.  That's not

9    really even the core of our argument.

10           The core of our argument is that really this only

11   applies in ongoing formal proceedings.  So it doesn't apply if

12   there's not an actual case that's pending.

13           THE COURT:  I am just curious what the position of the

14   defense happens to be on that issue.

15           MR. CATLETT:  On the issue of alternative open

16   channels of communication?

17           THE COURT:  Correct.

18           MR. CATLETT:  We think the statute leaves open

19   multiple additional avenues, including the criminal -- I'm

20   sorry -- the victim reaching directly out to the defense.  The

21   victim consenting.  Someone that is not connected to the

22   defense team making contact.

23           And so we think that there are alternative channels of

24   communication sufficient to satisfy intermediate scrutiny, if

25   that's the test Your Honor thinks applies.

1          THE COURT:  Why are prohibitions against harassment

2     and unprofessional conduct insufficient to protect the state's

3     interest in ensuring victim's rights?

4          MR. CATLETT:  Again, Your Honor, Mike Catlett.

5     Because we don't think that those adequately serve the

6     compelling interest of the state that we have identified.

7          Retraumatization can occur, even if the defense

8     attorney is not harassing the victim.  Just requiring the

9     victim to go and get an order of protection if a criminal

10    defense attorney or their agent is harassing the defendant

11    doesn't adequately serve all of the rights contained in the

12    Victim's Bill of Rights, including the right to refuse an

13    interview in the first place, which I was discussing earlier.

14         And so we don't think that those are sufficient to

15    serve all of the state's compelling interests.  Obviously that

16    might help serve an interest in not having victims be harassed,

17    but we think that there are more interests here than just that

18    narrow concern.

19         THE COURT:  Why is a victim's rights under the Arizona

20    Constitution to refuse an interview with the defense team

21    insufficient to protect the state's interest?

22         MR. CATLETT:  Your Honor, as -- Mike Catlett again.

23         As I attempted to explain earlier, just the right

24    existing in the constitution we don't think is sufficient.  We

25    think victims need to know that that right exists, and

1       therefore, that they can exercise it.

2              And we think that that is more likely to occur if

3       contact is happening through the prosecution and therefore, the

4       prosecution, at that point in time, has an opportunity to fully

5       apprise the victim of his or her rights, and therefore, allow

6       the victim, with that full knowledge, to decide whether to make

7       contact with criminal defense attorneys or not.

8              THE COURT:  What's the defense position as to

9       plaintiffs' overbreadth count?

10             MR. CATLETT:  Your Honor, we think it fails for many

11      of the same reasons that the direct First Amendment violation

12      fails.  We don't think that this statute chills speech in the

13      way that plaintiffs are claiming.

14             Again, mostly for the same reasons, that the statute

15      leaves alternative channels for communication.  This really

16      isn't largely a regulation on speech.  It's a regulation on

17      conduct and how information is obtained during ongoing criminal

18      proceedings, and therefore, we don't think that there's any

19      overbreadth issue with the statute at all.

20             THE COURT:  Thank you very much.

21             Plaintiff, please call your first witness.

22             MR. LANE:  Thank you, Your Honor.

23             THE COURT:  You are very welcome.

24             MR. LANE:  We call Richard Burr.

25             THE COURT:  Mr. Burr, if you will walk up to the front

1    of the courtroom and raise your right hand to be sworn, please.

2                **RICHARD BURR, PLAINTIFFS' WITNESS, SWORN**

3              THE COURT:  Mr. Burr, please be careful walking up the

4    stairs.  I see you negotiated them properly.  We have had

5    people fall up the stairs, and we've had to take breaks because

6    of that.

7              So good morning to you.  And do you have some water up

8    there and cups?

9              THE WITNESS:  I do.

10             THE COURT:  Very well.  Sir, when you sit down, if you

11   can adjust the microphone and speak directly into it so all of

12   the lawyers can hear you.

13             Counsel, it's your witness.  Go ahead.

14             MR. LANE:  Thank you very much, Your Honor.

15             THE COURT:  You're welcome.

16                           DIRECT EXAMINATION

17   BY MR. LANE:

18   Q.  Good morning, Mr. Burr.  Mr. Burr, can you state your name

19   and spell your name for the record, please?

20   A.  Yes.  I'm Richard Burr, R-I-C-H-A-R-D.  B-U-R-R.

21   Q.  Mr. Burr, can you tell us what you do for a living?

22   A.  I'm an attorney.

23   Q.  And where are you licensed?

24   A.  In Texas.

25   Q.  Where do you reside?

RICHARD BURR - DIRECT EXAMINATION                    40

1    A.   I live in east Texas, about 80 miles north of Houston.

2    Q.   All right.  Have you ever lived in the State of Arizona?

3    A.   No, I haven't.

4    Q.   Have you ever been subject to the statute that we are

5    discussing here in court today?

6    A.   No.

7    Q.   All right.  Can you tell the court a little bit about your

8    background in context of being an attorney.  What kind of law

9    do you practice?  Where do you practice it?

10   A.   I first became an attorney in 1976.  Excuse me.

11        In 1979 I started doing capital defense work in the

12   southeastern United States.  By 1981, I devoted my entire

13   practice to capital defense work, and that's what I've done

14   ever since.

15   Q.   All right.  Can you tell the Court what kinds of capital

16   cases you have taken?  Federal?  State?  What states?  What

17   federal courts?

18   A.   Both.  I have done work in both state and federal cases.  I

19   was for -- in 1995, I was appointed as the capital defense

20   counsel for Timothy McVey in the Oklahoma City bombing case.

21   And I represented Mr. McVey through direct appeal.  Came back

22   into his case for successor habeas proceedings just before he

23   was executed in 2001.

24        I've had several other appointments in federal capital

25   cases.  Between 1997 and 2014, I was a member of a project

RICHARD BURR – DIRECT EXAMINATION

1   called The Federal Death Penalty Resource Council, funded

2   through the Administrative Office of the Courts to provide

3   consultation and assistance to capital defense teams in federal

4   capital prosecutions.

5          So I have had a number of exposures to federal capital

6   cases.  At the same time, I've always had state cases in a

7   variety of states, mostly in the southeastern United States,

8   but some in the west, and since I have been in Texas, all in

9   Texas.

10  Q.  Have you been deemed learned counsel by federal courts in

11  the United States?

12  A.  Yes, yes.

13  Q.  Do you have any idea as to how many times you have been

14  deemed learned counsel on capital cases?

15  A.  Well, that's a term of art used in the federal statute for

16  appointing counsel in federal capital cases.  I have been --

17  you know, in the McVey case, I was the learned counsel, so to

18  speak.

19         I have been learned counsel in about six other federal

20  capital cases, none of which went to trial, none of which have

21  the death penalty authorized.

22  Q.  Okay.  Mr. Burr, you have been practicing law since what

23  did you say?

24  A.  1976.

25  Q.  Are you familiar with the statute that is the subject of

1    this litigation?

2    A.   Yes.

3    Q.   And how did you become familiar with that?

4    A.   I first learned about it in a seminar that I taught in here

5    probably in the late '90s or early 2000s.  I have done a number

6    of presentations in capital defense seminars over the country

7    through the years.

8            And I was speaking in particular about defense

9    initiated victim outreach to a seminar here in Phoenix, I think

10   it was.  It may have been in Tucson.  I am not sure.  But a

11   number of years ago, at least 20 years ago, I first learned

12   about the statute then.

13   Q.   Okay.  Now, you've raised the issue of defense initiated

14   victim outreach, also known as DIVO.  Will you explain to the

15   Court exactly what DIVO is, how it developed, and what it is

16   all about?

17   A.   Sure.  It began, Your Honor, in connection with the McVey

18   case, the Oklahoma City bombing lead defendant.  We felt like

19   we had to figure out a way to have contact and outreach with

20   the victims, because there were so many.  It was just

21   overwhelming.

22           We began working with a pioneer in the field of

23   restorative justice, a professor at Eastern Mennonite

24   University named Howard Zehr, Z-E-H-R.  And he, and a graduate

25   student of his, helped us develop a way of reaching out to

1    survivors in that case.

2         Now, there were too many for us to reach out to, so we

3    focused on the 39 people whom the government noticed as victim

4    impact witnesses.

5         We sent letters to each of them explaining who we

6    were, expressing our deepest sympathy for what had happened to

7    their loved ones, and offered to speak with them, if they

8    wanted to speak with us.

9         We also said that a person who was working with us

10   would be in contact with them, if it was easier to talk with

11   somebody not a lawyer on the case.  That was Dr. Zehr's

12   graduate student.  A few people talked with us, not many.

13        And then the case went to trial.  And about a year

14   after the trial, a number of the survivors of the people killed

15   in the case contacted us and wanted to meet with us.

16        And like I said, about a year we met in Oklahoma City

17   with 25 survivors, spent a day talking with them and them with

18   us.  And we all learned a lot about what had happened and what

19   they needed and what we might have provided had we been more

20   adept at what we were doing.

21        From that point forward, we began to develop, in a

22   fairly systematic way, a practice for defense teams to making

23   outreach with survivors.  And it involves a number of

24   principles that are really important that guide the work.

25        The first is to recognize there is a chance of

1    retraumatization, for the reason that the defendants' counsel

2    has mentioned, and that is, we are connected to the person that

3    they believe killed their loved one.  And that's frightening.

4          So we thought that the best way to reach out would be

5    for there to be a liaison, a person who was not a part of the

6    defense team, but who was engaged by the defense team, to make

7    outreach, and to in a sense become representatives of the

8    victims to the defense team.  That was the first step.

9          The second thing that evolved was to realize that all

10   we could do was to make an offer to survivors.  I will say

11   "survivors" because it's always capital cases that I work in,

12   to make an offer to survivors.

13         If they wanted to talk to us, we would be happy to

14   talk to them about anything they wanted to related to the case.

15   And it was always on their terms.  However they wanted to do

16   it, if they wanted to ask questions of us or make comments to

17   us through the liaison, that was fine, or if they wanted to

18   meet with us directly, we would arrange that.  It was totally

19   up to them.

20         And the communication was totally initiated by them

21   and guided by them.  We tried to respond -- the next component

22   is, if they did engage and they asked questions, we tried to

23   answer them, as best we could.  If we couldn't, because of our,

24   you know, defense needs of the client, we would explain why we

25   couldn't answer them.

1           And throughout the process, it was totally guided by

2    survivors and their interests and their concerns.

3           If they raised questions about whether the case could

4    be -- a trial could be avoided, we would say, yes, there is a

5    way to do that.  And we would talk with them about that.  But

6    we did not ask them for that.  We did not say, "Would you come

7    to the position of not supporting the death penalty?"  We never

8    do that.  Some people come to that position themselves, some

9    survivors.

10          Some survivors realize it's a protracted process and

11   they'd like it to be over.  And that often, you know, leads to

12   pleas that will take their interests into account, and plea

13   agreements that explicitly account for their interests.  That's

14   how the process has unfolded and evolved and how we teach it

15   and guide it.

16   Q.  Let me ask, the -- it's called Defense Initiated Victim

17   Outreach, do you go through prosecutors' offices and get

18   permission before the defense team initiates this victim

19   outreach?

20   A.  No.  We let prosecutors know, because we don't want

21   prosecutors to be blindsided.  We want -- if we make contact,

22   and a survivor says, you know, I got contacted by these people,

23   what should we do, we want them to know in advance that that

24   might happen.  And to the extent they are willing, we sit down

25   and talk with them about the process that we engage in and why

RICHARD BURR - DIRECT EXAMINATION                    46

1    we do it.

2              So -- but we don't ask their permission.  That's

3    critical because the outreach is from us to survivors.  And no

4    matter how honest and forthright prosecutors are, the fact that

5    it comes through a prosecutor suggests to survivors that they

6    shouldn't talk with us.  That's been the practical reality.

7              Even if prosecutors try to be utterly neutral about

8    it, that happens.  So we don't do it in a vacuum.  We do it

9    openly.  But we do not ask for permission.

10   Q.  In your experience, since the DIVO process really began to

11   be developed, can you give us an estimate of what percentage

12   victims in capital cases, their families, avail themselves of

13   DIVO's offer to communicate with them?

14   A.  I know mostly about federal cases, because I was involved

15   in that project for 17 years.  And that was where we really

16   developed the basic process.  And in the federal cases,

17   growing -- you know, increasingly, defense counsel do engage in

18   the process of outreach.  And I would say, of the cases in

19   which defense teams make outreach, probably 25 percent, maybe

20   30, maybe a third of the cases survivors get engaged and want

21   to have contact.  It's many more than I thought it would be

22   when we started this, and there's some reasons I have come to

23   understand for that, but --

24   Q.  What are those reasons?

25   A.  Well, it comes from a very fundamental principle of

UNITED STATES DISTRICT COURT

RICHARD BURR – DIRECT EXAMINATION

1    restorative justice.  Restorative justice understands a crime

2    as part of a three-part process.  There's the offender, there's

3    the victim, and there's the community.

4          And when a crime is committed, an offender creates an

5    obligation to the victim of the crime, or the survivor in a

6    murder.  The community has obligations, and the community has

7    obligations both to victims and the defendant.

8          And the obligation between the defendant, or an

9    offender, and a victim or survivor, arises because the very act

10   of committing a crime creates a relationship.  Involuntary and

11   awful.  But there is a relationship between the person who

12   committed the crime and the victim of it, or the survivor of

13   it.

14         And that relationship is there no matter what anybody

15   does.  It can be ignored, or it can be acted on.  The

16   relationship is between the offender and the survivor in a

17   capital case.

18         And I have come to understand that it is that very

19   relationship which drives, often drives survivors to want to

20   have some information about the offender.  And in a number of

21   cases, has led ultimately, after a plea agreement, to meetings

22   between defendants and survivors, where, you know, there was a

23   mediator kind of facilitating the meeting.

24         But it offers some ability for survivors to come to

25   some real peace about the relationship.  The relationship is

RICHARD BURR - DIRECT EXAMINATION

1  not going to keep haunting them, because they are going to

2  understand, as much as could be understood, about what

3  happened, why it happened, how it happened, and how could it

4  have been avoided.

5           Those are the kinds of questions that keep haunting

6  people and are, you know, the subject of nightmares and daytime

7  thoughts, intrusive thoughts.  So that relation -- you know,

8  positively working on that relationship is of immense value to

9  survivors in murder cases.

10 Q.  Have you got any standards or policies through DIVO

11 about -- you do your initial outreach, and I think you said you

12 send a letter to victims?  What if you hear nothing back from a

13 victim, what is next step?

14 A.  There are actually two letters that we've resolved to

15 sending.  One comes from the lawyer on the defense team, one

16 comes from the person we come to call the victim outreach

17 specialist, that liaison person.

18          The lawyer describes in general, you know, what the

19 invitation is and introduces the liaison.  The liaison says,

20 here's what I can do, if you are interested.  You know, I

21 can -- we can talk.  We can talk by phone.  We can meet.  I can

22 help you understand -- you know, if you have questions you want

23 to ask the defense team, I can help you get answers to them.

24          If there's no response at all, then the liaison gives

25 a phone call.  And if that person says no, that's it.  We make

1    it clear that the invitation is always there.  It's always

2    open.

3            If they want to engage, they are totally free to.  We

4    will always engage with them, if they choose to.  But there's

5    nothing pushy.  There's nothing -- it's not a -- I don't see it

6    as an investigative step, which is why we call it "outreach."

7            Investigation involves interrogating people, you know,

8    trying to get information from them.  This is not that kind of

9    process at all.

10   Q.  Have you ever been contacted by anyone who claims that the

11   mere receipt of a letter or two, or a phone call from someone

12   connected with DIVO, has retraumatized them?

13   A.  I have not had direct knowledge of that.  I have heard in

14   very rare instances that survivors have said that.

15           The truth is, I think that any contact with a survivor

16   of murder about the murder can be retraumatizing, because that

17   trauma is ever present.  It doesn't go away.  It can -- over

18   time, people learn to live with it and learn, you know, gain

19   some equilibrium in their lives and learn to live with that

20   loss in a way that can be okay.

21           But in the first few months and years, any incident,

22   any hearing, trials, are retraumatizing, because it brings up

23   the day that this happened.  And that is a retraumatization.

24   So it is subject to happening any time anybody contacts

25   survivors about a murder.

RICHARD BURR – DIRECT EXAMINATION

1    Q.  Including prosecutors?

2    A.  Absolutely.

3    Q.  Including police?

4    A.  Yes.

5    Q.  Including lawyers questioning witnesses in court?

6    A.  Yes.

7    Q.  Do you think or do you have any empirical knowledge of

8    whether simply being contacted by a defense representative is

9    any more or less traumatic than being contacted by a police

10   officer or a prosecutor?

11   A.  I don't know.  I mean, I don't know whether it is or not.

12   In my own experience and -- and I count as my experience all

13   the people I've helped over the years and worked with in this

14   effort, I don't think that our contact is any more traumatizing

15   than contact from the prosecution side of the case.

16           But one reason we decided that it was best to use an

17   intermediary, a liaison, is because it could be more

18   frightening to have direct contact with the team that is

19   representing this person in court.

20           The liaison, though they are engaged by the defense

21   team, they know nothing about the defendant.  They know nothing

22   about the crime, other than what's in the public record.  And

23   that's intentional.

24           Because we do not want the liaison to become in any

25   sense an advocate for the defense.  We want them to be neutral

RICHARD BURR - DIRECT EXAMINATION

1  about the defense.  You can stay neutral if you don't know

2  anything about it.  Their job is to focus on the needs and

3  interests and concerns of survivors.

4  Q.  You describe -- what is the defense team's interest in

5  doing this?  I mean, you are sending a neutral party in to talk

6  to victims.  I am understanding -- you tell me if I am wrong.

7       This neutral party has no agenda.  They are simply

8  there to get -- to offer themselves as a conduit between

9  defense team and victims, is that --

10 A.  Yes, sir.

11 Q.  Why would the defense team do that?

12 A.  We do it because we understand the relationship is between

13 survivors and our client, or is the person that survivors

14 believe are responsible for the death of their loved one.

15      And we are in the middle of that relationship.  And we

16 can ignore it, and for many years we have ignored it.  It goes

17 untended to.  What we have learned if we tend to it, in a

18 respectful and compassionate way, it can change the fundamental

19 dynamics of a case.

20      Survivors can become the people who want cases to be

21 resolved in a certain way.  When their interests are accounted

22 for, the criminal justice system can actually serve their

23 interests and collaterally it serves our client's interest.

24      In capital cases, it's never a good idea to go to

25 trial.  If you go to trial, you can get convicted and sentenced

1    to death.  If you don't go to trial, it's because you work out

2    a plea.  And the plea never involves a death sentence.

3           So we have the interest in avoiding trial.  We have an

4    interest -- we have understood that if we tend to that

5    relationship between our client and survivors, then that itself

6    can change the dynamics of a case and can make retribution look

7    different and be less harsh.

8           I mean, it's serendipity, you know, it is an odd thing

9    to not seek something that you want.  It's kind of -- in zen

10   there are these things called koans that make no sense if you

11   look at them with your logical, rational mind.  They are

12   contradictory.

13          But in the existence of human beings, if we tend to

14   relationships, the relationship itself can change everything

15   else.  And we have come to understand that.  And it can change

16   it for the collateral benefit of our clients, as well as for

17   the well being of survivors.

18   Q.  So is it fair to say that no DIVO representative is there

19   to push an agenda, to try to convince anyone not to seek the

20   death penalty, or any particular result in any particular case?

21   A.  Yes.  If we do what you just said, we are -- 99 times out

22   of 100 we will push people away.  And the effort to respect and

23   tend to that relationship will be impossible.

24   Q.  Has any bar complaint or other sanction been threatened by

25   prosecutors to your knowledge, outside of the State of Arizona,

1  for a work of a DIVO?

2  A.  No, not that I am aware of.  I mean, occasionally questions

3  arise.  Oftentimes, as Your Honor knows, capital defendants are

4  indigent, and there has to be money provided by the court for

5  defense services.

6        And one of the defense services that we have to ask

7  courts to provide money for is the victim liaison, the victim

8  outreach specialist.  So courts do know about it.

9        Occasionally questions come up, and prosecutors may

10  object to something about a contact.  And to my knowledge,

11  every time that's come up, if there's been a hearing, it has

12  been resolved by, you know, the incident being unpacked and

13  people come to understand what happened.

14  Q.  Do federal courts fund defense services, including DIVO?

15  A.  Yes.

16  Q.  And they do that knowing that this is what it is?  They are

17  not just writing a blank check for the defense?

18  A.  Absolutely.

19  Q.  You have to explain to a federal judge what DIVO involves,

20  and federal judges then sign off and pay for the DIVO?

21  A.  Yes.  It is very important to us that everybody understand

22  what we are doing, that we be as transparent as possible.

23  Q.  Will you talk a little bit about how you believe, or if you

24  believe, that the work that you are describing enhances the

25  integrity and truth seeking function of the criminal justice

RICHARD BURR – DIRECT EXAMINATION                    54

1    system?

2    A.   You know, I have come to understand that the truth seeking

3    function of the criminal justice system involves something more

4    than what happens at a trial.  Survivors in capital cases

5    especially, sometimes want cases to go to trial because they

6    think they are going to get all their answers to all of their

7    questions.  And invariably they are disappointed, because they

8    don't.  They don't have to hear from defendants at trial.  No

9    defendant ever has to testify, and often they do not.  So they

10   are hearing from prosecution witnesses and from defense

11   witnesses, but not the defendant.  And to survivors, the truth

12   does not come out.

13        So to the extent that the truth involves, back to the

14   restorative justice model, the defendant having obligations to

15   the victim and to the community, the truth can only be served

16   if a defendant can speak.

17        And in our adversarial system of justice, the

18   defendant cannot speak without paying a penalty for it.

19   Defendant can speak if a case can be resolved to the

20   satisfaction of everybody, and then allow speech.

21        So I think the bigger truth can be served by a case

22   that embraces survivors, or victims, and brings -- everybody

23   then starts working on those relationships, and that is the way

24   in which the arch of justice can move towards restoring people

25   to the best position they can be in.

1          THE COURT:  I'm sorry, Mr. Lane, before you ask your

2    next question, we are going to go ahead and take our morning

3    recess.

4          Court will be in recess until 10:45.  It's very warm

5    outside of the courtroom, so I will allow the parties to stay

6    in the courtroom.  You can't come north of the lectern here.

7    And just remember, all of the microphones are on, and you can

8    hear whatever you say in chambers.  So make sure you walk away

9    from the table, and the room is monitored by the U.S. Marshals

10   by way of these cameras.

11         Court is in recess until 10:45.

12         (Recess taken at 10:30 a.m.; resumes at 10:46 a.m.)

13         THE COURT:  This court will come to order.  All

14   parties present when the court last closed are present again.

15         Mr. Burr, you are still under oath.

16         Mr. Lane, please continue with your examination.

17         MR. LANE:  Thank you very much.  Just finishing up,

18   Your Honor.

19         THE COURT:  Thank you so much.

20   BY MR. LANE:

21   Q.  Last question-ish, Mr. Burr.  Lawyers never say "last

22   question" because it's never true.

23         THE COURT:  Does the "ish" change that?

24         MR. LANE:  Yes, it does.  Last question-ish.

25         THE COURT:  Students back there, remember this, okay?

56

```
 1              MR. LANE:  It's a term of art.

 2    BY MR. LANE:

 3    Q.  Do you believe that the DIVO process involves conduct or

 4    speech?

 5    A.  I think it involves speech, in a rather pure sense.  It is

 6    an invitation to survivors to speak and to be heard, and in the

 7    process, of course, there's speech from those making the

 8    invitation.  So it is all about communication.

 9              MR. LANE:  Thank you, sir.  I have no further

10    questions.

11              THE COURT:  Is there any cross-examination,

12    Mr. Catlett?

13              MR. CATLETT:  Yes, Your Honor.

14              THE COURT:  Come on up, please.

15                         CROSS-EXAMINATION

16    BY MR. CATLETT:

17    Q.  Morning, Mr. Burr.

18    A.  Good morning.

19    Q.  Thank you for being here this morning.  We've not had an

20    opportunity to meet.  My name is Mike Catlett, and I represent

21    the Arizona Attorney General in this matter.

22    A.  It's nice to meet you.

23    Q.  You testified earlier a bit about the Oklahoma City

24    bombing; do you remember that?

25    A.  Oh, yes.
```

RICHARD BURR - CROSS-EXAMINATION                57

1   Q.  And how many victims, would you say, were created as a

2   result of that tragic incident?

3   A.  Well, there were 168 people killed, and all of those people

4   had family members.  You know, just the direct survivors,

5   family members of those folks numbered close to a thousand.

6          There were also many people injured who did not get

7   killed, and there were studies done of Oklahoma City that said

8   about 50,000 people in Oklahoma City experienced symptoms of

9   PTSD after the bombing, so it was enormous.

10  Q.  And how many victims, direct or indirect, did you say you

11  reached out to?

12  A.  We focused on the 30 -- well, there were 39 people noticed

13  by the government as victim impact witnesses.  Now, some of

14  those people were firefighters, police officers, medical

15  examiner's office personnel.  Most of them though, of the 39,

16  probably 30 to 33 or 34 were family members.  We focused on

17  those folks.

18  Q.  And you were not subject to a victim contact regulation in

19  that case, correct?

20  A.  No.

21  Q.  You testified that not many agreed to speak with you,

22  correct?

23  A.  That's correct.

24  Q.  Do you recall the expert report that you provided for

25  Mr. Lane in this case?

RICHARD BURR - CROSS-EXAMINATION                    58

1    A.  Yes.

2    Q.  Am I correct that was a two-and-a-half-page letter to

3    Mr. Lane?

4    A.  Yes.

5    Q.  And you had not discussed the issues in the case with any

6    of the individual plaintiffs prior to issuing your report,

7    correct?

8    A.  I had not.  I had only talked with Mr. Lane.  And I think

9    I -- I think I have seen the initial pleadings.

10   Q.  And so at the time you issued your report and sat for your

11   deposition, you did not know whether any of the plaintiffs in

12   this case actually utilized defense initiated victim outreach,

13   correct?

14   A.  I did not know that in fact.  I knew that in capital cases

15   we have been teaching these principles for many, many years,

16   and I knew that a number of capital defense lawyers from

17   Arizona had been a part of those seminars.  In fact, there was

18   one in Tucson focused on that.

19           So I am assuming that people, were they able to do it

20   in capital cases, at least in federal cases, and I know in some

21   of the federal cases people did employ it.

22   Q.  But you didn't know whether any of the particular

23   defendants in this case utilized that?

24   A.  I did not.

25   Q.  And you offered two opinions in this case, correct?

RICHARD BURR – CROSS-EXAMINATION

1    A.   I don't know if I can parse the opinions in number, but --

2    Q.   That's fine.  But one of the things you've testified to, or

3    one opinion you gave, is that defense initiated victim outreach

4    needs to be done in a particular way, correct?

5    A.   Yes.

6    Q.   And the second opinion you have offered is that when

7    defense initiated victim outreach is done, and family members

8    choose to engage with the defense team, the results are, from

9    what have you seen, often very helpful, correct?

10   A.   Yes, if they choose to engage.

11   Q.   And those two opinions are based on your personal

12   experience with DIVO, correct?

13   A.   Yes, both in my own practice in my own cases, and in

14   consulting with other defense lawyers and victim outreach

15   specialists, and the ongoing work in their cases.

16   Q.   So let's first talk a little bit about that experience.

17   You are a member of the Texas bar?

18   A.   Yes.

19   Q.   You are currently only a member of the Texas bar?

20   A.   Currently, yes.  I have been a member of three other bars,

21   but having had no contact with those states in many years, I

22   resigned from them so I didn't have to keep paying dues.

23   Q.   And you have never been a member of the Arizona bar,

24   correct?

25   A.   Have not.

RICHARD BURR - CROSS-EXAMINATION                    60

1    Q.  Your primary experience as a lawyer is defending or

2    consulting on capital cases?

3    A.  Yes, for the last 41 years, I guess -- actually, yeah, 43

4    years.

5    Q.  You have never served as a prosecutor?

6    A.  I have not.

7    Q.  You have never represented a victim of a crime?

8    A.  No.

9    Q.  Including in Arizona?

10   A.  Including in Arizona.

11   Q.  You have no experience outside of capital cases in

12   defending criminal cases, do you?

13   A.  That's correct.

14   Q.  You have no experience defending any criminal cases in

15   Arizona, correct?

16   A.  Not directly, that's true.

17   Q.  Including capital cases?

18   A.  Including capital cases.  I have consulted on some capital

19   cases here, but I have not been counsel.

20   Q.  And so you have no experience outside of capital cases, in

21   terms of reaching out to victims and survivors, correct?

22   A.  That's correct.

23   Q.  And you don't know in what percentage of criminal

24   prosecutions in Arizona are capital cases, do you?

25   A.  I don't.

61

1   Q.  You have never been subject to terms A.R.S. Section

2   13-4433(b), have you?

3   A.  No.

4   Q.  You have never made a request for victim contact under that

5   statute, right?

6   A.  No.

7   Q.  You can't tell the Court what percentage of cases in

8   Arizona that survivors of crime agree to DIVO, can you?

9   A.  I cannot.

10  Q.  You have never been subject to the terms of Arizona Rule of

11  Criminal Procedure 39, have you?

12  A.  No.

13  Q.  You have never made a request to an Arizona State Court

14  Judge to be excused from Section 13-4433(b), have you?

15  A.  No.

16  Q.  You don't know whether DIVO is used by anyone in Arizona,

17  do you?

18  A.  I don't know.

19  Q.  There are only probably 15 or 20 people around the country

20  who have made a practice of utilizing DIVO, correct?

21  A.  Well, there are 15 or 20 -- probably a few more than that

22  by now who are victim outreach specialists, you know, who are

23  not -- some of them are lawyers, but for the most part they are

24  not lawyers.

25          They come from a variety of backgrounds, but they all

1    have had intense training on how to go about reaching out to

2    survivors in capital cases.  There may be a few more than that

3    now, but there are people who have been trained in virtually

4    every state in the country, or at least every region in the

5    country.

6    Q.  I appreciate that, and we will get to that intense training

7    in a second.

8            What percentage of noncapital criminal cases in

9    Arizona attempt to use DIVO, do you know?

10   A.  I have no idea.

11   Q.  And I believe you just testified about this, but DIVO

12   involves an individual that is called a DIVO specialist,

13   correct?

14   A.  Yes.

15   Q.  And DIVO specialists have specialized -- and I think the

16   term you just used is intense -- training in reaching out to

17   crime victims or survivors, correct?

18   A.  Yes.

19   Q.  You are not a DIVO specialist, correct?

20   A.  I am not.  I have helped train them.  I have observed the

21   trainings, and I have, you know, been a faculty in trainings,

22   but I am not a victim outreach specialist myself.

23   Q.  Do you know how many individuals located in Arizona are

24   trained as DIVO specialists?

25   A.  There is one person I can think of immediately whom I have

RICHARD BURR – CROSS-EXAMINATION

1  known for many years.  There may be others that I just don't

2  know -- or don't remember.

3  Q.  But sitting here this morning, you are only aware of one

4  trained DIVO specialist in Arizona?

5  A.  That's the only person I can recall, but I am 73 years old

6  and my memory is fairly poor.  You will learn one of these

7  days.

8  Q.  I fear I am quickly approaching.

9       I want to talk first a little bit about the first

10 opinion we discussed, which is that there's a particular way

11 that victim contact should happen.  DIVO is not an

12 investigatory tool, correct?

13 A.  That's correct.

14 Q.  And I think you testified earlier, that's largely because

15 investigation involves interrogating someone, correct?

16 A.  It involves trying to get information from people that will

17 help the defense, or will help the prosecution if you are a

18 prosecution investigator.  So it is -- it's pushy, you know.

19 It's pushy.  And it's trying to extract information.

20      This process is offering a bridge of communication, if

21 desired, and there's nothing pushy about it.

22 Q.  Investigation is pushy, correct?

23 A.  Generally, yes.

24 Q.  So in other words, DIVO is not used by the defense to

25 uncover facts that are helpful to the defense, correct?

1    A.   That's correct.  Incidentally, facts helpful to the defense

2    often come out, but it's because people offer them.  And now,

3    you know, in cases in which -- Ms. Brody mentioned that a

4    number of capital cases in Arizona involve murders within

5    families.

6            Those cases obviously have to have some investigation

7    done with respect to other family members.  Particularly if,

8    you know, they experienced the event where people were

9    murdered.  That's done by investigators.

10   Q.   But uncovering helpful evidence is not the primary purpose

11   of DIVO, correct?

12   A.   No, it's not.  It can happen, but it's not the purpose.

13   Q.   And creating mitigating evidence for the criminal defendant

14   is not the primary purpose of DIVO, correct?

15   A.   That's correct.  Again, it can happen, and -- I didn't say

16   this before, but it's probably worth mentioning in response to

17   your question.

18           If there is engagement with survivors, we talk with

19   our clients about that.  We let them know what's going on.

20   Because they are in that relationship, in some form they are in

21   it.

22           And particularly -- I mean, for the clients about whom

23   there is no question about guilt, part of what can happen with

24   engagement with survivors is our clients can come to recognize

25   the obligations they have to survivors.

1          And that can change their approach to their own cases,

2    and it can change the approach of the defense to the case.  And

3    in a large sense, can become mitigating.

4    Q.  I want to make sure that I have a clean answer for the

5    record.

6          The primary purpose of DIVO is not to create

7    mitigating evidence for the criminal defendant, correct?

8    A.  That's correct.

9    Q.  And the primary purpose of DIVO is not to turn survivors

10   into folks who are going to be opposed to the death penalty,

11   correct?

12   A.  That's correct.

13   Q.  And so you are not offering an opinion in this case as to

14   investigatory contact with crime victims, correct?

15   A.  That's correct.  I am not offering an opinion about that.

16   Q.  You referenced the intensive training that a DIVO

17   specialist undergoes.  How much training are we talking about,

18   and what is the nature of that training?  If you can explain to

19   the Court, please.

20   A.  Typically it's a five-day training, and it involves both,

21   you know, lectures or presentations, and practical exercises.

22   There are lectures and presentations about trauma.  Trauma that

23   survivors of murder suffer.

24          There is often presentations by survivors of murder,

25   either who have been engaged in victim outreach in the cases

1    that they were involved in, or who were not but wish they had

2    been.

3           There are exercises, many exercises throughout the

4    period about how to talk with people.  You know, you role play.

5    People serve as survivors.  People serve as victim outreach

6    folks and have conversations.  So that's what the process looks

7    like.

8           The faculty involved observe all the students, and at

9    the end of it, they recommend who among the students they

10   are -- should go on and start doing the work.  Not everybody is

11   chosen.  And when they do engage in a case, they do it under

12   the mentorship of a very experienced outreach specialist.

13   Q.  Thank you.  DIVO specialists are trained to make contact

14   with victims or survivors in a particular way, correct?

15   A.  Yes.

16   Q.  And the training involved to be a specialist has to do with

17   a lot of training about trauma as a victim or survivor of

18   homicide, correct?

19   A.  That's correct.

20   Q.  And the training involves how to reach out to victims or

21   survivors of trauma, keeping in mind the experiences those

22   people have had, and how to do that compassionately and

23   respectfully so as to not impose additional trauma, correct?

24   A.  That's correct.

25   Q.  And DIVO principles are developed to try to avoid

1    retraumatization to the extent possible, correct?

2    A.  Yes.

3    Q.  Is that a yes?

4    A.  Yes.

5    Q.  And this is not training that you received as a criminal

6    defense lawyer, correct?

7    A.  That's correct.

8    Q.  And some people are suited to make contact with victims and

9    others are not, correct?

10   A.  That's correct.

11   Q.  And that includes some people that take the training.  You

12   mentioned that some are cut from that process, correct?

13   A.  Yes.

14   Q.  And you are not suited, correct?

15   A.  I am not.  The reason is, it's very important for a victim

16   outreach specialist to be focused on survivors, on victims.

17   And I have been a lawyer for, I don't know, 46 years, and I am

18   an advocate to my core.

19          And I did try.  In one Texas case I tried to serve as

20   a victim outreach person.  And the survivor talked with me.

21   She was very gracious.

22          And I started mitigating my client -- or not my

23   client, but the client in the case to her.  And she was

24   gracious, but, you know, it sort of set off -- cut off the

25   conversation.  So I don't trust myself to do it because I

1   can't.  It is an important lesson I learned.

2   Q.  And you can't do it because you have been a criminal

3   defense attorney for 46 years?

4   A.  I can't not mitigate my client.  That's what I have done

5   all these years, and it is in my DNA.

6   Q.  I think you testified at your deposition that you didn't

7   think you did very well with that victim, correct?

8   A.  I did very poorly.

9   Q.  Because you found yourself what you teach people not to do,

10  which was to advocate with her on your client's behalf,

11  correct?

12  A.  Exactly.  I mean, in my defense, I knew a lot about the

13  client.  It was a case that I had been involved in from the

14  time I was with the NCCPA legal defense fund for years.  I have

15  never been counsel, but I had filed an amicus brief in the

16  Supreme Court in his case.  You know, I knew his case deeply.

17  And when you know a case deeply as a lawyer, your DNA causes

18  you to advocate.

19  Q.  And it's important not to get the roles of emissary and

20  advocate mixed up, correct?

21  A.  Absolutely.

22  Q.  And it's important to keep the specialist separate from the

23  defense team so that they don't get tainted by the advocacy

24  that is inherent in the defense team, correct?

25  A.  Yes.

69

1   Q.  And so the specialist is intentionally kept separate from

2   the rest of the defense team, right?

3   A.  Yes.  The only time the specialist would meet with the

4   defense team is when there's a discussion about the survivors

5   and what's going on, you know, with the outreach process.

6   Q.  And the specialist doesn't know what the theories of the

7   defense are, right?

8   A.  No.

9   Q.  And the DIVO specialist doesn't know much about the

10  defendant at all, right?

11  A.  That's correct, none other than, you know, what's available

12  in the public sources.

13  Q.  Switching gears a bit.  If a victim or survivor chooses to

14  engage in DIVO, it can often be beneficial to the victim or

15  survivor, that's one thing that you said in this case, correct?

16  A.  Yes.

17  Q.  But you have no opinion about whether contact by a DIVO

18  expert in instances when a victim chooses not to engage is

19  helpful to the victim, right?

20  A.  I don't know.  That's correct.  I assume it's not, unless

21  people change their mind and do decide to engage, but, no, if

22  there's no engagement, I know nothing about what's happening

23  with them.

24  Q.  Right.  And so DIVO only occurs if a victim or survivor

25  chooses to engage with a DIVO specialist, right?

1    A.   That's correct.

2    Q.   And that's an important part of the process, right?

3    A.   It is a very important part of the process.  It is guided

4    by survivors from the beginning.  Initiated -- the invitation

5    is made by us, but from that point on, it's guided by

6    survivors.

7    Q.   And when a crime victim is represented by counsel, the DIVO

8    specialist also deals directly with the crime victim's counsel,

9    correct?

10   A.   Yes.

11   Q.   And when the crime victim is not represented by counsel,

12   the DIVO specialist lets the prosecutor know that he or she is

13   making contact with the victim, correct?

14   A.   Yes.

15   Q.   Is that a yes?

16   A.   Yes.

17   Q.   And that's the approach that's respectful of prosecutors,

18   correct?

19   A.   Yes.

20   Q.   And you have always had an abiding concern about defense

21   teams making contact with victims or survivors in capital

22   cases, correct?

23   A.   Well, I have since we started this effort.  Before the

24   McVey case, I was -- you know, I occasionally made contact with

25   survivors in my cases, but not systematically, and it was

RICHARD BURR – CROSS-EXAMINATION

1   always to get their help.

2   Q.  So your experience in interaction with survivors and

3   victims after the Timothy McVey case has created an abiding

4   concern with you about defense teams making contact with

5   victims or survivors in capital cases, correct?

6   A.  Yes.

7   Q.  And because if it's done incorrectly, it could result in

8   additional trauma, correct?

9   A.  It could result in additional trauma and could actually

10  increase the antagonism within the trial -- you know, the

11  proceedings.

12  Q.  I think you have testified to this this morning, but DIVO

13  can also be beneficial to the defense, correct?

14  A.  Yes.

15  Q.  And if a DIVO specialist obtains exculpatory evidence from

16  a victim or survivor, you have decided that the specialist will

17  say to the defense team, "I have learned something that may be

18  exculpatory, but I can't tell you what it is because they have

19  asked it to be confidential," correct?

20  A.  If that happens, yes.

21  Q.  And the defense team then may ask the specialist to talk

22  with the victim some more and see if over time they may be

23  willing to have the exculpatory information disclosed, correct?

24  A.  Yes.

25  Q.  And one of the core principles of DIVO that cannot be

RICHARD BURR - CROSS-EXAMINATION

1  deviated from is that the defense, unless there's some

2  invitation by a survivor, should not be advocating with the

3  survivor for a particular outcome, correct?

4  A.  That's correct.  And even if there is an invitation, what

5  the outreach specialist or the defense team, if they are

6  involved directly, needs to do is to provide information and to

7  provide examples from other cases about what things might look

8  like.  For example, plea agreements that could take interest of

9  survivors into account.  What that might look like.

10 Q.  The defense should not be trying to turn the survivor into

11 a defense tool, correct?

12 A.  Absolutely.

13 Q.  And it's important not to do that, because you don't want

14 to disrespect or retraumatize survivors, correct?

15 A.  That's correct.

16 Q.  And it's important not to do that because survivors will

17 get angry and cut off any contact and become stronger advocates

18 for the death penalty than they might have been otherwise,

19 correct?

20 A.  Yes.

21 Q.  And another reason you don't do that is because you don't

22 want to disrespect or retraumatize survivors, correct?

23 A.  Yes.

24 Q.  And another reason you don't do it is because you don't

25 want to increase people's suffering, correct?

RICHARD BURR – CROSS-EXAMINATION

1   A.  Yes.

2   Q.  And you can't know until you make initial contact with

3   somebody if it's going to be traumatizing, correct?

4   A.  We know that any time a survivor is contacted about what

5   happened, it's potentially retraumatizing, whoever does that.

6   So we design our contact to try to be compassionate and kind

7   and very open-handed and offering.  And we think that's the

8   best way to go about it, to minimize the retraumatization.

9        We know that it will happen, simply by virtue of

10  bringing up the subject.

11  Q.  So you can't say that no victim has been retraumatized as

12  a result of DIVO, can you?

13  A.  No, I can't say that.

14  Q.  In fact, you know of one case in Lubbock, Texas where there

15  was an initial victim contact by letter, and the victim

16  outreach specialist learned from the prosecutor's office that

17  the contact was traumatizing, correct?

18  A.  Yes.

19  Q.  And if a crime victim or family member of a crime victim

20  proactively contacts defense team members in Arizona, nothing

21  in Section 13-4433 prevents interactions between a DIVO

22  specialist and the crime victim or family member, correct?

23  A.  Well, I am not a practitioner here, and I don't know the

24  ins and outs of that, but there will be practitioners

25  testifying, so I think that's a question that's better directed

1    to them.  I don't know.

2    Q.   Thank you for your time this morning, Mr. Burr.

3            MR. CATLETT:  Your Honor, I have no further questions.

4            THE COURT:  Mr. Lane, do you have any redirect?

5            MR. LANE:  No redirect, Your Honor.

6            THE COURT:  Subject to recall, plaintiffs?

7            MR. LANE:  Can he be excused, Your Honor?  He has a

8    plane to catch.

9            THE COURT:  Recall, Mr. Catlett?

10           MR. CATLETT:  No, Your Honor.

11           THE COURT:  Mr. Burr, thank you so much for testifying

12   this morning.  You are excused.  Please be careful walking down

13   the back stairs there.  Have a wonderful weekend coming up,

14   okay?

15           THE WITNESS:  Thank you, Your Honor.

16           THE COURT:  Next witness.

17           MR. KEENAN:  Your Honor, plaintiffs call Rhonda Neff.

18           MR. LANE:  Your Honor, may I walk with Mr. Burr for a

19   moment while this is ongoing?

20           THE COURT:  Yes, you may.

21           MR. LANE:  Thank you.

22           **RHONDA E. NEFF, PLAINTIFFS' WITNESS, SWORN**

23           THE COURT:  Ms. Neff, I think you were in the

24   courtroom.  Be careful walking up the back stairs there.

25   Adjust the microphone, speak directly into it.  And good

1    morning to you.

2              THE WITNESS:  Thank you, Judge -- Your Honor.  And

3    good morning to you as well.

4              THE COURT:  Thank you.

5              MR. KEENAN:  Your Honor, may I grab an exhibit before

6    I begin?

7              THE COURT:  No, just let the courtroom deputy know

8    what you need.

9              MR. KEENAN:  Sure.  I will need Plaintiffs' Exhibit 1.

10             May I approach?

11             THE COURT:  Yes.  Go ahead.

12                       DIRECT EXAMINATION

13   BY MR. KEENAN:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Can you introduce yourself?  Tell us your name.

17   A.  Yes, Rhonda Elaine Neff, R-H-O-N-D-A, E-L-A-I-N-E, N-E-F-F.

18   Q.  What is your relationship with Arizona Attorneys for

19   Criminal Justice?

20   A.  I have been a member since either late 2012 or early 2013,

21   and I am currently the incoming president of AACJ.

22   Q.  When you say AACJ, you are referring to Arizona Attorneys

23   for Criminal Justice, correct?

24   A.  Yes.

25   Q.  And when does your term as president begin?

1   A.   In January during the January board meeting.

2   Q.   Are you aware that AACJ is an organizational plaintiff in

3   this lawsuit challenging the constitutionality of A.R.S.

4   13-4433(b?).

5   A.   I am.

6   Q.   What line of work are you in, Ms. Neff?

7   A.   I am a practicing criminal defense attorney.  I also have

8   some civil practice in civil forfeiture, and I have represented

9   witnesses and victims in -- primarily related to criminal

10  cases.

11  Q.   How long have you worked as a criminal defense attorney in

12  Arizona?

13  A.   I was licensed in November of 2012, and I have been

14  practicing criminal defense almost exclusively since then.

15  Q.   And how about your work, civil work and work representing

16  victims, how long have you been doing that work?

17  A.   Throughout my entire practice as well.

18  Q.   So you are barred in Arizona?

19  A.   I am.

20  Q.   Where did you receive your undergraduate degree?

21  A.   The University of Wyoming in 2003.

22  Q.   And how about your law degree?

23  A.   The Phoenix School of Law in, oh gosh, I have to remember

24  what year I graduated.  I believe I graduated in 2012.

25  Q.   And have you ever been subject to state bar discipline in

1    Arizona?

2    A.  I have not.

3    Q.  And have you been subject to any other professional

4    sanctions?

5    A.  I have not.

6    Q.  Can you tell us what AACJ is?

7    A.  Yes.  It's an organization made up of several hundred

8    members across the state, primarily practicing in criminal

9    defense or associated to the criminal defense community, that

10   was founded to provide a voice for the defense, both in

11   promoting justice, you know, working with the legislature,

12   working with courts, working on the truth seeking function of

13   the defense side, and just generally representing, for lack of

14   a better word, the criminal defense bar.

15   Q.  Are you familiar with A.R.S. 13-4433(b)?

16   A.  I am.

17   Q.  And what is that statute?

18   A.  That is the -- I mean, we refer to it as the victims'

19   rights prohibition or restriction.  It is a statute that

20   prohibits defense counsel or anyone connected to a defendant

21   from having any kind of communication with the victim outside

22   of going through the prosecutor's office first.

23   Q.  So if I refer to the victim contact prohibition, will you

24   understand that to mean A.R.S. 13-4433(b)?

25   A.  Yes.

1    Q.  Are members of AACJ affected by the victim contact

2    prohibition?

3    A.  Yes.

4    Q.  I am going to move on to some of your personal experiences

5    related to -- involvement with the victim contact prohibition.

6           How has the victim contact prohibition affected your

7    practice as a criminal defense attorney?

8    A.  As a criminal defense attorney it has quite a bit of

9    impact.  As a criminal defense attorney, we get a limited

10   subset of information, and oftentimes, when crimes are being

11   investigated or alleged crimes are being investigated, the

12   investigation is targeted specifically towards one subset of

13   facts.

14          And those of us who have practiced in criminal defense

15   know that there are facts well beyond just that small subset

16   that lead into why something happens or how something happened,

17   or what the circumstances may have been around a particular

18   crime occurring.

19          And those are things that are just not inherently part

20   of a law enforcement investigation or even further

21   investigation through prosecutors' offices.

22          That's our job as defense attorneys to ensure that we

23   have the wide range of facts and circumstances known to be able

24   to best represent our clients, and to ensure that the

25   constitutional rights of our clients have been complied with.

RHONDA E. NEFF – DIRECT EXAMINATION

1    Q.  So in your experience, has the victim contact prohibition

2    limited your ability to speak directly to crime victims?

3    A.  Absolutely.  And I think in more than one way.  You know, a

4    lot of the crimes we know are related to family relationships

5    or are somehow connected through relationship.  And a lot of

6    times the people who have the information that would be

7    relevant to us to put together the larger picture, or to even

8    to understand the broader circumstances of what happened,

9    including things like our client's mental health history or our

10   client's drug and alcohol abuse history or use, things that

11   maybe our defendant is not as able to provide to us, we have a

12   restriction for being able to get that information from the

13   sources who would actually have that information.

14   Q.  In your practice, do you ever reach out directly to

15   individual victims in your cases without going through the

16   prosecutor's office?

17   A.  Absolutely not.

18   Q.  What do you believe would happen if you did reach out

19   directly to a victim without going through the prosecutor's

20   office?

21   A.  Well, I know what would happen.  If the contact is made by

22   the defense attorney to a victim, that contact is almost always

23   reported into the prosecutor's office, or to a victim advocate,

24   and the attorney ends up either being brought before the court

25   or the state bar or both.

UNITED STATES DISTRICT COURT

1   Q.   Do you have any personal experience with that happening?

2   A.   I do.

3   Q.   And can you describe that for us?

4   A.   Yes.  I spent a good portion of my career, I think close to

5   eight and a half years, practicing with largely under the

6   guidance of Michael Kimerer in the firm of Kimerer and Derrick.

7        And Mr. Kimerer, and I both had a case where we were

8   retained by the defendant's wife.  The defendant's son was one

9   of the named victims in the case.  I was not personally in the

10  initial meeting, but was dragged into the victim's right issue

11  through litigation.

12       But the wife brought the child in during the period of

13  time where we were being retained, so prior to us having any

14  background and facts or information on a case.

15       And when that happened, when the state found out that

16  we had had that initial contact with the victim, Mr. Kimerer,

17  and to some extent me not directly, were reported to the state

18  bar.

19  Q.   And in that situation, just to be clear, neither you nor

20  Mr. Kimerer had any idea that this son was a statutory crime

21  victim; is that correct?

22  A.   At the time, I -- I mean, I obviously can't testify to what

23  Mr. Kimerer knew.  At the time that this was coming about, it

24  was very early in it.  I think the defendant had only been

25  arrested for a short period of time.

1          We knew really no facts or information about the case

2    as a whole, up until the point that that meeting happened and

3    they provided us information as to what the arrest was about.

4    Q.  And did the state bar undertake some sort of investigation?

5    A.  It was summarily dismissed.  I believe it was just based on

6    a phone call.

7    Q.  But you did receive a phone call from the state bar?

8    A.  Mr. Kimerer did.  I did not personally speak to the state

9    bar on that.

10   Q.  Has a crime victim ever reached out to you in a case in

11   which you were the defense attorney?

12   A.  Yes.

13   Q.  And how did you respond?

14   A.  I take my ethical obligations extremely serious.  And I

15   have been contacted many times by crime victims, largely

16   related or in some form of relationship with my clients.

17          My practice has always been to -- well, I guess

18   there's two different scenarios.  One, I just get a message

19   from them saying, "Hi, I am a victim in this case.  I would

20   like to have some kind of contact with you."  And I notify the

21   prosecutor's office.  I won't return the phone call.

22          In some cases, I answer the call, not knowing who I am

23   answering the call for, and learn that I am speaking to a

24   victim.  In which case I tell them that I am unable to speak

25   with them.  That if they would like contact with me, they need

1   to reach out through the prosecutor's office, or they have the

2   ability to get an independent counsel involved.

3   Q.  And you go through this process because of concern related

4   to the victim contact prohibition, correct?

5   A.  Yes.  And actually, can I -- let me qualify that answer.

6   Yes, it's based on the victim's right prohibition clause in the

7   statute.  The statutory language itself says that we cannot

8   initiate contact with the victim.

9           My concern as a criminal defense attorney, and in my

10  capacity with AACJ and teaching other criminal defense lawyers

11  as well, is that "initiating" is somewhat a vague term.

12          And so even if the victim initially reaches out to me,

13  I am still initiating that contact back to them if I return a

14  phone call, or if I call them a second time, and I don't want

15  to risk that being considered a violation of the Victim's Bill

16  of Rights, or this particular statutory provision because I

17  have then initiated some form of communication back.  If --

18  particularly if there's a withdrawal of consent to speak with

19  me that I am unaware of.

20  Q.  So in that scenario, would you -- do you believe that the

21  victim contact prohibition cuts off your speech to a crime

22  victim?

23  A.  Yes.

24  Q.  In your experience, how are victims informed of their

25  rights under the constitution and the Victim's Bill of Rights,

RHONDA E. NEFF – DIRECT EXAMINATION                              83

1    specifically?

2    A.  Well, having done work as both a criminal defense attorney

3    and also victim's counsel, they are advised through a victim

4    rights packet that they receive if they elect into being a

5    victim at the time that the crime actually occurs.

6              THE COURT:  Sorry, Ms. Neff, there's a lot of

7    information that I am writing down here.  If you could slow

8    down, that would be very helpful.

9              THE WITNESS:  Certainly, Your Honor.

10             THE COURT:  What was the last thing you were saying

11   there.

12             THE WITNESS:  So at the time that a crime is committed

13   and a victim is contacted, they are given a victim rights

14   packet, is my understanding, that provides them with notice of

15   their victim's rights.

16             They are also advised at the beginning of every

17   hearing, a victim's rights advisement is now required, or at

18   least is given in the superior courts.

19             They, in my experience, have also gotten letters from

20   a victim advocate's office connected to the prosecutor's

21   office.  When I am representing a victim, I go over their

22   victim's rights with them as well.

23             So there are multiple different notifications

24   throughout the process that the victim gets of their rights,

25   including their right to choose whether to be interviewed by

1    the defendant or the defendant's counsel.

2    BY MR. KEENAN:

3    Q.  And I believe you mentioned this, if a victim were to call

4    you and you were to pick up the phone, would you also inform

5    them of their rights?

6    A.  Yes.  I have done that many times, and largely because if a

7    victim is reaching out to me and wanting to have some kind of

8    contact with me, going into what Mr. Burr was talking about in

9    that relationship that exists, me coming out as a defense

10   attorney and just saying, "I'm sorry I can't talk to you," and

11   hanging up the phone, oftentimes makes it appear as though the

12   defendant or the defense attorneys are not interested in what

13   the victim's position is, or what the victim has to say.

14          And so in order to let a victim know that the reason

15   that I am unable to engage in that conversation with them is

16   because of a statutory prohibition, makes it less impactful to

17   the victim in thinking that somehow it is a lack of desire on

18   our part to have that communication.

19   Q.  If the victim contact prohibition was not in effect in

20   Arizona, would you reach out directly to crime victims?

21   A.  In selective cases, I would.  I can't say that I would in

22   every case.  I think there are certain cases where it would

23   warrant the communication.  And there are other cases where I

24   don't know that any useful information or beneficial

25   information could come.  I think it would definitely be a

RHONDA E. NEFF – DIRECT EXAMINATION                    85

1    fact-by-fact circumstances, but, yes, I would.

2    Q.  Can you tell us other reasons why you would like to speak

3    with crime victims, if you were allowed?

4    A.  Certainly.  I think there are several reasons.  I don't

5    believe that as a defense attorney it's necessarily

6    investigative on my part.  I don't have any desire to

7    interrogate a victim or to try to coerce a victim into changing

8    their position or anything else.

9          But oftentimes, when I am representing a defendant in

10   a case, there are gaps in time, gaps in circumstances,

11   information about the nature of their relationship or how they

12   knew each other, that are not part of the investigation as a

13   whole.  And those play a very important role in my job as a

14   criminal defense attorney.

15         And quite frankly, that information is not just useful

16   for the criminal defendant.  It's oftentimes -- it's useful for

17   me as a defense attorney.  I need that information, because

18   part of my job is to advise the defendant of his rights.  What

19   the likelihood of success may be at trial.  What some of the

20   issues that may come up at trial are.  Who some of the

21   witnesses may be.  And the impact of trial on a particular

22   witness.

23         And there are times in cases where the information

24   that comes from the victim gives me the opportunity to go back

25   to my client and let them know of the impact of their actions

1    on a particular person, which can result in the case coming to

2    resolution prior to going to trial, because we have those

3    facts, we have that information, we know what that victim's

4    position and testimony may look like.

5    Q.  If the victim contact prohibition was, again, not in effect

6    in Arizona, and there was a child victim in one of your cases

7    where you were a criminal defense attorney, would you reach out

8    to that child?

9    A.  No.  Under no circumstance would I reach out directly to a

10   minor victim, regardless of a victim contact prohibition.  Even

11   if that law did not exist on the books, I would only reach out

12   to that minor victim either through the victim's

13   representative, meaning their guardian of some sort, or

14   victim's counsel if they had retained independent counsel.

15   Q.  If the victim contact prohibition, again, was not in effect

16   in Arizona, and you reached out to a victim who said they did

17   not want to speak with you, what would you do?

18   A.  I would absolutely respect that right.  They have a right

19   not to speak with me or be interviewed by me or speak to me in

20   any way.

21          I would thank them for their willingness to answer the

22   call, if that is what it was, and I would just tell them I

23   appreciate it, and that's the end of the conversation that I

24   would have with them.

25   Q.  If the -- again, victim contact prohibition was not in

1    effect and you reached out to a victim directly, they told you

2    they did not want to speak with you, but you persisted in

3    continuously contacting them anyway, do you think you would

4    face any negative consequences?

5    A.   Absolutely.

6          MR. CATLETT:  Your Honor, I am going to object, based

7    on speculation.

8          THE COURT:  Sustained.  I need some more foundation

9    information about what she specifically knows about that issue.

10   BY MR. KEENAN:

11   Q.   Sure.  Are you aware of any statutes, other than the victim

12   contact prohibition, that would -- that could play a part in

13   how you interact with crime victims in Arizona?

14   A.   Well, yes.  There are statutes and criminal rules regarding

15   an obligation not to harass, threaten, coerce victims, not to

16   engage in that type of behavior with them.  There are also

17   ethical restrictions against me engaging in that kind of

18   contact.

19   Q.   So again, if the victim contact prohibition was not in

20   effect, and you reached out to a victim who told you they did

21   not want to speak with you but you persisted, do you think any

22   of those regulations or laws that you mentioned would cause you

23   to face negative consequences?

24         MR. CATLETT:  Your Honor, same objection.

25         THE COURT:  Sustained again.

1          Mr. Keenan, I think Mr. Lane is trying to talk to you.

2     Why don't you turn around and visit with them.

3          MR. LANE:  Thank you, Your Honor.

4          (Discussion held between Mr. Lane and Mr. Keenan.)

5     BY MR. KEENAN:

6     Q.  Other than the victim contact prohibition, are there other

7     either ethical rules or laws that you think would apply to your

8     conduct when interacting with a crime victim?

9     A.  Yes, one of which is my ethical obligations in the oath I

10    took as a lawyer as a whole, to uphold the administration of

11    justice and the requirement that I act in a professional

12    manner.  And I don't believe that acting -- harassing,

13    threatening, or pushing a victim would be professional action.

14         So I believe, at a very minimum, it would be a

15    violation of my ethical requirements.  But I also believe that

16    there are orders put in place during criminal cases that

17    require the victim to be treated with dignity, respect, and

18    those would be violated as well, in which case I would be

19    subject to restrictions from a court or possible contempt

20    proceedings.

21    Q.  So you mentioned two issues there.  Court orders, which I

22    think you addressed, and ethical obligations.  If you were to

23    violate those ethical obligations, what would happen?

24    A.  Any number of things could happen based on the

25    egregiousness of the conduct.  I could face discipline from the

 1   state bar, either informally or formally.  I could lose my law

 2   license.  I could be suspended from the practice of law.

 3           There's a whole myriad of things that the state bar

 4   has at their disposal to discipline attorneys.  It would fall

 5   somewhere within that range.

 6   Q.  In your experience as president of AACJ, and as a criminal

 7   defense attorney in Arizona, do defense attorneys generally

 8   respect the law and refrain from reaching out directly to

 9   victims in their cases?

10           MR. CATLETT:  Objection, Your Honor, foundation.

11           THE COURT:  Sustained.

12   BY MR. KEENAN:

13   Q.  Through your work with AACJ, does that cause you to

14   interact with criminal defense attorneys in Arizona?

15   A.  Yes, almost on a daily basis.

16   Q.  How do you interact with those criminal defense attorneys

17   through AACJ?

18   A.  Well, I mean, in several ways.  My involvement with the

19   AACJ has largely been as a board member, so I act as a

20   consultant to other defense attorneys.

21           I am called upon to teach at seminars.  I am contacted

22   individually by members, which is one of the member benefits of

23   AACJ.  If they have questions on a particular case or have

24   insight that they need.

25           I also act as -- in the capacity of an executive board

RHONDA E. NEFF – DIRECT EXAMINATION

1    member as kind of an overseer of the organization as a whole to

2    ensure that our members have a broad base of people that they

3    can reach out to in order to discuss or get input on issues

4    related to criminal justice.

5              As part of that role, I have also served on the Amicus

6    and Rules Committee, assisting in amicus briefs.  And between

7    the Arizona Federal Courts, the Ninth Circuit Court of Appeals,

8    and the United States Supreme Court.

9              And I have also served on the legislative committee,

10   both testifying on bills, as well as being part of stakeholder

11   meetings.  So I have interacted with the defense community

12   pretty extensively in all of those ways.

13   Q.  Throughout all of these interactions, do you have any

14   indication that defense attorneys in Arizona do not respect the

15   law or their ethical obligations?

16   A.  My experience has been that they do, and, you know, I would

17   imagine that there are a few, just like there are on the state

18   side or plaintiffs' side or defendant's side in any case, I am

19   sure that there are a few people that maybe don't take their

20   ethical obligations as serious as others.  But that has not

21   been my experience in general with the criminal defense bar.

22   Q.  Getting back to your experience with the victim contact

23   prohibition, do you routinely ask prosecutors to relay your

24   requests to have contact with victims in your cases?

25   A.  I have historically either put in a request in a pleading

 1      form to file with the court to say that I would like to

 2      interview the victim.  I have also done it via email or letter.

 3              There are times other times where I don't have a lot

 4      of confidence that the information is actually conveyed to a

 5      victim.

 6              But oftentimes I will, as part of my mitigation packet

 7      or deviation letter include specific information that I would

 8      want the victim to know or understand about the defendant or

 9      the defendant's situation and will include in their request

10      that the prosecutor provide a copy of that to the victim.

11      Q.  What makes you unsure whether prosecutors are relaying that

12      information to victims?

13      A.  There's no accountability for it.  Nobody knows whether the

14      information has been conveyed or whether it hasn't.  The

15      defense doesn't ever have the ability to ask a victim during

16      any stage of the proceeding whether that was actually conveyed

17      to them.

18              And in general, I would like to believe that

19      prosecutors abide by their ethical obligations as well in their

20      requirements.

21              But I have had cases where I -- you know, I've

22      represented victims and/or defendants where information comes

23      out later that makes me believe that the victim was not

24      informed of the information we provided, or was not advised of

25      our request to provide contact.

92

1    Q.  Can you tell us about a specific instance where you felt

2    that a victim later -- or sorry.  Strike that.

3            Can you tell us about a specific example where you

4    believed a victim was not informed of your request for contact?

5    A.  Yeah.  I mean, we had a case that was a domestic case.  It

6    was a situation where there had been strained relations between

7    the family, and, you know, oftentimes these come up later in

8    post-conviction proceedings, where, you know, a victim will

9    reach out to the defense in some capacity, after they've

10   learned information that's become public in post-conviction

11   proceedings or habeas proceedings, or whatever it may be, where

12   they come out and say, "Hey, if we had known this, it would

13   have made a difference."

14   Q.  Have you ever experienced a situation where a victim's

15   testimony at trial, or an evidentiary hearing, differs from

16   what was in a police report?

17   A.  Pretty routinely.

18   Q.  Have you ever experienced prosecutors making charging

19   decisions in order to expand the number of witnesses who fall

20   under the statutory definition of a crime victim?

21            MR. CATLETT:  Objection, foundation.

22            THE COURT:  That's sustained.

23   BY MR. KEENAN:

24   Q.  Do you have any reason, from your experience, to believe

25   that prosecutors might, in some situations, expand the number

1    of witnesses who fall -- sorry, use charging decisions in order

2    to expand the number of witnesses who fall under the statutory

3    definition of victim?

4              MR. CATLETT:  Same objection, Your Honor.

5              THE COURT:  That's actually overruled.

6              You may answer.

7              THE WITNESS:  I believe -- I believe that in some of

8    my cases who has been considered a victim has been overly

9    expansive for people who have truly been victimized by a

10   particular crime.

11              Can I come out and say that I believe that it was an

12   act in bad faith by the prosecutor?  I cannot.  But I do

13   believe that there are cases that I have had personally or that

14   I have consulted on where I believe that the victim prohibition

15   has played a role in them making an expansive group of people

16   named as victims.

17   Q.  You mention that you represent at times crime victims as

18   part of your practice?

19   A.  I do.

20   Q.  Does the victim contact prohibition affect your work when

21   you represent crime victims?

22   A.  It does in a different way.  In the cases where I represent

23   victims, I think -- I guess one thing that's important to point

24   out as it relates to the victim's right prohibition is that the

25   language is very clear that it would prohibit the defendant or

RHONDA E. NEFF – DIRECT EXAMINATION

1    anyone on the defense team from having direct contact with a

2    victim without making the request directly through the

3    prosecutor.

4        It does not say "prosecutor and/or victim's

5    representative."  So oftentimes, even as victim's counsel, I

6    have to be the one, if I want to talk to the defense that

7    reaches out to them.  And then technically under the rules,

8    they would still be required to go through a prosecutor, even

9    before talking to me as a victim's attorney.  And so it does

10   impact it from that standpoint.

11       I also think that, you know, crimes affect different

12   victims in different ways.  And sometimes the victim has a lot

13   of anger, has a lot of sadness towards a particular defendant.

14   Sometimes they want answers as to what might have been going on

15   in that victim's mind.

16       The ability to have that contact for the victim to be

17   able to get that information from defense is important.  But

18   the other part of it that is impacted by it, that I have

19   noticed specifically as victim's counsel, is that there's not

20   really an effort made through victim's attorney or through a

21   victim's advocate to explain to a victim what the benefits of

22   talking to a defendant may be.

23       All of the rights against doing it are oftentimes

24   explained to a victim, but the good things that could come of

25   it, or the important things about restorative justice or even

1    getting answers, the ability to understand more why something

2    happened, that's not necessarily conveyed.

3              And oftentimes, even though there's a victim advocate

4    or there's, in a lot of case a victim's attorney, the victim

5    doesn't know what questions to ask.  The victim doesn't know

6    what questions to ask of a prosecutor about contact with the

7    defendant or whether it would be useful.

8              And so the only way -- one of the only ways that they

9    are going to be able to get that information to know that the

10   defendant is even interested in talking to them, is if

11   defendant or somebody on -- not the defendant directly, but

12   somebody -- defense counsel has the ability to actually walk up

13   and ask the question if they are willing to talk.

14   Q.  I just have a few more questions here.

15             MR. KEENAN:  Could we pull up Exhibit 1 for the

16   witness?

17             THE COURT:  You have to use the ELMO or your laptop.

18   You can just put it right on the ELMO there.  You can also draw

19   on the screen to the right of you.

20   BY MR. KEENAN:

21   Q.  Do you know what this is?

22   A.  I do.

23   Q.  And what is it?

24   A.  This is the standard letter sent out by the Arizona

25   Attorney General's Office to crime victims when a request for

1    interview has been made by a defense attorney.

2    Q.  Do you see the portion of the letter where there are lines

3    for a victim to check?

4    A.  I do.

5    Q.  And it provides two options, correct?

6    A.  Yes.

7    Q.  Do you think those two options accurately reflect the

8    rights -- or accurately reflect the Victim's Bill of Rights?

9    A.  As to the first one of asserting the right to refuse

10   defense discovery request, I think that's consistent with

11   what's in the Victim's Bill of Rights.

12          As to the second of waiving my rights and agreeing to

13   be interviewed or deposed before trial, I think that is, I

14   mean, quite frankly misleading in what it is.  They may be

15   waiving the very specific right not to be interviewed, but they

16   are not waiving their rights as a whole, plural, as it's stated

17   in here, of being a crime victim in order to engage in an

18   interview or being deposed prior to trial.

19   Q.  Thank you.  Do you believe the victim contact prohibition

20   impacts the truth seeking function of the criminal justice

21   system?

22   A.  Absolutely.

23   Q.  How or why?

24   A.  Well, I mean, the truth seeking function of the criminal

25   justice system, it's not intended to be just about prosecutions

RHONDA E. NEFF – DIRECT EXAMINATION

1    and criminal convictions and incarceration.  It's intended to

2    be about community and stabilization and people in general.

3            And when one side of it is blocked from having access

4    to important information of what actually constitutes truth,

5    but the other side is given unfair access to that, we have no

6    ability going into trial to say that in fact truth has been

7    found at the end of it.

8            There's an unfair advantage that goes into that, but

9    more importantly, the ability of us to represent a criminal

10   defendant rests on our ability to understand facts, engage the

11   importance of particular facts, or the lack of facts that may

12   exist with respect to something.

13           That is -- truth is all inclusive of both sides of

14   what happened and the underlying circumstances around what

15   happened.  As I testified before, oftentimes that is not the

16   purpose of the law enforcement investigation, to go get the

17   back history or to get information of the circumstances around

18   it.

19           They are tasked with investigating one particular act.

20   One particular act very often is not inclusive of what the

21   actual truth of the event or event is, and it can come down to

22   it where, you know, the ability to obtain the truth, to

23   investigate the truth, results in resolution, because we have

24   more information to go back to our client and say, listen,

25   here's what we have learned about this entire situation, we

RHONDA E. NEFF – CROSS-EXAMINATION

1    need to not retraumatize the victim by going into trial.  Or we

2    need to, you know, find a different way to resolve it.

3           It can also come out on the other end where -- you

4    know, we see it all the time, where the police reports are

5    either not accurate, don't provide a full accounting of a

6    story, or don't include any of the information that may be

7    exculpatory or necessary for the criminal defendant to be able

8    to assert his rights or to act on those.

9    Q.  Thank you.

10          MR. KEENAN:  No further questions, Your Honor.

11          THE COURT:  Is there any cross-examination,

12   Mr. Catlett?

13          MR. CATLETT:  Yes, Your Honor.

14          THE COURT:  Come on up.

15                       CROSS-EXAMINATION

16   BY MR. CATLETT:

17   Q.  Good morning, Ms. Neff.

18   A.  Good morning.  How are you?

19   Q.  Good.  How are you?

20   A.  Good.

21   Q.  Thank you for being here.

22          When you represent a victim as counsel, no lawyer can

23   reach out to the victim without going through you first,

24   correct?

25   A.  I mean, if you read the rule by its plain language, they

RHONDA E. NEFF – CROSS–EXAMINATION

1   can't reach out to me.  They can't reach out to my victim even

2   through me without going through the prosecutor's office.

3   Q.  When you represent a victim as counsel Rule 4.2 applies.

4   Are you aware of Rule 4.2?

5   A.  Yes.

6   Q.  And that rule applies, correct?

7   A.  Yes.

8   Q.  And under ER 4.2, if another lawyer wants to speak with a

9   victim that you are representing, regardless of whether it's

10  the prosecution or the defense, that lawyer has to go through

11  you first, correct?

12  A.  Yes.

13  Q.  And when you're victim's counsel, you explain their rights

14  as victims to them, correct?

15  A.  Absolutely.

16  Q.  When you serve as counsel to a victim, that impedes the

17  truth seeking function, correct?

18  A.  I don't believe it does, no.

19  Q.  If a defendant receives a Miranda warning and as a result

20  refuses to speak to prosecutors or the Court, that impedes the

21  truth seeking function, correct?

22  A.  No.

23  Q.  But when a victim is given the option of whether to speak

24  to defense counsel and chooses not to do that, that impedes the

25  truth seeking function?

1    A.   It may or may not, depending on the particular case or the

2    particular circumstances.  In some cases, it may.  Other cases

3    it may not impede necessarily the truth seeking function as

4    much as understanding the surrounding circumstances and/or

5    mitigation.

6    Q.   AACJ was formed in Arizona in 1986, correct?

7    A.   That sounds accurate.

8    Q.   And AACJ became aware of the Victim's Bill of Rights when

9    it was in progress of being proposed as a constitutional

10   amendment, correct?

11   A.   I wasn't practicing back then.  I can't tell you.  But I

12   would assume so.

13   Q.   Are you aware that a corporate representative of AACJ in

14   this case previously testified that AACJ has been aware since

15   the Victim's Bill of Rights was first proposed that it exists?

16   A.   I am not aware of that, no.

17   Q.   AACJ became aware of A.R.S. Section 13-4433-(b) on or near

18   its inception, correct?

19   A.   Again, I wasn't there as part of their board or their

20   executive board back then, but I would assume so.

21   Q.   AACJ has no evidence that the Arizona Legislature passed

22   what is now Section 13-4433(b) with the intent of restricting

23   defense attorneys' speech, correct?

24   A.   I am sorry.  Can you repeat the question?

25   Q.   Sure.  AACJ has no evidence that the Arizona Legislature

1    passed what is now Section 13-4433(b) with the intent of

2    restricting defense attorneys' speech, correct?

3    A.  I can't answer that question.  I think it depends on what

4    you define as evidence.  But I think the fact that a

5    restriction is put in place is evidence that that was their

6    intent, to stop speech.

7              MR. CATLETT:  Your Honor, if I need to access a

8    deposition transcript?

9              THE COURT:  Yes, just let us know which one.

10             MR. CATLETT:  It's the deposition transcript of Amy

11   Kalman.

12             THE COURT:  Come on up.

13             MR. CATLETT:  I'm sorry.  Amy Kalman on behalf of

14   AACJ.

15             THE COURT:  Do you want her to give it to the witness?

16             MR. CATLETT:  Yes, that would be great.

17             THE COURT:  Have you provided the plaintiffs with a

18   copy.

19             MR. CATLETT:  Yes, Your Honor.  They have a copy.

20   BY MR. CATLETT:

21   Q.  Ms. Neff, are you aware that Ms. Kalman was deposed in this

22   case?

23   A.  I was not, but I am not surprised by it.

24   Q.  And are you aware that Ms. Kalman was designated as AACJ,

25   as its corporate representative for purpose of the deposition?

1    A.  Yes, I believe Ms. Kalman was AACJ president at the time

2    this lawsuit was filed.

3            THE COURT:  What's the spelling of the name of the

4    person you keep referencing?

5            MR. CATLETT:  It's Amy, A-M-Y.  And last name is

6    Kalman, K-A-L-M-A-N.

7            THE COURT:  Thank you very much.

8    BY MR. CATLETT:

9    Q.  Ms. Neff, do you have any doubt in your mind that

10   Ms. Kalman told the truth when she was deposed in this case?

11   A.  I have no reason to believe that she would not.  She is a

12   very truthful person.

13   Q.  And can you please turn for me to page 16 of Ms. Kalman's

14   deposition transcript?

15   A.  Okay.

16   Q.  At line 3 on page 16, there's a question and -- I'm sorry.

17   Let's go to line 12.

18           At line 12 on page 16, a question is posed to

19   Ms. Kalman of:  Do you have any evidence that the Arizona

20   Legislature passed what is now 13-4433(b) and (c) with the

21   intent of restricting defense attorneys' free speech rights?

22           And her answer was:  I have no evidence.

23           Did I read that correctly?

24   A.  Yes.

25   Q.  Thank you.  Members of AACJ have been involved in

1    challenges to provisions of the Victim's Bill of Rights in

2    state court, correct?

3    A.  My understanding is yes.

4    Q.  And AACJ's members have been involved in challenges to --

5    or I am sorry.  Strike that.

6         AACJ believes that its members have sought judicial

7    relief from provisions of the Victim's Rights Implementation

8    Act in state court, correct?

9    A.  I am not aware of that specific challenge.  Again, I

10   wouldn't be surprised by it, but I don't have any specific

11   knowledge of it.

12   Q.  And how about more broadly, just seeking relief from the

13   restriction or the regulation that's contained in 4433?

14   A.  Are you referring to AACJ as an organization, or as

15   individual members.

16   Q.  Members.

17   A.  Yes, I would believe that the members would have been --

18   throughout the time practicing, would have sought some form of

19   relief from those restrictions.

20   Q.  And you agree that, if a lawyer in an individual criminal

21   case in Arizona State Court believes that it's imperative to

22   speak with the victim without going through the prosecutor's

23   office, he or she can seek permission to do so from the state

24   court, correct?

25   A.  I don't think that the restriction in 4433 actually sets

1      out a remedy of the prosecutor and/or the Court.  It just says

2      "prosecutor."

3              I do, however, believe that a defense attorney can

4      always file a motion with the court to take particular action.

5      In my personal experience, the court has been unwilling to

6      interfere in those types of communications absent a victim

7      coming out specifically asking that the restriction be removed.

8      Q.  Okay.  So a criminal defense lawyer in state court who

9      wants to make direct contact with the victim without going

10     through the prosecutor's office can ask the court for

11     permission to do so, correct?

12     A.  I would -- I would assume so, yes.

13     Q.  And if the court says no to that request, the defense

14     lawyer can appeal that denial, correct?

15     A.  I think it would depend on how the issue was raised and

16     when.  But there could be some relief on appeal for it.

17     Whether or not that relief would be subject to direct appeal

18     after conviction, or whether it would be subject to some kind

19     of special action makes a big difference.  The harm at that

20     point might -- would have already been done.

21     Q.  So they can seek appellate relief from the denial of a

22     request to make direct victim contact, either through direct

23     appeal or by filing a special action, correct?

24     A.  If they had a legal basis to do so, yes.

25     Q.  AACJ has no evidence that prosecutor's offices regularly

105

1    fail to pass on requests made pursuant to A.R.S. Section

2    13-4433(b), correct?

3    A.  As an organization, I am not aware of any.  From individual

4    member standpoints, I don't know that to be true.

5    Q.  AACJ is aware of cases where a crime victim consented to

6    contact with a representative of the defense team after being

7    notified by the prosecutor's office of a defense request made

8    under section 13-4433(b), correct?

9    A.  I can't answer that question yes from the standpoint that

10   the communication had been conveyed by a prosecutor's office.

11         I can say that we as an organization, and I

12   personally, am aware of cases where victim's contact was

13   allowed, once the victim was asked for that contact.  But

14   whether that filtered through the prosecutor's office or not I

15   can't say.

16   Q.  Can you turn for me to page 41 of Ms. Kalman's deposition

17   transcript?

18   A.  Certainly.

19   Q.  And at line 10, the question was posed to Ms. Kalman:  Are

20   you aware of any case where a crime victim consented to contact

21   with a representative of the defense after being notified by

22   the prosecutor's office of a defense request pursuant to A.R.S.

23   Section 13-4433(b)?

24         And Ms. Kalman's answer was:  AACJ is aware of such

25   cases.

1          Did I read that correctly?

2    A.  Yes.  And I have no reason to doubt that that's true.

3    Q.  And AACJ's members have filed motions challenging the

4    constitutionality of A.R.S. 13-4433(b) in cases where those

5    members represented a criminal defendant in Arizona State

6    Courts, correct?

7    A.  I have no specific knowledge of the actual cases being

8    filed, but I would say yes, that's probably accurate.

9    Q.  And AACJ's members currently represent defendants in state

10   court criminal proceedings where there are crime victims,

11   correct?

12   A.  Yes.

13   Q.  And AACJ would not be surprised if the number of such cases

14   is over a thousand, correct?

15   A.  A thousand cases where there's victims in defendants'

16   cases?

17   Q.  Correct.

18   A.  That wouldn't surprise me at all.  I think it's probably

19   higher than that.

20   Q.  And AACJ's participation in this case relates, at least

21   indirectly, to advancing the rights or interests of criminal

22   defendants in Arizona State Court criminal proceedings,

23   correct?

24   A.  Yes, that's part of our mission.

25   Q.  And that's part of why AACJ is participating in this case,

1   correct?

2   A.  Yes.

3   Q.  And in some instances when AACJ's members exercise speech

4   during ongoing criminal court proceedings, they do so mostly

5   for the benefit of their clients, correct?

6   A.  I can't say that it's mostly for the benefit of their

7   defendants.  I mean, I think inherent in your job as a defense

8   attorney is to look out for and protect the best interest of

9   your client.  I think that's any attorney's obligation.

10          However, I can't say that that's mainly the purpose of

11  why it would happen.  Again, a lot of times it has to do with

12  gathering the information in order to attempt the ability to --

13  for resolution in a case where otherwise there may not be.

14  Q.  And that benefits the client, correct?

15  A.  It can benefit all of the parties.  I guess that's why I am

16  struggling to answer the question yes or no.  Resolution in a

17  case can benefit the defendant certainly.  It can also benefit

18  the victims, the state, and defense counsel as a whole.  So I

19  think it is to benefit the criminal justice system as a whole.

20  Q.  So I think you took issue with my -- the word "mostly," so

21  let me rephrase.

22          In some instances, AACJ's members may want to exercise

23  their speech rights during ongoing criminal court proceedings

24  for the benefit of their clients, correct?

25  A.  Yes.

1    Q.  And AACJ's understanding is that Arizona Rule of Criminal

2    Procedure 39(b)(11), which I believe has been renumbered to 12,

3    (b)(12) now, bars criminal defense attorneys working on behalf

4    of a client from directly initiating contact with a crime

5    victim in an Arizona State Court criminal case, correct?

6    A.  Yes.

7    Q.  And earlier you talked about what might happen if the Court

8    issued the injunction that AACJ is seeking, and one thing you

9    said is it wouldn't be your desire to interrogate victims.  But

10   that's your choice, correct?

11   A.  That's -- I mean, yes, for me personally.

12   Organizationally, I would say I don't -- in my experience

13   dealing with criminal defense attorneys and teaching criminal

14   defense attorneys and consulting with them, I don't think

15   anybody's desire is to, quote, unquote, "interrogate" anybody.

16         Usually our fight is against people even trying to

17   interrogate our own clients, so I don't think our interest is

18   to interrogate anybody.  I do think that the truth seeking

19   function and the ability to speak to victims does have, to some

20   extent, an investigatory basis.  But I would not say that all

21   investigation equals interrogation.

22         THE COURT:  Mr. Catlett, we generally take our noon

23   lunch, but if you only have a handful of questions left, I will

24   allow you to finish.

25         MR. CATLETT:  I have a handful-ish, Your Honor.

1            THE COURT:  Well, that means we will -- coming from a

2      lawyer, that means we need to take our lunch recess right now.

3            Court is in recess until 1:00.  You can leave your

4      work items in here because the back door will be locked.  Court

5      is in recess.

6            (Recess taken at 12:02 p.m.; resumes at 1:05 p.m.)

7            THE COURT:  This court will come to order.  All

8      parties present when the court last closed are present again.

9            Mr. Catlett, you may continue with your

10     cross-examination.  And Ms. Neff, you are still under oath.

11     BY MR. CATLETT:

12     Q.  Good afternoon, Ms. Neff.

13     A.  Good afternoon.

14     Q.  Hope you had a good lunch break.

15            We were talking a little bit before the break about

16     what might happen if the victim contact regulation is lifted.

17     And in that circumstance, nothing would prevent AACJ's members

18     from questioning victims, correct?

19     A.  Subject to the victim agreeing to it, no.

20     Q.  Nothing in the law would prevent a member of AACJ from

21     approaching a minor witness, correct?

22     A.  I don't necessarily believe that to be the case.  And I

23     can't cite off the top of my head which statutes or rules may

24     apply, but, I mean, generally, you do have to contact minors

25     through a guardian or through a representative adult.

RHONDA E. NEFF — CROSS-EXAMINATION

1  Q.  But sitting here today, you can't identify any specific

2  statute that might restrict a criminal defense lawyer from

3  reaching out to a minor victim, correct?

4  A.  I can't identify it by number, no.

5  Q.  Does AACJ know of any attorneys -- any of its members who

6  have been sanctioned solely because of violating the regulation

7  in 13-4433(b)?

8  A.  I don't know with any specificity as to the sanctions.  I

9  know that members of AACJ have been brought before the state

10  bar for victim's contact violations, or at least I've heard of

11  members being put before the state bar.

12  Q.  During direct, you talked a little bit about an issue of

13  not knowing whether a prosecutor has passed along a victim

14  contact request to the victim.

15        If you had concerns about that as defense counsel, one

16  option for you would be to ask the Court to order the

17  prosecution to provide proof that a request was passed along,

18  correct?

19  A.  That could be one option and is largely why you see defense

20  attorneys, including myself now, file that as a request on the

21  record, with a specific request in it that the State file a

22  response indicating that they have in fact conveyed it.  I have

23  never had a prosecutor file a response to that, however.

24        THE COURT:  Ms. Neff, I know the defense counsel has

25  not raised the objection as it relates to being nonresponsive.

UNITED STATES DISTRICT COURT

RHONDA E. NEFF – REDIRECT EXAMINATION

```
1    Can you listen to the question and answer it without a

2    two-minute narrative after your answer?

3              THE WITNESS:  Absolutely, Your Honor.

4    BY MR. CATLETT:

5    Q.  And with that instruction in mind, Ms. Neff, can you ask

6    the court, as a criminal defendant, to order the prosecution to

7    produce proof that it has passed along a victim contact request

8    if, as a defense lawyer, you are concerned that request has not

9    been passed along?

10   A.  Yes.

11   Q.  Thank you for your time this afternoon.

12             MR. CATLETT:  Your Honor, I have nothing further.

13             THE COURT:  That's not a handful-ish.  I thought you

14   you had way more than that.

15             Is there any redirect?

16             MR. KEENAN:  Yes, Your Honor.

17             THE COURT:  Come on up.

18                       REDIRECT EXAMINATION

19   BY MR. KEENAN:

20   Q.  You testified on cross that there's nothing to prevent

21   defense attorneys from asking a court to require a prosecutor

22   to respond about whether they reached out to a victim related

23   to a criminal defense attorney's request to speak with them; is

24   that right?

25   A.  Yes.
```

1    Q.  Have you had experience of courts actually ordering

2    prosecutors to do that?

3    A.  No.

4    Q.  Based on the plain language of A.R.S. 13-3433B, is there

5    any authority in that statute that allows state court judges to

6    disregard or do away with the requirement that criminal defense

7    attorneys initiate contact with victims without going through

8    the prosecutor's office?

9    A.  In that statute, no.

10   Q.  Thank you.

11            MR. KEENAN:  No further questions.

12            THE COURT:  Subject to recall, plaintiff?

13            MR. KEENAN:  No, Your Honor.

14            THE COURT:  Defense?

15            MR. CATLETT:  No, Your Honor.

16            THE COURT:  Ms. Neff, thank you so much for coming in

17   this morning and afternoon.  You have a wonderful day.  Please

18   be careful walking down the steps there.

19            THE WITNESS:  Thank you, Your Honor.

20            THE COURT:  You're very welcome.

21            THE WITNESS:  And would you like this exhibit put

22   back.

23            THE COURT:  No, you can just leave it there.  Thank

24   you though.

25            THE WITNESS:  Thank you.

 1          THE COURT:  Next witness, please.

 2          MR. LANE:  The plaintiffs call Rich Robertson.

 3          **RICH ROBERTSON, PLAINTIFFS' WITNESS, SWORN**

 4          THE COURT:  Mr. Robertson, I know you have been in the

 5   courtroom so you know everything I have told the witnesses.

 6   Good afternoon to you, and please speak loud enough so we can

 7   all hear you.

 8          THE WITNESS:  Thank you, Your Honor.

 9          THE COURT:  You are very welcome.

10                    DIRECT EXAMINATION

11   BY MR. LANE:

12   Q.  State your name and spell your name for the record.

13   A.  Rich Robertson, R-I-C-H, R-O-B-E-R-T-S-O-N.

14   Q.  Sir, how are you employed?

15   A.  I own R3 Investigations.  I am a state licensed private

16   investigator.

17   Q.  All right.  And how long have you been a private

18   investigator?

19   A.  22 years.

20   Q.  Prior to that, what did you do?

21   A.  I was a journalist.

22   Q.  What kind of a journalist?

23   A.  I was a newspaper reporter for 25 years and, then I did

24   television for five years.

25   Q.  Were you an investigative reporter?

1    A.  I was the head of the investigative team at the Arizona

2    Republic.

3    Q.  Okay.  So is it fair to say that you have about 50 years of

4    investigation experience?

5    A.  Thank you for reminding me.

6    Q.  I am with you.

7            Are you familiar with the statute that is in question

8    in this case?

9    A.  I am.

10   Q.  How long have you -- if you recall, how long have you been

11   living with this statute?

12   A.  Well, the entire time I have been a private investigator it

13   has applied to me.  So since I started in 2000.

14   Q.  So will you describe for the Court, who hires you to do

15   these investigations?

16   A.  I am typically hired by the criminal defense bar --

17   attorney.

18   Q.  Okay.  To do what?

19   A.  Fact investigations typically is mostly what we do, is

20   gather the facts the attorneys need to help litigate their

21   case.

22   Q.  Are these capital and noncapital?

23   A.  All the way through.  Misdemeanors to capital, both state

24   and federal.

25   Q.  Okay.  In context of your job, do you have to become

1  familiar with police reports on every case?

2  A.  Absolutely.

3  Q.  Have you had experience over the years in investigating a

4  case and finding evidence that is inconsistent with what you

5  see in police reports?

6  A.  Practically every case.

7  Q.  Okay.  Have you ever had occasion to investigate a case

8  where, for example, there was a gunpoint robbery -- just a

9  hypothetical -- gunpoint robbery, one witness, identification

10  case, police reports indicate something like, well, good

11  lighting, victim 100 percent positive this is the guy.

12       And then during the course of your investigation, you

13  find facts that cast serious doubt on what the police reports

14  contain?

15  A.  Yes, it happens frequently.

16  Q.  Have you had occasion to speak to victims of crimes?

17  A.  Yes.

18  Q.  Do you have to invoke the statute before you are permitted

19  to speak to victims of crimes?

20  A.  I don't know that I am required to, but I do as a matter of

21  practice, because it's -- I want to make sure we're covered.

22  Q.  Give me -- for instance, give me a typical example of how

23  it is that you are authorized to go talk to the victim of a

24  crime?

25  A.  Well, I won't go -- well, I will talk to crime victims when

1    it's not a state case.  We talk to crime victims all the time

2    in federal cases.  We talk to victims on cases that have

3    Arizona witnesses that were charged in other states.  We talk

4    to --

5    Q.  Let me just stop.  Arizona witnesses that were charged in

6    other states?

7    A.  I'm sorry, on cases that were charged in other states.

8    Q.  So if somebody is a defendant in a Texas case and the

9    victims are living in Arizona?

10   A.  Correct, or -- yes, that's right.

11   Q.  Okay.

12   A.  So we can speak to them.  And then of course there's the

13   times when the victims will reach out to us as well, to the

14   defense, to initiate the contact and want to talk to somebody.

15   Q.  Have you obtained valuable information from victims?

16   A.  Frequently.

17   Q.  Have you ever had an experience where a victim says, "No, I

18   don't want to have anything to do with you.  I don't want to

19   talk to you"?

20   A.  Yes, absolutely.

21   Q.  How often does that happen?

22   A.  I hate to quantify it, but at least half.

23   Q.  And what's your response when a victim says, "I don't want

24   to talk to you"?

25   A.  Well, I treat it the same way as any other witness.  I say,

1    "Thank you.  Appreciate it.  Here's my card if you change your

2    mind."

3    Q.  And then that's it?

4    A.  Pretty much, yep.

5    Q.  All right.  And in your professional career, does the

6    statute hamstring you in your efforts to investigate cases?

7    A.  It does.

8    Q.  In what way?

9    A.  Well, there's incomplete -- inability to get complete

10   facts.  So often, obviously the victim is at the core of the

11   case.  And when we have to rely on how the victim's version of

12   events is characterized in a police report, we know that those

13   police reports are frequently not accurate or complete.  They

14   are told from a point of view.

15          So from an investigative standpoint, you want to get

16   as much information as you possibly can from as many places and

17   sources as you possibly can.

18   Q.  Do you find evidence in handling your cases that the police

19   will at times skew the reports?

20          MS. SAWYER:  Objection, leading, Your Honor.

21          THE COURT:  That's sustained.

22   BY MR. LANE:

23   Q.  Do you believe that the police are biased or unbiased in

24   their writing of reports, generally?

25   A.  I think a lot of them come from a point of view.  "Biased"

1    sounds like a motive.  I am not sure that that's always the

2    case.  I have certainly seen that.

3              But they do come from a point of view and fairly

4    narrow sometimes.  Their case is just enough information to get

5    somebody -- to get probable cause to make an arrest.

6    Q.  Have you ever discovered exculpatory evidence for a

7    defendant when you have talked to victims?

8    A.  Yes.

9    Q.  In your discovery of exculpatory evidence, have you

10   searched police reports and found that that evidence is not

11   mentioned in police reports?

12   A.  There's frequently information missing.

13   Q.  Can you tell me what kinds of problems you have encountered

14   with, for example, determining who is a victim, who is not a

15   victim, accidentally talking to victims?  Has anything like

16   that ever happened to be you?

17   A.  Yes, there's kind of two different things.  Number one,

18   victims, the definition of victims is broader than just the

19   person who may have been the subject of a criminal act.

20             It depends on the act.  It depends on their relatives

21   and whether they are minors and stuff.  So the statute defining

22   victims is fairly complicated and two degrees of sanguinity --

23   whatever that word is.

24             It gets -- so we have to sit down frequently and say,

25   wait a minute, is this person covered as a victim, before we

1    initiate -- try to initiate some contact.

2            And the second part of your question had to do with, I

3    think, inadvertent contact, correct?

4    Q.  Yes.

5    A.  Yes, we will go out and do interviews attempting to find

6    witnesses who may be a neighbor, or a relative, and, you know,

7    knock on the door, and lo and behold the victim answers the

8    door.

9            And we don't always know who the victim is by sight,

10   but, you know, it can lead to some awkward kinds of

11   conversations and memos to file and all kinds of things.

12   Q.  Generally speaking, what are your marching orders from

13   defense attorneys vis-a-vis complying with the statute?

14   A.  Well, the overarching order is don't violate the statute.

15   There seems to be some interpretation differences.  Some

16   attorneys are far more conservative on it than others,

17   particularly in pre-charging kind of situations.

18           Some attorneys, by reading of the statute, we are not

19   representing a defendant in a pre-charging situation, so

20   victims are accessible to us.  So we use that window of

21   opportunity, if you will, to interview victims.

22           Some attorneys, however, don't even want to go there,

23   because they just don't want to do anything.  Victims are

24   radioactive, frankly.

25   Q.  All right.  Do you have attorneys that tell you, "Don't

1    even try to talk to victims under any circumstances"?

2              MS. SAWYER:  Objection, leading, Your Honor.

3              THE COURT:  That's overruled.

4              You may answer.

5              THE WITNESS:  Yes, I mean, lots of times it doesn't

6    even have to be said.  I know that we don't -- aren't going to

7    interview victims unless it's in compliance with the statute.

8    BY MR. LANE:

9    Q.  Now, have you ever heard of any witness or victim of any

10   crime who has shown you or complained later that the mere sight

11   of you showing up or calling has so traumatized them that they

12   have complained about it?

13   A.  There probably has been.  I can't think of an instance off

14   the top of my head.  But I know that -- you know, we interview

15   so many people.  I mean, I interview jurors post -- and after

16   trials and jurors like to complain to the county attorneys and

17   the courts about us showing up.

18              I am sure that there's probably been victims that have

19   complained that I don't even know about necessarily.

20   Q.  Well, have you ever been on the receiving end of any

21   official complaint that has resulted in some sort of an

22   investigation?

23   A.  Not that I am aware of.  I have never been investigated for

24   that, to my knowledge.

25   Q.  All right.  Will you characterize for the Court the

1    response?  I mean, you have heard all of the talk about

2    retraumatizing victims.  That's one of the cornerstone reasons

3    why this statute allegedly exists, right?  You heard all of

4    that?

5    A.  Yes.

6    Q.  Okay.  My question to you is, characterize for the Court,

7    how traumatic is it when you show up and you explained who you

8    are and a victim says, "I don't want to talk to you"?

9              MS. SAWYER:  Objection, foundation.

10             MR. LANE:  I am asking him what his experience is.

11   That is the foundation.

12             THE COURT:  That's not how you asked the question.

13   Sustained.

14   BY MR. LANE:

15   Q.  Have you had experience -- you have already said you have

16   had experience where victims don't want to talk to you?

17   A.  Correct.

18   Q.  All right.  Well, what are your observations of the

19   emotional state of those victims after you introduce yourself

20   and explain what you want to do, and they say no?

21   A.  It can be all over the map.  I mean, not just -- the

22   reactions can vary widely.  Some of them are very gracious

23   about it.  Some of them are angry about it.

24             I don't remember anybody being, you know, overtly

25   traumatized to the point of hyperventilating and falling down

1   or anything like that.  I mean, it's not like that.

2           They -- there seems to be, if I can go here.  There

3   seems to be a belief that, you know, defendants are evil and

4   anybody helping the defendant is evil also.  So you get that

5   kind of reaction at times from people.

6           And part of the skill, if you will, the art of the

7   interview, is to try to show them that that's just not the

8   case.

9           This is -- I am here.  I am human being just like you

10  are.  We have some questions to ask.  You know, I would be

11  happy to ask -- tell you what questions I am going to ask you,

12  and if I ask a question that you don't want to answer, you

13  don't have to answer.

14          I mean, there's just ways of having that conversation

15  with them to find out -- kind of make them comfortable with the

16  situation.

17          But if they are adamant and said, "I don't want you

18  here.  I don't want you on my property.  I want you to leave."

19  Absolutely, we do that every time.

20  Q.  Okay.  When you are meeting with witnesses or victims --

21  well not victims, just generally witnesses, do you usually call

22  them on the phone or do you just show up?

23  A.  It depends on the circumstances.  I mean, every case is a

24  little bit different.  We don't have any set rule for how we do

25  that.  So it may be reaching out through -- by phone or -- you

1    know, obviously with the victims they had to have already

2    initiated the contact before we were going to talk to them

3    anyways, so that door is already opened.  But then we decide

4    whether it is going to be by phone or in person or what have

5    you.

6    Q.   Okay.  You heard Mr. Burr testify that DIVO is simply a

7    conduit between the defense camp and the victims, right?

8    A.   Sure.

9    Q.   You heard him say that investigating is a little pushier,

10   right?

11   A.   I heard that, yes.

12   Q.   Do you agree with that?

13   A.   Well, I don't -- I have heard words like interrogation and

14   pushy and that kind of thing.  No, I don't agree with that.  I

15   mean, obviously you are there to gather information, and you

16   can ask direct questions.

17         But there's no value to an investigator or to the

18   defense team to alienate who -- a person you are interviewing,

19   whether it is a victim or a witness of any kind.

20         So you treat people respectfully, and you are not

21   interrogating them in the sense that -- we have no control over

22   them anyway.  Police interrogate people by putting them in an

23   interview room and not letting them leave.  That's not what we

24   do.

25         So we have to find a way to make them comfortable,

1    meet them at some point in the middle, and have a conversation

2    about the facts that we are interested in hearing.  Letting

3    them tell their story.

4    Q.  So when you say, "You are letting them tell their story,"

5    are you saying they are the ones engaged in speaking to you,

6    and you are receiving their speech?

7    A.  Yes.  I mean, we obviously have to start the conversation,

8    explain everything, why you are there.  Let them hear from my

9    words why we want to hear this information.  Answer any

10   question they might have.  But then at that point, it's shut up

11   and let them tell their story.

12   Q.  Okay.  So is it a dialogue, you are asking questions, they

13   are giving you answers?

14   A.  In both directions.  It can go both directions.

15   Q.  Okay.

16   Q.  Is it fair to say that it's a conversation?

17   A.  It is, absolutely.

18   Q.  Okay.  This is -- is this in your mind just purely speech?

19   You are speaking and they are speaking?

20           MS. SAWYER:  Objection, foundation.

21           THE COURT:  That's overruled.

22           You may answer.

23           THE WITNESS:  Yes.  I mean, it's all about words and

24   ideas and information.

25

1    BY MR. LANE:

2    Q.  Are you going in with any agenda, trying to change their

3    minds about anything?

4    A.  No.

5    Q.  Just the facts?

6    A.  My job there is to try to gather information.  I want to

7    hear a point of view.  Every witness comes at a matter from a

8    different point of view, and a victim has a unique point of

9    view that is really important to the overall picture.  And so

10   it's important to hear what they have to say, good, bad or

11   indifferent.

12   Q.  Have you had occasion where you have learned information

13   from doing an investigation with a witness that causes you to

14   have a conversation with an attorney where then an attorney

15   decides, this guy should take a plea, or this guy should go to

16   trial, based on your investigation?

17   A.  Sure.  I mean, part of my role is collaborating with the

18   defense team and giving -- so the attorney can give good advice

19   to the defendant.  And evaluating the witnesses, evaluating the

20   evidence, is part of what I do to help them do -- and make a

21   determination.

22        What's this going to look like at a trial?  How

23   effective is that testimony going to be against you?  Is it

24   inconsistent or consistent with what you have told us already

25   up to this point?  There's just all kinds of factors that go

1    into it.

2    Q.  In your professional opinion, does this enhance the truth

3    seeking function of the criminal justice system?

4    A.  It is absolutely the goal.

5    Q.  All right.

6         MR. LANE:  May I have one moment, Your Honor?

7         THE COURT:  Of course you can.

8         MR. LANE:  No further questions, Your Honor.

9         THE COURT:  Is there any cross-examination,

10   Ms. Sawyer?

11        MS. SAWYER:  Yes, Your Honor.

12        THE COURT:  Come on up, please.

13                      CROSS-EXAMINATION

14   BY MS. SAWYER:

15   Q.  Good afternoon, Mr. Robertson.

16   A.  Good afternoon.

17   Q.  I'm Kate Sawyer.  I represent Defendant Brnovich today.

18        THE COURT:  I'm sorry, Ms. Sawyer.  Can you move the

19   microphone down?  Just speak into one of them.

20        MS. SAWYER:  Is this a little better?

21        THE COURT:  That's perfect.  Thank you.

22   BY MS. SAWYER:

23   Q.  Mr. Robertson, when you were hired as an investigator by an

24   attorney for a criminal defendant, you work at the direction of

25   the attorney, correct?

RICH ROBERTSON – CROSS–EXAMINATION

1    A.   Correct.

2    Q.   In all of the cases you have worked on, on behalf of a

3    criminal defendant in Arizona State Court proceedings, you have

4    been working on behalf of that criminal defendant's criminal

5    defense attorney, correct?

6    A.   Correct.

7    Q.   You are a member of the plaintiff organization AACJ; is

8    that correct?

9    A.   I am an associate member because I am a non–attorney.

10   Q.   And you don't have any personal knowledge that in the

11   course of any criminal proceeding you have been involved with,

12   as an investigator, that a prosecutor's office has failed to

13   notify a victim of the defense team's request for an interview

14   with the victim, correct?

15   A.   It would only be anecdotally.   It gets talked about.

16   Q.   You don't have --

17   A.   I don't have any personal knowledge.

18   Q.   You don't have any personal knowledge of that happening; is

19   that correct?

20   A.   Correct.   Correct.

21   Q.   In a case when you are not working on behalf of a criminal

22   defense, there's an ongoing case, is it correct that you have

23   never knowingly initiated contact with a crime victim to

24   discuss their status as a crime victim in that case?

25   A.   Can you repeat that?

RICH ROBERTSON – CROSS–EXAMINATION

1    Q.  Sure.  In a case that's ongoing, when you are not working

2    on behalf of the criminal defense attorney.

3    A.  When I am not working on --

4    Q.  When you are not working on behalf of others, there's a

5    case, is it correct that you have never knowingly initiated

6    contact with a crime victim to discuss their status as a crime

7    victim in that case?

8    A.  Um, I apologize.  I am not sure I understand.  There's too

9    many double negatives in there.

10   Q.  Okay.  Sure.  Let me try to repeat that for you.

11        Is it correct that you have not contacted victims when

12   you are not working on a case, just to talk about their status

13   as a victim in that case?

14   A.  Oh, you mean like go rogue and just go out and start

15   talking to people?

16   Q.  Just talking to victims.  Have you ever?

17   A.  I suspect I have talked to victims.  There's lots of

18   victims out there.

19   Q.  Have you --

20        THE COURT:  Stop, stop, stop.

21        Counsel, when he starts to answer, just let him

22   answer.  If you want me to strike what he said, let me know.

23        And also, Mr. Robertson, can you wait for her to

24   finish the question, please.

25        What was the last question again?

1        MS. SAWYER:  We will try this one more time.

2   BY MS. SAWYER:

3   Q.  Okay.  Have you knowingly contacted a victim, you mention

4   that you might have contact.  Have you knowingly contacted a

5   victim in a case you are not working on, for the purpose of

6   talking to that victim about their status as a victim in that

7   case?

8   A.  I don't believe so.

9   Q.  Okay.  Crime victims have affirmatively reached out to you

10  as an investigator, in connection with your representation of a

11  criminal defense; is that correct?

12  A.  That's correct.

13  Q.  And you have been involved in cases where after request has

14  been made through a prosecutor, a victim has consented to

15  contact with a representative of the defense team?

16  A.  Yes.

17  Q.  Okay.  And you are not a DIVO specialist as Mr. Burr talked

18  about earlier; is that correct?

19  A.  I am not.

20        MS. SAWYER:  I have no further questions, Your Honor.

21        THE COURT:  Is there any redirect, Mr. Lane?

22        MR. LANE:  No, Your Honor.

23        THE COURT:  Subject to recall?

24        MR. LANE:  He can be excused from the plaintiffs'

25  perspective, Your Honor.

 1              THE COURT:  Defense?

 2              MS. SAWYER:  No, Your Honor.

 3              THE COURT:  Mr. Robertson, thank you so much for

 4    coming in this afternoon.  You are excused.  Have a nice week.

 5              Next witness, please.

 6              MS. BRODY:  Your Honor, the plaintiffs call John

 7    Canby.

 8              **JOHN A. CANBY, PLAINTIFFS' WITNESS, SWORN**

 9              THE COURT:  Mr. Canby, good afternoon to you.  Please

10    adjust the microphone.  And counsel, you may begin.

11                          DIRECT EXAMINATION

12    BY MS. BRODY:

13    Q.  Good afternoon, Mr. Canby.  Will you please state and spell

14    your name for the record?

15    A.  My name is John Adams Canby, J-O-H-N, A-D-A-M-S, C-A-N-B-Y.

16    Q.  And you are a plaintiff in this lawsuit challenging the

17    constitutionally of A.R.S. 13-4433(b), correct?

18    A.  Yes, I am.

19    Q.  And I may refer to that as the victim contact prohibition.

20    You know what I am talking about in that case?

21    A.  Yes.

22    Q.  And Mr. Canby, you are a lawyer licensed to practice law in

23    Arizona, correct?

24    A.  Yes, I am.

25    Q.  Are you admitted to practice in any other jurisdiction?

1    A.  No, I am only barred in Arizona.

2    Q.  Okay.  And what year were you first admitted to practice in

3    Arizona?

4    A.  1986.

5    Q.  And in those approximately 26 years -- how many years of

6    practice is that?  That's almost 40 years of practice?

7    A.  I think that's right.  Not that good at math, but been a

8    long time.

9    Q.  Okay.  So in those years of practice, Mr. Canby, have you

10   ever been subject to professional discipline by the State Bar

11   of Arizona?

12   A.  No.

13   Q.  And have you ever had any other professional sanctions?

14   A.  No.

15   Q.  Where did you get your undergrad degree?

16   A.  Oberlin College.

17   Q.  When?

18   A.  I graduated from Oberlin College in 1982.

19   Q.  Okay.  What about law school?

20   A.  That would have been 1985.  I got a little cheat sheet with

21   just dates on it, if I could refer to it?  ASU Law School.  I

22   graduated in 1985.

23   Q.  Okay.  And what did you do -- well, let's -- did you always

24   want to be a lawyer, Mr. Canby?

25   A.  I did.  I knew I wanted to be a lawyer from a young age.  I

JOHN A. CANBY – DIRECT EXAMINATION

1    grew up in a family of lawyers, and law was a frequent
2    dinnertime topic.
3    Q.   Okay.  So what is your current position right now?
4    A.   I am capital resource counsel at the Maricopa County Public
5    Defender's Office.
6    Q.   And how long have you been in that job?
7    A.   About seven years.
8    Q.   And what are your duties, Mr. Canby, as the capital
9    resource counsel at the Maricopa County Public Defender's
10   Office?
11   A.   In the Public Defender's Office, we have a capital unit
12   that consists of 10 capital defense teams.  Each team has two
13   lawyers, a mitigating specialist, a paralegal, and an
14   investigator.  And I am considered the third lawyer on -- for
15   those teams.
16        Those teams each carry two cases at a time.  So we
17   have 20 capital cases in our office at any one time.  And I am
18   considered the third lawyer on all of those cases.
19        On some other cases, where the lawyers don't quite
20   meet the statutory requirements to do capital cases, I am
21   officially appointed by the court as advisory counsel to those
22   two lawyers.  So it is a little more formal in those cases.
23   Q.   I see.  So there's approximately 10 teams, each team has
24   two cases, and you serve as a lawyer on all of those cases?
25   A.   Correct.

JOHN A. CANBY – DIRECT EXAMINATION

1   Q.   Okay.  And does your job require you to both appear in

2   court in those cases, and work behind the scenes?

3   A.   Yeah, I attend all the team meetings that occur for those

4   teams, but I also -- typically I don't -- I am not always in

5   court for every hearing, because I have a lot of cases.

6   Sometimes the hearings are at the same time.  But I do try to

7   attend court every time.

8          And I do sometimes make argument in court or take over

9   an issue or maybe file a motion on a particular issue on a

10  case.  I am not the lead lawyer though.  There's a lead counsel

11  who is primarily responsible for the case.

12  Q.   So you would consider yourself to be part of the defense

13  team on all 20 of those cases?

14  A.   I do.

15  Q.   Okay.  And can you just describe sort of how you got this

16  job that you are working in right now?

17  A.   Well, I worked at the Legal Defender's Office doing capital

18  defense for 15 years before I took this job at the Public

19  Defender's Office, so I have been doing capital defense for a

20  long time.

21         I am also an instructor at the National College of

22  Voir Dire in Boulder, Colorado.  And I teach other lawyers

23  around the country how to pick juries in capital cases.  And

24  when the Maricopa County Public Defender's Office created the

25  job I have, and I am the first one, one of the requirements was

1   expertise in jury selection and training in jury selection, and

2   also of course, you know, experience doing capital cases over

3   many years, and I fit those qualifications, so I think that's

4   why I have this job.

5   Q.  So you consider yourself an expert in capital defense?

6   A.  I do.

7   Q.  Would you say that you are the most experienced capital

8   defense lawyer at the Maricopa County Public Defender's Office?

9   A.  I think I am, yes.

10  Q.  In addition to coordinating with those lawyers within your

11  office, do you have contact with other lawyers outside of the

12  office doing capital defense?

13  A.  I do.  One of the things I do is I participate in training

14  that's open to all of the capital defense, or actually all

15  defense lawyers in the valley and in the state.  And when I do

16  that, I talk about my position, and I offer the opportunity for

17  those people to call me and for advice on cases.  And as long

18  as I don't have a conflict or something like that, that's

19  something we offer, and that's considered to be part of my job

20  as well.  My office encourages that.

21  Q.  So that's -- that puts you in frequent contact with lawyers

22  around the state handling capital defense?

23  A.  Yes.

24  Q.  So let me just back up a little bit, Mr. Canby, to talk a

25  little bit about your career leading up to your current

1    position.

2            What was your first job out of law school, I think you

3    said in 1985?

4    A.  Yeah, from 1985 through '89 I worked for a small criminal

5    defense, Toles and Associates.  It was Jeremy Toles' firm, and

6    I was an associate of his.

7    Q.  That was in Phoenix area?

8    A.  That was in Phoenix.  Most of our work was in city court,

9    but we did do some Superior Court work as well.

10   Q.  And then you said 1989.  What did you start doing in 1989?

11   A.  In 1989 I became a Deputy County Attorney in the Pinal

12   County Attorney's Office where I stayed until 1998.

13   Q.  What were your duties in the Pinal County Attorney's

14   Office?

15   A.  For most of the time, I was the chief of the pretrial unit,

16   which involved really being the charging -- running the

17   charging unit.  And the charging unit basically reviews cases

18   that are submitted by police departments and decides whether

19   charges are appropriate, or whether further maybe investigation

20   is required, things like that.  So you are working with the

21   police in deciding which charges to file.

22   Q.  So you were a prosecutor in charge of the charging

23   decisions in the Pinal County Attorney's Office?

24   A.  Yes, and I also prosecuted my own cases in addition to

25   that.

1   Q.  Okay.  And how long were you a prosecutor?

2   A.  I think that was about eight, nine years, something like

3   that.

4   Q.  And it sounds like, Mr. Canby, based on the timeline, that

5   actually this law that we're talking about today went into

6   effect at the time that you were working as a prosecutor?

7   A.  It did go into effect, and I recall that discussion, you

8   know, discussion about the law and it taking effect.

9   Q.  In your experience as a prosecutor at that time, Mr. Canby,

10  were you familiar with defense lawyers who were acting in a

11  harassing manner towards crime victims?

12  A.  I was not -- I had not experienced that myself, and I had

13  not seen that.  That was not what the Pinal -- the defense

14  attorneys that I was dealing with were doing.

15  Q.  Okay.  Now after that law changed, Mr. Canby, and when you

16  were a prosecutor, did you ever receive any requests from

17  defense counsel to speak with a crime victim?

18  A.  Yes, I received frequent requests.

19  Q.  And what did you do when you got those requests?

20  A.  I would pass them on.  They would typically be in the

21  form of -- often be in the form of a letter with a signature

22  line so that it would be returned to the defense counsel.  But

23  other times it might have just been an oral request.  You know,

24  if it was a little less serious case, something that's not

25  involving, you know, trauma or something like that.  Not all

JOHN A. CANBY – DIRECT EXAMINATION

1    cases involve the same level of trauma.

2    Q.  Of course, of course.

3             Now, in those -- do you recall if any of those

4    requests that you passed on from defense lawyers in any of

5    those cases did victims agree to speak with defense lawyers?

6    A.  They did.  Frequently they did, and frequently they didn't.

7    I mean, it was really probably about half, really.

8    Q.  Now, Mr. Canby, you have been here -- you've heard some of

9    the testimony today.  I want to ask you, when you were a

10   prosecutor for this eight or so years in the Pinal County

11   Attorney's Office, did you ever have any special training about

12   how to reach out to crime victims?

13   A.  No, no training whatsoever.

14   Q.  Did you ever have any training about victim traumatization

15   as a prosecutor?

16   A.  I don't believe so.  I don't recall that.

17   Q.  And how to avoid -- any training on how to avoid trauma

18   when talking with crime victims as a prosecutor?

19   A.  I don't recall any training along those lines.

20   Q.  Okay.  After you left the Pinal County Attorney's Office

21   in, I think you said approximately 1999, what did you do then?

22   A.  I took a job at the Legal Defender's Office as a criminal

23   defense lawyer.

24   Q.  Okay.  And what were your duties when you went to the Legal

25   Defender's Office?

1   A.  For the first year, I had a general caseload, but by the

2   second year I had a -- I had a capital caseload and was doing

3   exclusively capital cases.

4   Q.  Okay.  And then in 2016 you came to your current position

5   in the Maricopa County Public Defender's Office?

6   A.  Correct, or 2015 perhaps.  I am not quite sure.

7   Q.  We will fudge the numbers a little.  Thank you.

8           Are you familiar with the organizational plaintiff in

9   this case, Arizona Attorneys for Criminal Justice?

10  A.  Yes.  I am a member and a former president for Arizona

11  Attorneys for Criminal Justice.

12  Q.  And were you a board member as well?

13  A.  I was a board member for many years.  I am not currently a

14  board member.

15  Q.  Do you have any other activities of note outside the

16  practice of law that you would like to mention?

17  A.  Well, I am a guitar player, and I play in a band locally.

18  So I like to talk about that.  I am not sure anybody else wants

19  to hear about that.

20  Q.  You never know.

21          Okay.  Now, Mr. Canby, aside from your job as a member

22  of the capital defense team, do you have personal views on the

23  death penalty?

24  A.  I do.  I have both moral and practical objections to the

25  death penalty.

1   Q.  Can you explain your moral objections to the death penalty?

2   A.  My moral objection is I don't believe the government should

3   be seeking to kill an individual in a situation that is not

4   immediate self-defense or war.

5   Q.  And can you explain your practical objections to the death

6   penalty?

7   A.  I've -- over the years I have been involved in many death

8   penalty cases, and what I have seen is that everybody is

9   damaged by the case.  Nobody benefits.  Everybody comes out in

10  worse shape, the lawyers, the victims, the clients, the

11  families, the judges, the jurors.  Everybody is traumatized by

12  a capital case.

13  Q.  Okay.  Now, getting to the statute at issue in this case,

14  Mr. Canby, the victim contact prohibition, this statute has

15  been in effect the entire time you have been a criminal defense

16  lawyer in Arizona, correct?

17  A.  Actually, I don't think it was in effect when I worked at

18  Toles and Associates immediately out of law school.

19  Q.  Thank you.  So I guess since your move to the Legal

20  Defender's office and after that?

21  A.  Yes.

22  Q.  And as a defense lawyer or as part of a defense team, have

23  you ever directly initiated contact with a statutory crime

24  victim?

25  A.  No.

JOHN A. CANBY – DIRECT EXAMINATION

1  Q.  To your knowledge, for the defense teams that you have been

2  a part of, has any member of those teams, directly initiated

3  contact with statutory crime victims?

4  A.  No.  One caveat, outside of the courtroom.  Sometimes in a

5  case, you -- there's contact with a victim in the course of the

6  case.

7  Q.  Sure.  You can run into them in the courtroom, or you could

8  be questioning them?

9  A.  Right, for instance, and you don't go through the

10  prosecutor for that.

11  Q.  Okay.  So if the victim, for instance, is testifying in

12  court, you may have contact with them by questioning them?

13  A.  Correct.  And you can also -- there's -- I mean, you can

14  sort of indirectly address a victim.  You can talk about your

15  client's willingness to plead and things like that in front of

16  the victim.  You are not directly addressing them, but

17  certainly they're hearing and you are communicating.

18  Q.  So you are talking about communicating in court where you

19  might not be directly addressing the victim, but you are

20  delivering a message that you would like the victim to hear?

21  A.  Right, and perhaps I am delivering a message to the judge

22  knowing that the victim is listening.

23  Q.  Understood.  Would outside of that context, Mr. Canby,

24  would you like to be able to initiate contact with crime

25  victims?

JOHN A. CANBY – DIRECT EXAMINATION                    141

1    A.   I would.

2    Q.   And can you talk about some of the things that you and

3    other members of the capital defense teams that you are part of

4    would want to talk to statutory crime victims about?

5    A.   Well, a couple of things.  Obviously, one of the things we

6    are always interested in capital cases is mitigation.  And

7    mitigation is really any reason for any individual juror to

8    give a life sentence in a capital case.  So it can really

9    involve a pretty wide spectrum of things.

10           Maybe one of the better ways to explain it is, many of

11   our cases involve homicides where liabilities are really not at

12   issue, and often they are inter family cases, a murder within a

13   family.

14           And I could give you, for instance, an example of a

15   client who is accused of killing his abusive father for

16   instance.  His brother who grew up in the same home would be

17   covered under the statute.

18           And that's a person who would likely have valuable

19   mitigation that would be beneficial to the client, because that

20   person grew up in the same home.  Would know about the abuse.

21   May have been subject to the same abuse.  Would know about

22   mental health issues.  Would know about the neighborhood.

23   Would know about issues that like, just a wealth of information

24   that other people may not have, and there may not be another

25   person.

1          And that prohibition against talking to people would

2     extend to the mother, too, who would also have a lot of that

3     same information.

4          So one of the things I would like to do is gather

5     information if the victim was willing to talk to me and wanted

6     to, obviously for the benefit of my client.  But I would

7     also -- I also have information that I believe could be helpful

8     to a victim based on my experience with these cases.

9     Q.  What kind of information is that that you think would be

10    helpful for crime victims to hear?

11    A.  Well, you know, I agree with the previous testimony that

12    bringing up a crime like this can be traumatizing to anybody.

13    And what I don't think prosecutors explain to the victims every

14    time is how much that's going to occur over the years, if

15    there's going to actually -- if you are going to pursue a death

16    penalty.  So there's going to be many more contacts.  And I am

17    not sure that that's explained to victims.

18         And so what I would like to do is offer my perspective

19    and also encourage victims who are considering whether to

20    support a death penalty in a case they are involved in, to talk

21    to other victims who have been through it, and to talk about

22    what their experience was, and maybe get some more information.

23         I think with that information, they would be more

24    likely to make a decision that was more beneficial for their

25    interest, and coincidentally, it would be beneficial for my

1    client's interest, possibly, and mine too.  I mean, nobody

2    wants to be in a capital trial.  You want to settle these

3    cases.

4    Q.  Can you explain a little bit more why the victim's views on

5    the death penalty might be helpful to the client?

6    A.  In my experience, the victim's views don't necessarily

7    dictate what the prosecution will do, but it's probably the

8    primary factor.

9            And so often when a victim makes a decision to not --

10   that they don't want a death penalty anymore, that's enough for

11   the state to drop the allegation of death.

12   Q.  Okay.  So it's a -- the influence on the prosecutor that

13   you are talking about?

14   A.  Yes.

15   Q.  You mentioned wanting to talk to victims about your

16   personal experience with death penalty cases.  Can you just

17   talk a little bit about some of the things that you might want

18   to explain to them if you had the chance?

19   A.  Well, I think, first of all, it's just the amount of time

20   involved.  I am not sure people realize that death penalty

21   cases, where there's a death penalty return, go on and on and

22   on.  They really kind of never end until -- the person dies one

23   way or another.  The client dies one way or another.

24           Also, you know, they are dealing with one set of

25   prosecutors.  There will be another set of prosecutors if the

1   death penalty stays.  There will be another set.  They may be

2   comfortable with this set.  They may not realize all of the

3   stages that are involved.

4          They may not realize how many times they may have to

5   sit in court and hear facts that are disturbing to them, and I

6   have seen victims run out of court, traumatized during trials

7   because of what they are hearing.  And I don't know if they

8   knew that was going to happen.

9          I don't know if they realize -- you know, put that in

10  the calculation of in their decision in whether they were in

11  support of the death penalty or not in the case.  I think that

12  information would be helpful.  I wouldn't force it on anybody

13  obviously, but if they wanted to hear it, I think it would help

14  everybody.

15  Q.  So Mr. Canby, you are talking about information that you

16  have about the criminal legal process.  And my question is,

17  don't -- do you agree that folks on the prosecution side to

18  be -- should have access to that information and be able to

19  share it with crime victims?

20  A.  I think some prosecutors do, it helps though, and I think

21  they probably do -- good ones, I think do do that, but I don't

22  think necessarily they all do.

23  Q.  Okay.  What's the basis for your belief that prosecutors

24  aren't sharing that information?

25  A.  Well, I mean, just in the context of, for instance, the

1   request for -- to talk to a victim, I have had situations where

2   I could not get back from the prosecutor even whether or not

3   they were -- they had any contact.

4           In other words, did you put forward my request?  And

5   then the trial comes up.  The victim doesn't show up.  We're

6   deciding whether to dismiss the case or whatever, and the judge

7   is asking the prosecutor, "Have you had contact?"  And they

8   say, "Haven't had contact for a couple of years."

9           Well, okay, I doubt they passed on my request.  But

10  they didn't tell me that.

11  Q.  So you are talking about an instance where you have made a

12  request through the prosecutor's office to speak with a crime

13  victim?

14  A.  Correct.

15  Q.  And in that situation that you are describing, the later

16  court proceedings led you to believe that your request had not

17  been --

18  A.  Right.  I hear nothing back in response to that.  And then

19  at the time of trial, it turns out the prosecutor admits to the

20  judge, "I haven't had any contact with the victim for some

21  time."  I can't sometimes get prosecutors to answer that

22  question, "Are you in contact with the victim?"  They won't

23  even answer that sometimes.

24  Q.  Okay.  And so you haven't been able to get that

25  confirmation or accountability that -- about the prosecutors

1    fulfilling that obligation?

2    A.  Right, and that's what leads me to believe that it may not

3    occur in every case.

4    Q.  Have you ever been on a defense team, Mr. Canby, where you

5    have -- I guess you have described, you have been on a defense

6    team where you have made request to contact crime victims?

7    A.  Yes.

8    Q.  Okay.  And your belief is that the County Attorney's Office

9    regularly does not forward requests to speak with crime

10   victims?

11        MR. CATLETT:  Objection, foundation.

12        THE COURT:  Calls for speculation.  Sustained.

13   BY MS. BRODY:

14   Q.  What is your belief about the practices at the Maricopa

15   County Attorney's Office with respect to forwarding requests by

16   the defense team to speak with crime victims?

17        MR. CATLETT:  Same objection, Your Honor.

18        THE COURT:  Sustained.

19   BY MS. BRODY:

20   Q.  Mr. Canby, to your knowledge, have you always complied with

21   13-4433-(b)?

22   A.  Yes.

23   Q.  Now, beyond not initiating contact with crime victims,

24   which is what is prohibited by the statute, do you believe that

25   your speech is chilled even further by that statute?

1    A.   I do, because I think that I and other defense attorneys

2    are overly careful when we get anywhere near these sensitive

3    issues that seem to be -- I think the term was used

4    "radioactive" earlier.  I agree with that.  There seems to be a

5    large sensitivity and a fair amount of aggressiveness in

6    pursuing those issues by our opponents.

7    Q.   Who are you referring to when you talk about your

8    opponents?

9    A.   At least the Maricopa County Attorney's Office does not

10   hesitate to take action against lawyers they feel have come

11   even close to violating this provision.

12   Q.   Mr. Canby, do you rely on your law license to make a living

13   for yourself and your family?

14   A.   That's the way I make my living, and that's the way I

15   provide for my family.

16   Q.   Have you ever had any instances, Mr. Canby, where a crime

17   victim has initiated contact with you?

18   A.   I have.  That's happened several times.

19   Q.   Can you talk about an example of a case where that has

20   happened?

21   A.   I can think of one where -- this is the Julius Moore case.

22   I represented Julius Moore, and this was a case that took seven

23   years to go to trial.  There were two trials, originally a

24   mistrial, and then a second trial.

25        And throughout all of those trials, a brother of

1    somebody who -- of a deceased victim in the case had been

2    attending all hearings, you know, just very -- one of those

3    victims that's involved, plugged in, listening to everything.

4            And one day we're walking down the street with my

5    co-counsel, and he's behind us on the sidewalk and he says,

6    "Hey, I don't know if I can talk to you, but can I have a word

7    with you?"  And we said, you know, "You can, as long as you

8    want to talk to us.  We can't talk to you, but, you know, if

9    you want to talk to us, yeah."  And he says to us --

10           MR. CATLETT:  Your Honor, objection, hearsay.

11           THE COURT:  I will allow it.

12           Go ahead.

13           THE WITNESS:  He says to me, you know, I know that

14    your client is accused of killing my sister, but I just want to

15    tell you, I really appreciate the work you are doing for that

16    young man in there and for the issues you are fighting about.

17    And I just felt that he needed to say that and we needed to

18    hear it.

19            It made us feel much better about defending our client

20    in front of him in court, and we were able to express our

21    condolences to him.

22    BY MS. BRODY:

23    Q.  Are there any other instances where you have had direct

24    contact with a crime victim?

25    A.  I mentioned earlier that sometimes it happens in court.  I

1    had a case, another similar case, took seven years to

2    resolution, without a death penalty.

3           There was a mistrial in the penalty phase of the first

4    trial, and we were getting ready to retry the penalty phase the

5    second time, which is what you have to do under Arizona law.

6    It's not a life sentence in the first time.

7           And my client had been accused of killing a woman who

8    was working in a convenience market, and her husband was

9    very -- another victim who attended everything, came to court

10   all the time, was very plugged in.

11          And we -- Judge Reinstein offered to do a settlement

12   conference in an attempt to settle the case and called us

13   together with the victim, my client, and got us in a conference

14   room, a jury room.

15          And I offered to the victim that my client would

16   answer any questions that he had and would talk to him about

17   anything, absent -- you know, if it got out of bounds, I would

18   stop him, but, you know, within reason, he was available to

19   answer any questions, take care of any concerns, whatever he

20   wanted to ask him.

21          And the victim said, "You know, I'm not gonna do that.

22   I don't really want to talk to him."  But three days later he

23   switches his position on the death penalty.  We are in jury

24   selection, and I get a plea offer.

25          So we have already summoned 150 jurors in.  We are

1    already working on them, and I come in the office in the

2    morning and get this offer.  So had that conversation been able

3    to occur many years earlier, I think we would have saved

4    everybody a lot of the trouble, a lot of expense, a lot of

5    heartache, a lot of trauma.

6    Q.  Thank you, Mr. Canby.

7            MS. BRODY:  I don't have any other questions.

8            THE COURT:  Is there any cross-examination?

9            MR. CATLETT:  Yes, Your Honor.

10           THE COURT:  Come on up, please.

11                          CROSS-EXAMINATION

12   BY MR. CATLETT:

13   Q.  Good afternoon, Mr. Canby.

14   A.  Good afternoon.  I am sure as you are aware by now, my name

15   is Mike Catlett, and I represent Attorney General Mark Brnovich

16   in this matter.

17           Did the Maricopa County Attorney's Office take any

18   action against you in the case that you were just referring to

19   in front of Judge Reinstein.

20   A.  No.

21   Q.  Did the state bar?

22   A.  No.

23   Q.  And did the Maricopa County Attorney's Office take action

24   against you for the victim contact you had in Mr. Moore's case?

25   A.  They didn't, but we were glad that nobody was watching.

1    Q.  So the answer is no?

2    A.  No.

3    Q.  And did the state bar take action against you?

4    A.  No.

5    Q.  Do you file your victim contact requests with the court?

6    A.  Depends on the case.

7    Q.  Do you agree with Ms. Neff that that is one way to ensure

8    that the prosecutor's office will pass that request along to

9    the victim?

10          MS. BRODY:  Objection, Your Honor.  I think that

11   misstates Ms. Neff's testimony.  I think her testimony was it

12   did not ensure that it was passed along.

13          THE COURT:  It is overruled.

14          You may answer.

15          THE WITNESS:  My --

16          THE COURT:  Will you ask the question again, please?

17          THE WITNESS:  That would help.

18          MR. CATLETT:  Sure.  Let me leave off the

19   objectionable part.

20   BY MR. CATLETT:

21   Q.  Do you agree that that is one way to help ensure that the

22   prosecutor's office is passing along your request for victim

23   contact to the victim?

24   A.  I agree that that might accomplish that in some cases.

25   Q.  Has the Maricopa County Attorney's Office taken action

JOHN A. CANBY – CROSS-EXAMINATION

1    against you at all for ever violating the regulation at issue

2    in this case?

3    A.   No, not the regulation at issue in this case.

4    Q.   How about the state bar?

5    A.   No, no.

6    Q.   You mentioned during direct that you were currently a

7    capital resource counsel at the Maricopa County Public

8    Defender's Office, correct?

9    A.   Correct.

10   Q.   And you are one of the attorneys working on approximately

11   20 capital cases in your unit?

12   A.   Some of them do not have a death penalty alleged yet, but

13   they have been identified as potential capital cases, so not

14   every one is a notice to capital case.

15   Q.   Thank you for that clarification.

16            You don't personally do the factual investigation on

17   any of those cases, correct?

18   A.   We have investigators that primarily do our fact

19   investigation and our direction.

20   Q.   But do you personally do the factual investigation in any

21   of those cases?  you don't, right?

22   A.   Typically, not.  I might on an individual issue basis, if I

23   was the best person to do it.

24   Q.   You don't -- sorry, strike that.

25            You have served as counsel to a criminal defendant in

1    over 50 first-degree murder cases?

2    A.  Yes.

3    Q.  And probably another 150 non-homicide cases?

4    A.  At least, yes.

5    Q.  You have never represented anyone in their capacity as a

6    crime victim, correct?

7    A.  Not in the capacity as a crime victim.  I have represented

8    victims of crime certainly.

9    Q.  And I think you testified that at one point in your career,

10   you were a prosecutor at the Pinal County Attorney's Office?

11   A.  Correct.

12   Q.  And you were there for about eight and a half years?

13   A.  Yes.

14   Q.  That was a yes?

15   A.  Yes.

16   Q.  And you prosecuted hundreds of criminal cases during that

17   time, correct?

18   A.  I did.  The way it worked though, I would not typically try

19   the cases.  I would handle them up until an offer stage, and if

20   the defense attorney didn't take the offer, the trial unit

21   would take the case to trial.

22   Q.  You handled hundreds of criminal cases during that time; is

23   that correct?

24   A.  Yes, I did.

25   Q.  And during your time at Pinal County, if a criminal defense

1    attorney asked you to request a victim contact, you would do

2    so, correct?

3    A.  Yes.

4    Q.  And you did so in every case, every single case where that

5    request was made of you, correct?

6    A.  I believe so.

7    Q.  And in your eight and a half years at the Pinal County

8    Attorney's Office, and in the hundreds of cases that you helped

9    to prosecute or handle, you never overcharged a case in order

10   to increase the pool of victims that would be subject to the

11   regulation at issue in this case, did you?

12   A.  I never did.

13   Q.  And you have never had reason to believe, during the course

14   of a case, that a prosecutor did not contact a victim pursuant

15   to 13-4433(b) in response to a request from you, correct?

16   A.  Well, just the situation I described earlier where the

17   victim was apparently out of contact with the prosecutor.

18           MR. CATLETT:  Can we have Mr. Canby's deposition

19   transcript?

20   BY MR. CATLETT:

21   Q.  Mr. Canby, do you recall being deposed in this case?

22   A.  I do, back in 2017, I believe.

23   Q.  And is that your transcript that appears to be in front of

24   you?

25   A.  It appears to be, yes.

JOHN A. CANBY – CROSS-EXAMINATION

1   Q.  You were placed under oath in connection with that

2   deposition?

3   A.  I was.

4   Q.  Did you tell the truth?

5   A.  I believe I did.

6   Q.  If you could turn for me to page 40 of the deposition?

7   A.  Yes.

8   Q.  At the bottom of page 40 at line 22, there was a question

9   asked of you:  So you have never had a reason to believe during

10  the course of a case that a prosecutor did not contact a victim

11  pursuant to 13-4433(b) in response to a request from you?

12       And your answer was:  I generally didn't know one way

13  or the other whether they had or not passed on my request.

14       Correct?

15  A.  Correct.

16  Q.  And you wouldn't say that prosecutors' offices regularly

17  fail to pass on requests pursuant to section 13-4433(b), would

18  you?

19  A.  I really don't know the answer to that question.

20  Q.  Can you turn for me to page 41?

21  A.  Yes.

22  Q.  At line 15 of your deposition, you were asked:  Do you

23  believe prosecutors' offices regularly fail to pass on requests

24  pursuant to A.R.S. 13-4433-(b)?

25       Do you see that?

JOHN A. CANBY – CROSS-EXAMINATION

1   A.  I do.

2   Q.  And your answer was:  I -- I don't know.  I think

3   prosecutor offices, I don't know that they all do that.  No, I

4   wouldn't say offices.

5        Did I read that correctly?

6   A.  Yes.

7   Q.  And during your time at Pinal County Attorney's Office, you

8   were not aware of any attorney who did not comply with the

9   requirement to notify a victim of a defense request to initiate

10  contact under 13-4433(b), correct?

11  A.  Correct.

12  Q.  You first became aware of the Victim's Bill of Rights in

13  the Arizona Constitution way back when it was passed, correct?

14  A.  Correct.

15  Q.  And you first became aware of the Victims' Rights

16  Implementation Act about a year later, correct?

17  A.  Correct.

18  Q.  And that includes the regulation that is at issue in this

19  case, correct?

20  A.  Correct.

21  Q.  That was in the early '90s?

22  A.  I think so.

23  Q.  And your participation in this case relates to the rights

24  or interests of the criminal defendants you represent in

25  Arizona State Court, correct?

UNITED STATES DISTRICT COURT

1    A.  Yes, it relates to that, yes.

2    Q.  And you have sought permission from the Maricopa County

3    Superior Court to make direct contact with the victim, haven't

4    you?

5    A.  I have done that before, yes.

6    Q.  And sometimes the answer to that request is yes, and

7    sometimes the answer is no, correct?

8    A.  Correct.

9    Q.  And if the state trial court rules against your request,

10   you can seek review from a higher state court through a special

11   action, correct?

12   A.  Correct.

13   Q.  And you comply with Arizona Rule of Criminal Procedure

14   39(b) in cases where you represent a criminal defendant in

15   state court, correct?

16   A.  I do.

17   Q.  And you plan to continue complying with that rule until the

18   Arizona Supreme Court amends it or a court enjoins it, correct?

19   A.  Correct.

20   Q.  And the regulation at issue in this case does not prevent a

21   victim from affirmatively reaching out to you in connection

22   with your representation of a criminal defendant, correct?

23   A.  Correct.

24   Q.  And that has happened, right?

25   A.  That has happened, yes.

1   Q.  And you have been involved in cases where a victim

2   consented to contact with a representative of the defense after

3   being notified by the prosecutor's office pursuant to section

4   13-4433(b), correct?

5   A.  Correct.

6   Q.  And you filed papers in Maricopa County Superior Court

7   alleging that Section 13-4433(b) is unconstitutional as applied

8   to a client of yours, correct?

9   A.  Yes, I have done that.

10   Q.  And you have argued in that case, or those cases, that if

11   you were not allowed to contact the victim, that would violate

12   the criminal defendant's rights to a fair trial and full

13   defense, correct?

14   A.  Correct.

15   Q.  And you can't speak out during the course of a case if

16   doing so is against the interest of your defense client,

17   correct?

18   A.  Correct.

19   Q.  So, for example, if you believe that your client in a

20   criminal -- personally believe that your client in a criminal

21   case is guilty, you cannot state as much to the court or the

22   jury without the client's permission, correct?

23   A.  That's correct.

24   Q.  And your ethical duties would prevent you from publicizing

25   through a blog post or a newspaper editorial a belief that your

1   client is guilty, correct?

2   A.   Correct.

3   Q.   And in a case where a victim is represented by a private

4   attorney, you are not allowed, without violating the ethical

5   rules, to contact the victim directly, but rather must go

6   through the victim's attorney, correct?

7   A.   Correct.

8   Q.   So a victim who has not retained counsel is subject to

9   direct defense counsel contact, but a victim who has retained

10  counsel is not subject to direct defense counsel contact; is

11  that correct?

12  A.   I think you have to go through the prosecutor.

13  Q.   Sorry?

14  A.   I think -- I am not sure I understand your question, but --

15  Q.   Let me try again.  I may have fumbled that.  I apologize.

16          So if a victim who has not retained counsel is subject

17  to direct -- a victim who has not retained counsel is subject

18  to direct defense counsel contact, but a victim who has

19  retained counsel is not subject to direct defense contact?

20  A.   I disagree.

21  Q.   And you disagree because of the regulation that is at issue

22  in this case, correct?

23  A.   Correct.

24  Q.   You can't insulate yourself as a lawyer from discipline or

25  sanction by having a defense investigator do something you are

1    not permitted to do, correct?

2    A.  Correct.

3    Q.  You testified on direct that in your experience as a

4    prosecutor, defense lawyers were not making inappropriate

5    contact with victims, correct?

6    A.  Correct.

7    Q.  By the time you became a prosecutor though, the regulation

8    at issue in this case was already in place, wasn't it?

9    A.  Correct.

10   Q.  And did I hear you correctly that half of the victims

11   contacted when you were a prosecutor agreed to defense counsel

12   contact?

13   A.  Of my cases, that's probably right.

14   Q.  And am I correct that you have testified on direct that

15   there are ways for you to convey messages to a victim without

16   running afoul of the regulation at issue here, correct?

17   A.  I did testify to that.

18   Q.  13-4433(b) is enjoined and you make direct contact with a

19   victim, you probably would not plan on informing the victim

20   that they have a right to refuse to talk to you, correct?

21   A.  Probably not.

22   Q.  And if section 13-4433(b) is enjoined, and you decide that

23   you have a very good reason for doing so, you would initiate

24   direct contact with a minor victim at the minor victim's

25   school, correct?

JOHN A. CANBY – REDIRECT EXAMINATION          161

```
 1    A.  I don't think so.

 2    Q.  Can you turn for me to page 96 of your deposition, please?

 3          Line 19, you were asked:  In the course of initiating

 4    direct contact with a minor victim, would you ever initiate

 5    that contact at the minor victim's school?

 6          And your answer was:  I would have to know more.  That

 7    wouldn't -- that would -- generally the answer would be no,

 8    unless there was a very good reason for doing so, which I

 9    suppose it could be possible.

10          Did I read that correctly?

11    A.  I think so, yes.

12    Q.  Thank you.

13          MR. CATLETT:  No further questions, Your Honor.

14          THE COURT:  Is there any redirect?

15          MS. BRODY:  Very briefly, Your Honor.

16          THE COURT:  Come on up.

17                    REDIRECT EXAMINATION

18    BY MS. BRODY:

19    Q.  Mr. Canby, you responded to Mr. Catlett in your testimony

20    just now that your desire to speak with crime victims is

21    related to the rights of your clients when you are representing

22    them as criminal defendants, correct?

23    A.  Correct.

24    Q.  Does your desire to speak with crime victims also relate to

25    your own rights?
```

JOHN A. CANBY – REDIRECT EXAMINATION

1   A.  Yes, it does, it does.  I feel that I have valuable

2   information, and also that conveying that information might

3   result in a benefit to me as well.

4   Q.  Thank you.

5            MS. BRODY:  That's all.

6            THE COURT:  Subject to recall, plaintiffs?

7            MS. BRODY:  No, Your Honor.

8            THE COURT:  Defense?

9            MR. CATLETT:  No, Your Honor.

10            THE COURT:  Mr. Canby, thank you so much for coming in

11   this afternoon.

12            THE WITNESS:  Thank you.

13            THE COURT:  I must ask you, what's the name of the

14   band?

15            THE WITNESS:  Quinn Jolly the Band.

16            THE COURT:  I'm sorry?

17            THE WITNESS:  We are actually named after another

18   lawyer who's named Quinn Jolly.  He is not in the band, but he

19   has a really nice name, and I asked him if I could name my band

20   after him.  So we are Quinn Jolly the Band.

21            THE COURT:  Very well.

22            Next witness, please.

23            MR. LANE:  Plaintiff rests in their case in chief,

24   Your Honor.

25            THE COURT:  Mr. Catlett?

UNITED STATES DISTRICT COURT

1      MR. CATLETT:  Your Honor, defendants don't have any
2  live witnesses to call.  We did designate a number of
3  deposition transcript portions.  I didn't know how Your Honor
4  wanted to handle that if --
5      THE COURT:  Well, everything that you have designated
6  obviously I will have an opportunity to read through all of it,
7  since it is going to be part of the record.  But if you would
8  like to highlight some of those areas, I will allow you to do
9  so during the course of your closing or, if you have some ideas
10  as it relates to how you would like to present your case a
11  different way, let me know.
12      MR. CATLETT:  No, Your Honor.  I think we will just
13  highlight portions that we want to highlight during closing.
14      THE COURT:  Okay.
15      MR. CATLETT:  So defense rests, unless my co-counsel
16  have anything.
17      MR. KING:  Defendant Vessella does not intend to put
18  on any evidence, Your Honor.
19      MR CARLTON:  Nor is defendant Colonel Silbert.
20      THE COURT:  Very well.  So you all can gather your
21  thoughts as it relates to the Court's questions earlier today.
22  We will be in recess until 2:45.  That gives you about 32
23  minutes, and then I will give both sides 30 minutes to present
24  their closings.
25      Court is in recess until 2:45.

1          (Recess taken at 2:13 p.m.; resumes at 2:45 p.m.)

2          THE COURT:  This court will come to order.  All

3     parties present when the court last closed are present again.

4          Plaintiffs, the Court is prepared for your closing

5     arguments.

6          MR. KEENAN:  Thank you.

7          The victim contact prohibition found in A.R.S.

8     13-4433(b) violates the free speech rights of the plaintiffs,

9     criminal defense attorneys, and others working on the criminal

10    defense team, like investigators, by specifically prohibiting

11    them from initiating contact with statutory crime victims

12    except through their litigation adversary, the prosecutor.

13         By doing so, this law, which has no counterpart in

14    either federal or any other state law, clearly targets

15    protected speech and not conduct.

16         In fact, the victim contact prohibition imposes an

17    overbroad content and viewpoint prior restraint on plaintiffs'

18    speech, because it forbids them from communicating with their

19    intended target of their speech, and does so based on their

20    identity as members of the criminal defense team.

21         As the Ninth Circuit noted nearly 40 years ago,

22    attorneys and other trial participants do not lose their

23    constitutional rights at the courthouse door, yet this is

24    precisely what A.R.S. 13-4433(b) does.  It strips plaintiffs of

25    their First Amendment Rights, and does so by drawing a

1    distinction based on the message a speaker conveys, which, as

2    the Supreme Court has held, raises significant First Amendment

3    concerns, and subjects this law to strict scrutiny.

4           As we have heard from the witnesses today, Arizona's

5    victim contact prohibition, not only prevents members of the

6    defense team from speaking their intended message to crime

7    victims, but in practice, prevents almost all communication

8    between members of defense team and crime victims in Arizona.

9           The form letters used by defendants do not cure these

10   problems with the victim contact prohibition, but rather

11   compound them by forcing plaintiffs to speak a particular

12   message in the form of a government drafted script -- in the

13   words of the Supreme Court -- thereby imposing a content based

14   restriction on speech in violation of the First Amendment.

15          The problems with this were touched upon by Mrs. Neff

16   in her testimony.  The government drafted script that the

17   Attorney General's Office uses and that is in evidence, is

18   clearly different from the defense team's message it wants

19   to -- intends to provide.

20          And those government drafted scripts can also mislead

21   victims on what the Victim's Bill of Rights actually does in

22   Arizona.

23          As we heard from the witnesses today, fear of

24   professional discipline and other sanctions routinely deter

25   plaintiffs from speaking to crime victims on any topic, whether

1    part of the investigatory function of their work, or on matters

2    of interest to victims, or on matters of great public concern,

3    like the imposition of the death penalty.

4            As Mr. Robertson testified, this chill even prevents

5    some attorneys, criminal defense attorneys, from speaking to

6    possible crime victims in the pre-charging stage of a case when

7    the victim's -- sorry -- when the victim contact prohibition

8    isn't even in effect yet.

9            As the Supreme Court explained, speech concerning

10   public affairs, like the death penalty, is more than self

11   expression.  It is the essence of self government.

12           Importantly, the Supreme Court also explained that

13   blanket rules restricting speech by defense attorneys should

14   not be accepted without careful First Amendment scrutiny.

15           The victim contact prohibition simply cannot withstand

16   such scrutiny for several reasons.  First, as the Ninth Circuit

17   explained, being a member of a regulated profession does not

18   result in the surrender of First Amendment rights.

19           And the defendant's reliance on the recent opinion in

20   *Tingley v. Ferguson* is unavailing, as that case is inapposite

21   to ours.  In *Tingley*, the Ninth Circuit was reviewing law that

22   prohibited conversion therapy on children.

23           The Court in *Tingley* described conversion therapy as,

24   quote, "therapeutic practices and psychological interventions

25   that seek to change a person's sexual orientation or gender

1    identity."

2            The court noted that the American Psychological

3    Association, quote, "Has twice conducted a systematic review of

4    the research on conversion therapy and adopted a resolution

5    that conversion therapy puts individuals at a significant risk

6    of harm."

7            Moreover, the court noted that the Washington State

8    Board of Health issued a health impact report on the bill at

9    issue in that case and found that, quote, "Conversion therapy

10   is associated with negative health outcomes such as depression,

11   self stigma, cognitive and emotional distance, emotional

12   distress, and negative self-image."

13           The harms associated with conversion therapy,

14   therefore, are significantly different, in both kind and

15   degree, than any suggested harms imposed by criminal defense

16   attorneys simply initiating contact with victims without going

17   through a prosecutor.

18           The Court in *Tingley* also rejected Mr. Tingley's

19   contention that his treatments, quote, consist entirely of

20   speech and considered conversion therapy conduct, because,

21   quote, the practices of psychotherapy is not different from the

22   practice of other forms of medicine simply because it uses

23   words to treat ailments.

24           Importantly, the Court in *Tingley* also found that

25   health professions differ from other licensed professions, like

1    attorneys for example, because health professions treat other

2    humans, and their treatment can result in physical and

3    psychological harm to their patients.  These

4    important distinctions doom Defendants' reliance on *Tingley*.

5         Plaintiffs here are not treating anyone in the same

6    way as the defendant was in *Tingley*.  They want to initiate

7    contact to gain information from crime victims, or to provide

8    information to crime victims, all of which is protected by the

9    First Amendment.

10        Here the government's only stated interest in

11   upholding the victim contact prohibition is to effectuate other

12   guarantees of Arizona's Victim Bill of Rights, which include

13   ensuring victims are treated with fairness, respect, and

14   dignity, and are free from intimidation, harassment, or abuse

15   throughout the criminal justice system, as well as a right to

16   refuse defense interviews.

17        But the defendants have failed to explain how allowing

18   the defense team to -- and only members of the defense team --

19   to initiate contact undermines these guarantees in the victims

20   bill of rights.

21        In fact, the victim contact prohibition does not limit

22   its prohibition to harassing or abusive contact by members of

23   the defense team.  Rather, it prohibits all contact initiated

24   by the defense.

25        And as we heard from every witness who testified

1    today, plaintiffs will abide by their legal and ethical duties

2    when contacting crime victims should this Court enjoin

3    enforcement of the victim contact prohibition.

4         Indeed, we have heard that it is in the interest of

5    the defense team to initiate contact with victims in as polite

6    a way as possible and still, if a victim simply says they do

7    not want to speak with the defense team, plaintiffs will cease

8    those communications.

9         Importantly, as we heard from some witnesses today,

10   there is nothing inherently traumatizing or harassing about

11   being approached by a criminal defense attorney or an

12   investigator working with the defense.

13        Rather, we heard that contact with a defense team can

14   in fact be quite helpful to crime victims.  Moreover, any

15   potential discomfort that a victim might feel stems from being

16   the victim of a crime and from interacting with the criminal

17   justice system generally, including prosecutors.

18        And even if there was a victim who specifically found

19   interacting with the defense team "traumatic," they would still

20   not be required to do so.

21        Again, as we heard from every one of plaintiffs'

22   witnesses, if plaintiffs were told by someone that they did not

23   want to speak with the defense team, that would end the

24   conduct.  And if that did not end the conduct, they would

25   almost certainly face other professional and possibly criminal

1     sanctions that exist outside of the victim contact prohibition.

2           Moreover, even if the contact -- if contact with

3     members of the defense team did cause discomfort, the First

4     Amendment would still protect that speech.

5           As the Supreme Court explained in *Snyder versus*

6     *Phelps*, even inappropriate, controversial or troubling speech

7     receives First Amendment protection.  The victim contact

8     prohibition therefore, does not further a compelling government

9     interest, nor is it narrowly tailored to achieve that interest.

10          As we discussed, it does not spare crime victims from

11    all communications about the crime, as prosecutors and even the

12    media may still initiate contact with crime victims without

13    limitation.

14          It does not prevent only disrespectful or harassing

15    speech, but all speech by plaintiffs.  And despite there being

16    other regulations to prevent harassment, like criminal

17    sanctions and Ethical Rule 4.4(a), for example, the victim

18    contact prohibition assumes, without justification, that

19    criminal defense lawyers, and those working with them, will not

20    abide by these other regulations and ethical duties undermining

21    foundational tenets of our system, which presume all attorneys

22    and those working with them will uphold their ethical duties.

23          But there's more.  The victim contact prohibition

24    threatens other important state interests, including the

25    administration of justice by first, impeding criminal defense

1    attorneys from providing effective assistance of counsel, which

2    undermines a right to fair trial.

3           Second, by placing prosecutors who have an ethical

4    duty to, quote, "seek justice, not merely conviction," into an

5    ethical quandary by forcing them to limit and often prevent

6    First Amendment protected communication between the defense

7    team and crime victims, despite having no legitimate stake in

8    preventing such communications.

9           And third, as we heard from the witnesses today, the

10   victim contact prohibition undermines the truth seeking

11   function of the criminal justice system.

12          In fact, not only does the plain language of A.R.S.

13   13-4433(b) undermine the truth seeking function of the criminal

14   justice system, but as we heard from witnesses today,

15   prosecutors sometimes apparently use the victim contact

16   prohibition not as a shield to protect crime victims from

17   harassment, but as a sword to specifically undermine the

18   system's truth seeking function by aggressively filing bar

19   charges against defense attorneys, even for inadvertently

20   speaking with crime victims, and worse, by possibly making

21   charging decisions to prevent defense counsel from interviewing

22   witnesses who should arguably not be considered crime victims

23   at all.

24          Finally, because I believe the defendants will likely

25   mention this fact in their closing, that the victim contact

1     prohibition has been on the books since 1991, I would be remiss

2     not to point out that there's absolutely no authority for the

3     proposition that a statute or regulation that otherwise

4     violates the First Amendment is -- somehow passes

5     constitutional muster, simply because it was passed a set

6     number of years ago.

7              Nor is there any authority for the proposition that a

8     First Amendment facial challenge to a law requires evidence of

9     legislative intent to restrict speech.  What matters is what

10    the law says and what the law does.

11             The point of the matter here, Your Honor, is that this

12    law is an unconstitutional infringement on plaintiffs' First

13    Amendment Right to free speech.  And for all of the reasons

14    discussed in our briefing and here today, plaintiffs ask this

15    Court to enjoin enforcement of A.R.S. 13-4433(b).

16             Thank you.

17             THE COURT:  Thank you very much, Mr. Keenan.

18             Mr. Catlett, do you have a closing argument?

19             MR. CATLETT:  Your Honor, I am going to allow

20    Ms. Sawyer to give the closing today.

21             THE COURT:  Ms. Sawyer, come on up, please.

22             MS. SAWYER:  Thank you, Your Honor.

23             THE COURT:  You're welcome.

24             MS. SAWYER:  I want to briefly summarize three points

25    for the Court today in closing.

1          First, as my co-counsel stated earlier in his opening,

2    the testimony today is irrelevant.  This is a facial challenge,

3    and plaintiffs did not show that this statute is

4    unconstitutional in all circumstances.

5          Second, the statute challenged here that is

6    specifically A.R.S. Section 13-4433 Subsection B, has been on

7    the books for over 30 years.  Both the legislature and the

8    Arizona Courts through its Rule of Criminal Procedure 39 have

9    continued to affirm the importance of this provision by keeping

10   it as part of the rules that protect crime victims in Arizona.

11         But despite that, plaintiffs brought this challenge in

12   2017, making only one claim, and that is, that this statute

13   violates their own First Amendment rights to free speech.

14         Yet plaintiffs' arguments throughout their filings,

15   throughout their depositions, and their testimony today,

16   highlight plaintiffs' actual arguments, most of which are

17   completely unrelated to the First Amendment.

18         Plaintiffs do not challenge crime victims'

19   constitutional right to refuse to participate in pretrial

20   discovery requests made by the defendant or the defense team,

21   but it seems that many of plaintiffs' arguments go to that

22   point.

23         Similarly, plaintiffs make arguments that appear to go

24   to their ethical duties, but plaintiffs, if they wanted to

25   raise those claims, they should do so in state court, and they

1   certainly have not done so here.

2          And many of plaintiffs' arguments have to do with

3   their criminal defendants clients' rights, and again, those

4   aren't challenged here either.

5          For example, testimony from multiple plaintiffs

6   confirms that obtaining an injunction in this case will further

7   their clients' rights, and many plaintiffs testified that they

8   have not sought to contact crime victims outside of the

9   representation of defendant clients.

10         And some plaintiffs confirmed that they have raised

11  constitutional challenges on behalf of their clients in other

12  cases.

13         One more point is that as my co-counsel explained in

14  opening -- I'm not sure if he did explain this completely, but

15  defendant Brnovich continues to assert that plaintiffs have

16  shoehorned this issue into a First Amendment claim to avoid

17  things such as *Younger* abstention, and Defendant Brnovich

18  reserves that for sake of appeal here.

19         So while what is before the Court is plaintiffs' sole

20  claim that this statute violates plaintiffs' First Amendment

21  rights, their allegations throughout the course of this

22  litigation do not match that claim.

23         Second, even when narrowing in on plaintiffs' actual

24  claim, plaintiffs can't succeed here.  And that's what this

25  Court needs to decide, is what is going to be the standard that

```
 1    this is looked at under?
 2            At the core, the statute is a regulation of attorney
 3    conduct.  This statute applies only during the course of
 4    ongoing criminal proceedings, and it's comparable to Arizona
 5    Rule of Professional Conduct 4.2, which regulates how lawyers
 6    must communicate with represented persons.
 7            ER4.2 is accepted and understood to regulate conduct
 8    within the scope of representation.  And for those victims who
 9    have the benefit of their own counsel, all parties agree that
10    even without the statute, contact must be initiated through
11    victim's counsel.
12            The Ninth Circuit confirmed just a few weeks ago in
13    Tingley versus Ferguson, that under the Supreme Court's
14    decision in NIFLA, states may regulate professional conduct
15    even though that conduct incidentally involves speech.
16            The Ninth Circuit noted specifically that as support
17    for that conclusion, the Supreme Court described regulations on
18    professional conduct it had previously upheld, including state
19    rules that limit lawyers' communication with potential clients.
20            So Tingley's effect here is not limited the way that
21    plaintiffs' counsel argues that it is.
22            The statute is such a regulation of conduct.  It
23    regulates professional conduct, and the Court should conclude
24    that the statute is reasonable related to a legitimate state
25    interest here.
```

1            But even if the Court concludes that the statute does

2    not regulate speech, plaintiffs' claims still fails -- or if

3    the Court concludes that it does regulate speech, plaintiffs'

4    claims still fail here.

5            If the Court here concludes that the statute regulates

6    speech, at most the statute is a reasonable time, place, and

7    manner regulation.  First, it's content neutral.  Similar to ER

8    4.2, the statute applies to direct communication from the

9    defense team of any kind on any topic and from any viewpoint

10   during the course of ongoing judicial proceedings.

11           It's narrowly tailored to the state's many significant

12   interests, and I know my co-counsel discussed those in his

13   opening.  But those interests include regulating the practice

14   of law, furthering crime victims' constitutional right to

15   refuse an interview with the defense.

16           And we've heard even today that defense counsel won't

17   necessarily have to tell a victim of that right.  The statute

18   furthers other goals of the Victim's Bill of Rights, and the

19   implementing statutes.

20           Those statutes were adopted, quote, "To provide crime

21   victims with basic rights of respect, protection, participation

22   and to aid the healing of their ordeals.  This includes

23   avoiding victims' suffering from retraumatization caused by any

24   contact from the defense team.

25           And even one of plaintiffs' witnesses testified today

1    that there's a higher risk of that happening from contact with

2    the defense counsel.  Further, this statute also levels the

3    playing field for victims that are unable to hire their own

4    counsel.  These interests are significant and compelling

5    reasons for the statute.

6          And if the statute is enjoined, it's not going to be

7    DIVO specialists going to be the ones contacting victims, and

8    nothing in other rules protect victims from just the mere

9    contact that can be traumatizing.

10          And lastly, the statute leaves open ample channels for

11   plaintiffs to communicate their messages.  Nothing prohibits

12   victims from reaching out, and we have heard that today.

13          Plaintiffs can also contact victims in cases where

14   they aren't working on behalf of the defendant.  As testified

15   by plaintiffs' witness today, defense attorney can say things

16   in court that convey their messages.

17          Plaintiffs are free to speak to the public generally,

18   subject to even other traditional ethical rules.  And even

19   during ongoing judicial proceedings, the messages that

20   plaintiffs want to disseminate, such as the merits of the death

21   penalty can be disseminated by like-minded persons and

22   entities, as long as those persons are not acting on behalf of

23   the defendant.

24          In closing, this statute is a regulation of attorney

25   conduct.  It should be upheld along with many other regulations

1    that are common to the practice of law.  Even if the Court

2    considers this to be a regulation of speech, it is no more than

3    a constitutional time, place, and manner regulation.

4         I would like to bring up one more matter for the

5    Court, if I may, before concluding, and that's related to the

6    form of the injunction that plaintiffs have proposed.

7         Can I address that with you now?

8         THE COURT:  Yes.

9         MS. SAWYER:  Okay.  Should the Court be inclined to

10   issue an injunction here, Defendant Brnovich does not agree

11   with the proposed form of injunction that plaintiffs have

12   submitted.

13        Defendant Brnovich asks that if an injunction is

14   issued, that it be limited to enjoining A.R.S. 13-4433(b) as

15   applied only to defendants' attorneys, and those that

16   defendants' attorneys direct or supervise.

17        So as it is written, that limitation would need to be

18   inserted in multiple paragraphs of the proposed injunction.

19        And I have nothing else unless Your Honor has

20   questions.

21        THE COURT:  Ms. Sawyer, thank you so much for your

22   comments during your closing.

23        Mr. Keenan, do you have a rebuttal closing?

24        MR. LANE:  I'd like to do that, if I may, Your Honor?

25        THE COURT:  Mr. Lane, come on up.  I know the lectern

1     has gone down a little bit.

2               MR. LANE:  I am going to raise the bar here a little

3     bit, Your Honor.

4               THE COURT:  It's under the right side.

5               MR. LANE:  I can probably do this.  I am guessing you

6     can hear me.

7               THE COURT:  I can.

8               MR. LANE:  Thank you, Your Honor.

9          I am going to respond directly to counsel's points

10    regarding the constitutionality of the statute.  They basically

11    argue that the testimony today is irrelevant because it's a

12    facial challenge.

13         Well, it's a facial challenge, but there has to be an

14    evidentiary underpinning for why it's unconstitutional as

15    applied in practice.  And the testimony today showed this Court

16    very clearly that it is a regulation on speech.  Contrary to

17    what they have argued obsessively from the beginning that this

18    is a regulation of conduct, it is not a regulation of conduct.

19         And in fact, the Ninth Circuit case that they cited

20    about conversion therapy dealt with conduct and regulating

21    psychotherapeutic conduct as applied to juveniles.

22         Because in that case, they were -- the

23    psychotherapists were conducting psychotherapy.  They were

24    trying to change the behavior of their subjects.  They were

25    trying to use speech and therapy to change someone who they

1     believed was ill.

2          It is similar to the regulation of the practice of

3     medicine.  In fact, the Ninth Circuit talked about, it's part

4     of medical regulation and this is bogus therapy that harms

5     people.

6          This, on the other hand, is pure speech.  Richard Burr

7     testified that they send a neutral out to reach out to victims

8     of crime, and the neutral says, "Hey, I am here to listen to

9     anything you, the victim, have to say.  Tell me what you're

10    interested in and I will convey it back to the defense team."

11         No one is pushing an agenda.  No one is trying to get

12    victims of crimes to say or do anything, or change who they are

13    or their sexual orientation or treat them for some

14    psychotherapeutic disease.  They are simply talking to them to

15    get information from them, and to convey information to them.

16    There is no more pure form of speech than that.

17         So no, this is not conduct.  This is a regulation of

18    pure unadulterated speech.  And the U.S. Supreme Court in 2018

19    shot down the notion that speech, while one is engaged in a

20    profession, is somehow applied a different standard than pure

21    speech.

22         There is no such thing as professional speech.  The

23    Attorney General's Office is essentially arguing the same thing

24    that was argued in 2018, which is, this is actually

25    professional speech, and so you need to just have a rational

basis to deal with it.

But the U.S. Supreme Court shot down the notion that there is no such category as professional speech.  So this is identified as -- under the same rubric as any other form of speech.

They complain that it's only a regulation for lawyers and regulates the practice of law.  This Court asked the most probative question early on before we started the testimony today, and that is -- to the Attorney General's office -- this court said:  Can you name any other regulations that apply only to one side of the criminal justice equation?

Every example they gave this Court during their argument, both in opening and in closing, every single example went straight to the heart of the integrity of the criminal justice system.

It's a regulation on speech that I can't engage in an ex parte communication with Your Honor.  That's true, it regulates my speech.  But they can't do it either, because both parties equally have to participate in the criminal justice system if it is going to function.

So it is a rational reason for limiting free speech. I can't engage in ex parte communications with jurors during a trial, nor can they.  I have to abide by the rules of attorney regulation when I deal with my clients, so do they.  There is no rule that they spoke of that applies only to one side but

not the other.

And every single one of those rules applies to both sides, because it goes directly to the heart of the integrity of the entire criminal justice system.  So not only is there a rational basis for that, there's a compelling state need to regulate the integrity of the criminal justice system.

This statute skews the result.  Just speaking as -- Your Honor talked about -- you're 56 so talk slowly.  I am 68, and I have been around the block a few times, I have been a criminal defense attorney for 42 years.

I can't tell you how many cases exist, and you know it from just being alive and being on the bench and being in the U.S. Attorney's Office prior to that, you read a police report.  Gunpoint robbery.  Somebody gets stuck up at gunpoint.  You read the police reports.  Victim identified perpetrator in a photo array lineup.  100 percent positive.  Good lighting.

You go out and you talk to the victim.  Well, yeah, we were at a bar.  It was my birthday.  I had five shots of tequila.  I left my glasses at home.  It was raining.  The guy came up behind me.  Stuck a gun in my ribs.  Took my wallet.  I turned around.  I am pretty sure that's the guy, but -- you know, I didn't say I was 100 percent positive, but I think it's the guy.  That's the kind of stuff you get when you talk to victims.

The system is skewed without that information.  As a

1  defense attorney, you can't go back to the jail and tell your

2  client, "They've got nothing.  This case is going to go away.

3  It is going to get dismissed, or they are going to offer you

4  something that you should take, like time-served maybe."

5          Or, very frequently you go back to the jail and say,

6  "Dude, you are cooked.  You better take this deal, because they

7  are going to bury you under the courthouse if you don't.  I

8  talked to the victim.  This guy is the most persuasive person I

9  have ever met in my entire life.  You have no chance."

10         That's what lawyers in 49 states can do.  There's only

11 one state in the entire United States of America where they

12 can't do that, and that is right here.

13         Because as a guy I used to work with used to say when

14 he got on his motorcycle and not wear his helmet -- despite the

15 government rule saying you have to wear a helmet.  He always

16 used to say, "Lord, protect me from those who wish to protect

17 me."

18         In Arizona, thank you State of Arizona for protecting

19 people from making decisions on their own as to whether they

20 want to talk to defense attorneys and their investigators or

21 not.  These are adults we are talking about, and maybe

22 children.  But the testimony has been that nobody really is

23 going to go talk to children and undermine the integrity of the

24 parent-child relationship, unless they believe that there's

25 some absolutely overwhelming need to do that.

1          But the point is, your average Arizona crime victim

2    has a right to get any information that the defense wants to

3    give them, and to reject any information that the defense wants

4    to give them.  It is their decision.  It is not the State's

5    decision.  They don't have to go through big brother to get

6    permission to go talk to anyone.

7          Clarence Thomas in the gun case that just came down

8    out of the U.S. Supreme Court talked about how, you know, on

9    the Second Amendment issue, you don't need the government's

10   permission to exercise your constitutional right to carry a

11   gun.

12         He also analogized that, and we filed a supplemental

13   briefing with Your Honor.  He analogized that to, just like you

14   don't have to ask the government permission to exercise your

15   rights under the First Amendment.  He should have put in a

16   little asterisk saying, "Except in the State of Arizona.  You

17   have to ask the government's permission to exercise your rights

18   under the First Amendment."

19         Again, the only state in the country that does this.

20         They talk about how this really is a violation of the

21   client's Sixth Amendment right to the effective assistance of

22   counsel, if it's anything here.  And I don't disagree with that

23   at all.

24         I think a bunch of criminal defendants should probably

25   file petitions, habeas petitions in federal court if they are

1    that far down the road, or motions in court saying, "My

2    attorney is being rendered ineffective as counsel by this First

3    Amendment violation."

4           It's the lawyer's First Amendment violation, but it's

5    the client's right to the effective assistance of counsel.

6    That's a separate issue.  I think they are right.  I think it

7    is a violation of the client's rights, but that's not the issue

8    before the Court.

9           The issue before the Court is the other half of the

10   equation, which is, it's a violation of the attorneys' and the

11   investigators' rights to speak, which may impact a defendant's

12   Sixth Amendment right for the effective assistance of counsel.

13   But that's not the issue before the court.

14          They cry about, oh, well, victims with wherewithal to

15   hire lawyers have an advantage because you have to go through

16   counsel to talk to those victims.  And impoverished victims

17   don't have counsel, and so they are at a disadvantage.

18          Well, if the State of Arizona wants to fix that and

19   give everybody who is the victim of a crime a lawyer, they can

20   do that.  We don't oppose that.  Give everyone who is a victim

21   of a crime a lawyer and you have evened the playing field for

22   rich victims and poor victims, but that's again, not the issue

23   before the Court.

24          They then talk about how this is a reasonable time,

25   place, and manner restriction.  Now, to me, when I was in law

1  school, I remember time, place, and manner basically was, you

2  can't have a brass band playing outside of a hospital zone at

3  3:00 in the morning.  Makes sense.  You can have a brass band

4  playing, just not in that time, not in that place, and not in

5  that manner.

6          This is not a time, place, or manner restriction.

7  This is -- the time of when you can talk to victims isn't on

8  the table.  The place where you can talk to victims isn't on

9  the table.  It is the manner in which you are talking to the

10  victims which is on the table, I guess, under their logic,

11  which is, you need big brother's permission before you can go

12  talk to victims.

13          But time, place, and manner restrictions have to be

14  content neutral and viewpoint neutral in order to pass muster.

15  You can't say, well, if you are a democrat standing on the

16  street corner at noon, you can't get on your soapbox and yell

17  at the crowd.  But if you are a republican, you can.  That is

18  certainly a time, place, and manner restriction that would not

19  pass muster because it is not viewpoint neutral.

20          This is also not viewpoint or content neutral.  It

21  only applies to the defense message that the defense

22  investigator wants to give, which is, I am a defense

23  investigator, I would love to talk to you about your

24  perceptions about what happened, or I am a DIVO neutral

25  representative, here is what I have to offer you.

1          Those are the viewpoints that are discriminated

2    against under the guise of protecting victims from trauma.  But

3    Mr. Burr testified, and the other witnesses also testified, and

4    Your Honor asked this question as well, which is another

5    perfect question in the context of our case.

6          You asked the attorney general, is there any evidence

7    anywhere that when a prosecutor gets on the phone, or shows up

8    at the door of a victim, that's any less traumatic than when

9    the defense attorney does, or when the police do, or when a

10   victim's advocate does, or when your next-door neighbor shows

11   up on your door to talk about the murder that you just

12   experienced?

13         The entire system is traumatic, and there's no denying

14   it, and it's horrific, and it's a terrible thing that every

15   single participant in the entire criminal justice system has to

16   deal with.  Defense attorneys have to deal with it.  You have

17   to deal with it as a judge, I am sure, more than anyone.  You

18   see witnesses from time to time just break down on the witness

19   stand because it is traumatic.

20         Testifying in court is horrific for innumerable

21   numbers of people.  And it's an unfortunate byproduct of the

22   system.  This reach out by the defense investigator, who has a

23   very vested interest in being polite and obsequious and

24   respectful, is probably less traumatic than a direct

25   examination by a prosecutor asking someone to relive the worst

1    day of their entire life on the witness stand in front of a

2    room full of strangers.  Trauma is a horrible thing, but it is

3    an unfortunate byproduct that we cannot avoid in this system.

4           But at least a subpoenaed witness, you know -- I mean,

5    a subpoenaed witness has no alternative.  They have to get on

6    the stand and do whatever they are asked to do.

7           If a defense investigator knocks on a victim's door,

8    the victim, if they believe they're about to be traumatized,

9    has a right to say, "I'm sorry, I don't want to talk to you.  I

10   never want to see you again.  Leave me alone.  Have no further

11   communication with me," and slam the door in that

12   investigator's face.

13          Another wonderful question was asked by this Court,

14   aren't there laws on the books already to protect any further

15   harassment of that victim?  And the answer is, of course there

16   are.  Harassment is against the law.  Stalking is against the

17   law.  Tampering with witnesses is against the law.  Bar

18   complaints result in sanctions.  There are innumerable other

19   remedies available to keep the defense bar in check, other than

20   limiting their right to communicate with victims, which is all

21   this statute does.  It is an elimination of pure speech.

22          In Colorado where I am from, the Supreme Court wrote

23   an ethical opinion, because what was happening is prosecutors

24   would reach out to victims, as well as the defense, there's no

25   prohibition on either side in talking to victims in Colorado,

1   or any other state, but the prosecutors would tell victims,

2   "Listen, you may get a call from the defense attorney in the

3   case, I am going to tell you, you know, you shouldn't talk to

4   that guy because he is going to screw up this case.  If you

5   talk to this defense attorney, you might as well have this case

6   dismissed."

7            And the defense bar was bringing complaints against

8   prosecutors for sending that message to victims, because it is

9   telling them, flat out, you know, don't talk.

10           The Colorado Supreme Court wrote an ethical opinion

11  saying, both sides in the equation are hereby required to

12  affirmatively encourage any and all witnesses to talk to the

13  other side.  Because it enhances the truth keeping aspects and

14  the justice seeking mission of our entire system.

15           Skewing it by prejudicing witnesses against one side

16  or the other, results in a skewed system that is not our goal.

17  This entire statute skews the system.  It skews the truth

18  seeking function and the justice seeking function, or the

19  entire system.  And it's not tolerated in 49 other states.

20           They talk about other avenues of communication exist.

21  Well, yeah, you could, you know, subtly do what Mr. Canby

22  suggested in the open court when the victims are sitting in the

23  audience say, "You know, if somebody would just offer a life

24  sentence here, we'd probably take it."

25           You know, the government doesn't get to decide how a

1    message is delivered.  That's not their job.  Their job is to

2    prosecute cases.

3           It is up to the person who is sending the message to

4    decide how they want to send it, as long as it is within the

5    law.  The Court can limit it as it applies to both sides as a

6    regulatory measure in the profession of the practice of law,

7    but that's not the testimony we've heard.

8           The testimony we've heard is that this is pure

9    unadulterated speech, and it is being limited by the

10   government.  They have to show a compelling reason for it.

11          I had a bet with my law partner.  I said, "I bet

12   they're going to bring in victims to talk about, you know, the

13   compelling need that they have not to be traumatized."  They

14   didn't put on any victims.  They didn't put on anybody.

15          There is no one shred of evidence before this Court

16   that victims of crimes suffer severe psychological damage when

17   they have their doorbell rung, or they get a letter in the

18   mail, or their phone rings and it's a defense investigator.

19          There is no compelling reason for this statute, other

20   than to skew the fact finding process and to make the

21   politicians who pass this law look like they are very, very

22   supportive of victims' rights.  But in the meantime, it's

23   violative of the First Amendment of the United States

24   Constitution.

25          This Court, and I know your background, you have

1    devoted your entire life and career to preserving, protecting,

2    and defending the Constitution of the United States.  And you

3    are never going to get a more clear case of a violation of the

4    First Amendment free speech rights than this case.

5            So I would ask this Court to please right that

6    injunction and eliminate the enforcement of this statute in any

7    way, shape, or form in the future.

8            Thank you, Your Honor.

9            THE COURT:  Mr. Lane, I certainly appreciate all of

10   that.  I equally appreciate all the papers filed in the case,

11   the questions and the arguments.

12           This Court will take the matter under advisement at

13   this point, but I will give you until the 3rd of October to

14   file simultaneous, supplemental briefs.  And they will be

15   limited to no more than 12 pages.  If it is more than 12 pages,

16   it will be rejected.  There will be -- no further briefing will

17   be permitted after that.  And once the supplemental briefing is

18   complete, this Court will issue a ruling in due course.

19           Is there anything else from the plaintiffs?

20           MR. LANE:  Your Honor, I had two objections to the

21   declarations that the State was trying to enter into evidence.

22   I don't know that the Court has ever ruled on that.  It was a

23   hearsay --

24           THE COURT:  They weren't received.

25           MR. LANE:  Okay.

1            THE COURT:  They weren't received into evidence.

2            MR. LANE:  All right.  Thank you.

3            THE COURT:  Is there anything else from the

4    plaintiffs?

5            MR. LANE:  No, Your Honor.

6            THE COURT:  Defense?

7            MR. CATLETT:  No, Your Honor.

8            THE COURT:  Everyone have a wonderful day and great

9    upcoming weekend.  Court is adjourned.

10            (Proceedings conclude at 3:26 p.m.)

1                       C E R T I F I C A T E

2

3           I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6           I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 26th day of September,

12   2022.

13

14                                    s/Elva Cruz-Lauer
                                Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT